# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

BRIAN CRAIG,

      *Plaintiff,*

v.

TARGET CORPORATION, BRIAN C.
CORNELL, DAVID P. ABNEY,
DOUGLAS M. BAKER, JR, GEORGE
S. BARRETT, GAIL K. BOUDREAUX,
ROBERT L. EDWARDS, MELANIE L.
HEALEY, DONALD R. KNAUSS,
CHRISTINE A. LEAHY, MONICA C.
LOZANO, GRACE PUMA, DERICA
W. RICE, and DMITRI L. STOCKTON,

      *Defendants.*

No.: 2:23-cv-599-JLB-KCD

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ...................................................................... 1

BACKGROUND ...................................................................... 7

    A.    For Years, Target Has Publicly Committed to ESG and DEI
        Initiatives and Warned of Potential Risks Arising from Them ............. 7

    B.    Following These Warnings, But *Before* Any Alleged
        Misstatements Were Made, Plaintiff Purchased Target Stock ............. 8

    C.    The 2022 Proxy Accurately Disclosed All Information and
        Shareholders Voted in Favor of Each of the Board's Vote
        Solicitations........................................................................ 9

    D.    The 2023 Proxy Continued To Warn About ESG-Related Risks ....... 13

    E.    In May 2023, Target Launched Its Annual Pride Collection and
        Experienced Backlash ...................................................... 14

    F.    In Mid-May 2023, Target's Stock Price Declined ............................. 14

    G.    Shareholders Reelected the Board After Discussing the Backlash....... 15

ARGUMENT ...................................................................... 15

I.    **PLAINTIFF'S SECTION 10(B) CLAIM SHOULD BE DISMISSED..... 15**

    A.    Plaintiff Does Not Have Standing To Bring Claims Under
        Section 10(b) .................................................................. 17

    B.    The Complaint Fails To Plead Transaction Causation or
        Reliance ......................................................................... 18

    C.    The Complaint Fails To Plead Material Misstatements or
        Omissions ...................................................................... 19

    D.    The Complaint Fails To Plead a Strong Inference of Scienter ............ 35

    E.    The Complaint Fails To Plead Loss Causation ................................. 40

II.    **PLAINTIFF'S SECTION 14(A) CLAIM SHOULD BE DISMISSED .... 45**

    A.    The Complaint Fails To Plead a Material
        Misstatement/Omission and Scienter ............................................. 45

ii

B.    The Complaint Fails To Plead Both Transaction and Loss Causation ......................................................................... 46

**III.    PLAINTIFF'S SECTION 20(A) CLAIM SHOULD BE DISMISSED .... 50**

**CONCLUSION ............................................................... 50**

**LOCAL RULE 3.01(G) CERTIFICATION ........................................... 50**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Advisors G. P. v. Berman*,
   2014 WL 12772264 (C.D. Cal. Sept. 16, 2014) ................................................. 48

*Arora v. HDFC Bank Ltd.*,
   2023 WL 3179533 (E.D.N.Y. May 1, 2023) .................................................... 25

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ................................................................................. 19, 22

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723 (1975) ................................................................................. 15, 17

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) ................................................................... 7, 35

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ...................................................................... 45, 46

*Cambridge Ret. Sys. v. MEDNAX, Inc.*,
   2019 WL 4893029 (S.D. Fla. Oct. 3, 2019) ...................................................... 33

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) ................................................................. *passim*

*Cavalier Carpets, Inc. v. Caylor*,
   746 F.2d 749 (11th Cir. 1984) ...................................................................... 19

*Chen v. China Green Agric. Inc.*,
   2022 WL 3868111 (S.D.N.Y. Aug. 30, 2022) ................................................ 43, 44

*Chiarenza v. IBSG Int'l, Inc.*,
   2010 WL 3463304 (S.D. Fla. Sept. 2, 2010) .................................................. 38, 39

*In re Citigroup Inc. S'holder Deriv. Litig.*,
   964 A.2d 106 (Del. Ch. 2009) ....................................................................... 25

*Drucker v. Just for Feet Inc.*,
   2000 WL 36733071 (N.D. Ala. Sept. 29, 2000) ................................................ 22

*Druskin v. Answerthink, Inc.*,
   299 F. Supp. 2d 1307 (S.D. Fla. 2004) ............................................................ 44

*Durgin v. Mon*,
   415 F. App'x 161 (11th Cir. 2011) ................................................................... 37

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
   595 F. Supp. 2d 1253 (M.D. Fla. 2009),
   *aff'd*, 594 F.3d 783 (11th Cir. 2010) .............................................................*passim*

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
   594 F.3d 783 (11th Cir. 2010) ............................................................ 46, 47, 49

*In re Faro Techs. Sec. Litig.*,
   2007 WL 430731 (M.D. Fla. Feb. 3, 2007) ..................................................... 38

*Fernau v. Enchante Beauty Prods., Inc.*,
   847 F. App'x 612 (11th Cir. 2021) ................................................................... 19

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir. 2006) ........................................................... 17, 18, 23

*Gen. Elec. Co. v. Cathcart*,
   980 F.2d 927 (3d Cir. 1992) ............................................................................ 49

*Gould v. Am.-Hawaiian S.S. Co.*,
   535 F.2d 761 (3d Cir. 1976) ............................................................................ 46

*Gross v. Summa Four, Inc.*,
   93 F.3d 987 (1st Cir. 1996) ............................................................................. 18

*Guo v. Mahaffy*,
   2020 WL 5798531 (D. Colo. Sept. 29, 2020) .................................................. 21

*Hattaway v. Apyx Med. Corp.*,
   2023 WL 4030465 (M.D. Fla. June 15, 2023) ................................................. 42

*Henningsen v. ADT Corp.*,
   161 F. Supp. 3d 1161 (S.D. Fla. 2015), *aff'd sub nom.*
   *IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp.*,
   600 F. App'x 850 (11th Cir. 2016) ..............................................................21, 24

*In re Home Loan Servicing Sols., Ltd. Sec. Litig.*,
   2016 WL 10592320 (S.D. Fla. June 6, 2016) .................................................. 44

*Janus Cap. Grp., Inc. v. First Deriv. Traders,*
    564 U.S. 135 (2011) ....................................................................... 19

*Rubenstein ex rel. Jefferies Fin. Grp. Inc. v. Adamany,*
    2023 WL 6119810 (2d Cir. Sept. 19, 2023) ......................... 48, 49, 50

*In re JPMorgan Chase Deriv. Litig.,*
    2014 WL 5430487 (E.D. Cal. Oct. 24, 2014).............................. 49, 50

*Kadel v. Flood,*
    427 F. App'x 778 (11th Cir. 2011) .................................................. 40

*Kaufman v. Allemang,*
    70 F. Supp. 3d 682 (D. Del. 2014) .................................................. 21

*Knurr v. Orbital ATK, Inc.,*
    272 F. Supp. 3d 784 (E.D. Va. 2017) .............................................. 37

*Lanfear v. Home Depot Inc.,*
    718 F. Supp. 2d 1364 (N.D. Ga. 2010),
    *aff'd* 679 F.3d 1267 (11th Cir. 2012) ................................................ 29

*Lee v. Frost,*
    2021 WL 3912651 (S.D. Fla. Sept. 1, 2021) ................................*passim*

*In re Lululemon Sec. Litig.,*
    14 F. Supp. 3d 553 (S.D.N.Y. 2014),
    *aff'd,* 604 F. App'x 62 (2d Cir. 2015) .............................................. 22

*MacPhee v. MiMedx Grp., Inc.,*
    73 F.4th 1220 (11th Cir. 2023) ....................................... 41, 42, 43, 44

*McCauley v. City of Chicago,*
    671 F.3d 611 (7th Cir. 2011) .......................................................... 16

*McDowell v. Bracken,*
    317 F. Supp. 3d 1162 (S.D. Fla. 2018),
    *aff'd,* 794 F. App'x 910 (11th Cir. 2019) ..................................... 46, 47

*McDowell v. Bracken,*
    794 F. App'x 910 (11th Cir. 2019) ............................................. 48, 50

*In re Merck & Co., Inc. Sec. Litig.,*
    432 F.3d 261 (3d Cir. 2005)............................................................ 44

*In re Metris Cos., Inc. Sec. Litig.*,
    428 F. Supp. 2d 1004 (D. Minn. 2006) ............................................................ 39

*Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr. v. Welbilt, Inc.*,
    2020 WL 905591 (M.D. Fla. Feb. 6, 2020) ......................................... 36, 37, 38

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013)..................................................32, 41, 43, 44

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008)....................................................16, 35, 36, 40

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ............................................................................ 26, 30, 33

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) ............................................................................ 37

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
    297 F.3d 1182 (11th Cir. 2002)........................................................................ 16

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015) .............................................................. 25

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enter., Inc.*,
    572 F. App'x 713 (11th Cir. 2014) ................................................................... 33

*Pledger v. Reliance Tr. Co.*,
    2019 WL 10886802 (N.D. Ga. Mar. 28, 2019)................................................ 29

*Raul v. Rynd*,
    929 F. Supp. 2d 333 (D. Del. 2013) ................................................................. 31

*In re Recoton Corp. Sec. Litig.*,
    358 F. Supp. 2d 1130 (M.D. Fla. 2005) ........................................................... 36

*Robbins v. Kroger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997)................................................................... 18, 41

*Roberts v. Peat, Marwick, Mitchell & Co.*,
    857 F.2d 646 (9th Cir. 1988) ............................................................................ 18

*Roer v. Oxbridge, Inc.*,
    198 F. Supp. 2d 212 (E.D.N.Y. 2001)............................................................... 18

vii

*S.E.C. v. Prince*,
   942 F. Supp. 2d 108 (D.D.C. 2013) ................................................... 37

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977) ........................................................................ 26

*Sapssov v. Health Mgmt. Assocs., Inc.*,
   608 F. App'x 885 (11th Cir. 2015) ................................................... 41

*Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*,
   365 F.3d 353 (5th Cir. 2004) .......................................................... 36

*In re Spectrum Brands, Inc. Sec. Litig.*,
   461 F. Supp. 2d 1297 (N.D. Ga. 2006) ................................. 20, 23, 25

*Stark Trading v. Falconbridge Ltd.*,
   552 F.3d 568 (7th Cir. 2009) .......................................................... 19

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
   552 U.S. 148 (2008) ............................................................. 18, 19, 45

*Superintendent of Ins. v. Bankers Life & Cas. Co.*,
   404 U.S. 6 (1971) .......................................................................... 26

*Teachers' Ret. Sys. of La. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) .......................................................... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................. 7, 16, 35

*In re The Home Depot, Inc. S'holder Deriv. Litig.*,
   223 F. Supp. 3d 1317 (N.D. Ga. 2016) ............................................ 45

*Thompson v. RelationServe Media, Inc.*,
   610 F.3d 628 (11th Cir. 2010) ......................................................... 40

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) ...................................................................... 33

*In re Tupperware Brands Corp. Sec. Litig.*,
   2023 WL 5091802 (11th Cir. Aug. 8, 2023) .................................... 39

*United States v. Bestfoods*,
   524 U.S. 51 (1988) ........................................................................ 29

*Va. Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991) ........................................................26, 28, 48, 50

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015) ....................................................... 17

*Winer Fam. Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007).............................................................. 18

## Statutes

15 U.S.C. § 78u-4(b) ......................................................................17, 35

15 U.S.C. § 78u-5(c) ........................................................................ 34

Defendants respectfully move to dismiss the Complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6).

## INTRODUCTION

As Target Corporation ("Target") has repeatedly warned investors, the expectations of stakeholders vary, change, and evolve. Plaintiff is one example. Plaintiff disagrees with Target's business judgment regarding the best way to grow its business. Specifically, Plaintiff dislikes certain initiatives related to ESG (environmental, social, and governance) and DEI (diversity, equity, and inclusion) and disagrees that they are in the long-term interests of Target and its shareholders.

Plaintiff attempts to frame his disagreement as claims under the securities laws. But disagreement with business decisions is not a basis for a federal securities claim. The securities laws protect investors against being defrauded; they are neither vehicles for expressing disapproval, nor do they insure investors against ordinary market losses. Because Plaintiff's dispute with Target is, at bottom, a complaint about its business judgment, he fails to state a securities claim.

The Complaint asserts claims under Sections 10(b) and 14(a) of the Securities Exchange Act of 1934. Plaintiff alleges that Target's 2022 and 2023 Proxies misled him as to Target's approach to overseeing risk related to its ESG and DEI initiatives, its reasons for adopting those initiatives, and the relevance of those initiatives to calculating executive compensation. He alleges these statements were shown to be false because of particular merchandising decisions Target made for Pride Month in

June 2023. And he alleges those merchandising decisions resulted in a backlash from certain customers that Plaintiff alleges caused Target's stock price to drop.

To plead a Section 10(b) claim, a plaintiff with standing for such a claim must allege (1) a material misrepresentation or omission (i.e., "falsity"); (2) scienter; (3) a connection between the misrepresentation and the plaintiff's transactions in the security; (4) reliance; (5) economic loss; and (6) loss causation. Section 14(a) claims share the falsity element and the loss causation element. Where those claims sound in fraud, as is the case here, they also share the scienter element. And because Section 14(a) is fundamentally about protecting shareholder votes, it further requires that plaintiff plead that the solicitation of votes itself (as opposed to decisions or events following the vote) directly caused the allegedly harmful outcomes.

Securities complaints are also held to heightened and exacting pleading standards created by Congress to avoid abuses of securities litigation that risked harming the U.S. economy. As a result, complaints must identify specific statements (not inferences) and allege particularized *facts* (not speculation) showing how each alleged misstatement was materially false or misleading. The standard is even higher for scienter, which again requires the pleading of *facts* that generate a "strong inference" of fraudulent intent. Those facts must be particularized to each individual defendant; generalized allegations as to groups are never sufficient.

Plaintiff fails on every element of his claims.

2

**Standing, Reliance, and Transaction Causation.**  To have Section 10(b) standing, Plaintiff must have purchased Target stock at an artificially inflated price. But Plaintiff's only purchase of Target stock was *before* any of the alleged misstatements were made, meaning that there could be no inflation baked into the purchase price. Plaintiff therefore lacks standing.  For the same reason, Plaintiff cannot plead transaction causation—that the alleged misstatements caused his purchase—and reliance upon the misstatements in connection with his purchase. **It is impossible to satisfy these elements where the purchase precedes the alleged misstatements.** Each of these failings is independent grounds for dismissal with prejudice.

**Falsity.**  To plead falsity under both Sections 10(b) and 14(a), Plaintiff must plead particularized facts identifying the alleged misstatements and their content, and showing how and why they are false or misleading.

*Alleged Misstatements.*  To attempt to meet this standard, Plaintiff alleges three categories of alleged misstatements in the Proxies: (1) that the Board oversaw social and political issues and risks arising from its adoption of ESG mandates ("Risk Statements"); (2) that the Board adopted ESG and DEI mandates for a specific reason: as a means of increasing shareholder returns ("Reason Statements"); and (3) Target's executive compensation plans aligned executives' incentives with maximizing shareholder value ("Compensation Statements").

*Alleged Inconsistency.*  Plaintiff alleges that the Risk Statements were misleading because they indicated the Board's Governance & Sustainability Committee ("GS

Committee") was monitoring all forms of social and political risk. Instead, Plaintiff claims they were only monitoring the risk of failing to meet the expectations of "stakeholders," which he defines as progressive nonprofits. Plaintiff alleges that the Reason Statements were misleading because they indicated the Board adopted ESG and DEI initiatives to advance shareholder value. Instead, Plaintiff alleges that they pursued ESG and DEI initiatives for the purposes of advancing "stakeholder" interests rather than shareholder value. And Plaintiff alleges the Compensation Statements were misleading because they indicated that executive compensation was designed to align with shareholder value, but they did not disclose that progress toward diversity goals factored into Target's calculation of executive bonus payments.

*Pleading Failures*. All of Plaintiff's falsity allegations fail under the applicable pleading standard. Plaintiff pleads no facts showing any of the alleged misstatements were false. Instead, he relies on impermissible inferences and mischaracterizations:

Risk Statements. Plaintiff infers that the existence of a conservative boycott means risk associated with conservative reactions to ESG and DEI policies was ignored. He also speculates that risk monitoring was limited to "stakeholders," which he defines narrowly as progressive nonprofits, contrary to Target's express definition.

Reason Statements. Plaintiff alleges that three statements in the Proxies represented that the Board adopted ESG and DEI initiatives to advance shareholder value, but those statements do not mention ESG or DEI mandates at all.

Compensation Statements.  Plaintiff alleges that the Proxies did not disclose that progress toward diversity goals was a compensation-related factor, but ultimately concedes (as he must) that it was explicitly disclosed.

In addition, most of the alleged misstatements are not actionable because they are immaterial as a matter of law, including because they are too vague, the risk that they allegedly concealed was actually disclosed, and because the Complaint alleges facts establishing that they did not impact investor decision-making.

**Scienter.**  Because both the Section 10(b) claim and 14(a) claim sound in fraud, Plaintiff is required to plead with particularity facts showing a "strong inference" of scienter as to each Defendant; pleading scienter via generalized or group allegations is not allowed.  Here, Plaintiff fails to plead facts showing scienter on a Defendant-specific basis, and therefore fails this element as a matter of law.  Nor does Plaintiff plead particularized facts supporting even an invalid group-wide inference of scienter. Instead, Plaintiff points to supposed "red flags" that relate to public information about the potential risk of conservative backlash, not to any evidence that Target was failing to monitor that risk.  Plaintiff only attempts to plead individualized allegations of scienter against Mr. Cornell, but the statements Plaintiff claims show scienter instead demonstrate that Mr. Cornell's beliefs aligned with what was said in the Proxies.

**Section 10(b) Loss Causation.**  For his Section 10(b) claim, Plaintiff must also plead the existence of a corrective disclosure—news revealing the truth he alleges was concealed by the misstatements—that caused a stock drop.  He fails to do so.  The launch of the 2023 Pride Collection and the backlash thereto did not reveal any

allegedly concealed truth regarding Target's risk oversight policies. And news of those events is not adequately alleged to have caused Target's stock price to drop.

**Section 14(a) Causation.** To plead causation under Section 14(a), Plaintiff must additionally plead that his injury was directly caused by the shareholder vote (not some event or decision that came after the shareholder vote). He cannot do so here. Plaintiff claims injuries from a drop in Target's stock price beginning May 17, 2023, and allegedly resulting from the backlash against the 2023 Pride Collection. But the votes he challenges are director elections and a series of non-binding advisory votes. Losses from business decisions following the election of directors cannot be causally tied back to their election as a matter of law. Claims related to advisory votes also are foreclosed by controlling Supreme Court authority. In any event, the Complaint itself admits that *after* the purported "correction" of the alleged misstatements (i.e., the release of the 2023 Pride Collection and subsequent backlash), stockholders continued to vote in line with Board recommendations, showing the alleged misstatements were not causally connected to any voting decisions.

*    *    *

Ultimately, Plaintiff's grievance is not with Target's disclosures, but with its business decisions. That Plaintiff dislikes the *outcome* of those decisions does not show that Target lied about its *approach* and does not state a securities claim.

6

# BACKGROUND[1]

## A.  For Years, Target Has Publicly Committed to ESG and DEI Initiatives and Warned of Potential Risks Arising from Them

Like all retailers, Target offers an assortment of merchandise.  For many years, Target has publicly affirmed its commitment to implementing ESG and DEI initiatives as part of its overall corporate strategy for long-term shareholder growth.[2]  As part of that commitment, for more than a decade, Target has offered merchandise in support of the LGBTQ+ community during Pride Month.  (*See* Ex. C.)

Target has repeatedly cautioned investors about potential reputational risks posed by its involvement (or lack thereof) in DEI and ESG initiatives.  For example, Target's 2021 Annual Report warned that Target's "continued success is dependent on positive perceptions of Target."  (Ex. D at 7.)  Specifically, Target warned:

> Our reputation is based in large part on perceptions, both about us and others with whom we do business . . . .  Target's responses to crises and ***our position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation***.  While reputations may take decades to build, negative incidents involving us or others with whom we do business can quickly erode trust and

---

[1] References to "¶" are to the Complaint (ECF No. 1).  References to "Ex." are to the exhibits to the accompanying declaration of Alexander Rodney, executed November 7, 2023.  Under the PSLRA, courts must consider the complaint in its entirety, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Those documents include "relevant public documents required to be filed with the SEC, and actually filed" and undisputedly authentic evidence on which Plaintiff relies.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999).  The exhibits cited herein consist of SEC filings and certain public documents that were expressly incorporated into the Complaint by reference.  The 2022 Proxy is attached as Exhibit A and the 2023 Proxy is attached as Exhibit B.  Unless otherwise indicated, citations are omitted, and emphasis is added.

[2] *See, e.g.*, ¶ 7 ("Target was an early adopter of corporate LGBT initiatives, publishing a 'Pride Manifesto' in 2015."); ¶ 10 (Target pledged to "increase representation of Black team members" in 2020); ¶ 54 (Mr. Cornell's reaffirmation that Target would "continue to embrace our belief of diversity and inclusion" in wake of 2016 backlash to Target's response to North Carolina's transgender bill).

confidence *and can result in consumer boycotts*, workforce unrest or walkouts, government investigations, or litigation.

(*Id.*)  Target reiterated these risks in its 2022 Annual Report, which similarly warned investors that "stakeholder expectations regarding environmental, social, and governance matters continue to evolve and are not uniform" and that any failure, or perceived failure, to "meet evolving and varied stakeholder expectations could adversely affect" Target's reputation.  (Ex. E at 8.)  Target explicitly warned that "[n]egative incidents" related to ESG and DEI matters could result in "consumer boycotts" and negatively impact Target's operations and financial condition.  (*Id.*)

### B. Following These Warnings, But *Before* Any Alleged Misstatements Were Made, Plaintiff Purchased Target Stock

After the disclosure of Target's commitment to ESG and DEI initiatives, its warnings of the risks associated with that commitment, and following years of Target's annual offering of a Pride Month collection, Plaintiff chose to invest in Target stock. Plaintiff's only purchase of Target stock took place on April 11, 2022.  (¶ 25.)

On April 25, 2022, Target issued its 2022 Proxy in advance of its 2022 Annual Shareholder Meeting on June 8, 2022.  (¶ 110.)  The Complaint alleges that Plaintiff relied on certain alleged misstatements in the 2022 Proxy in connection with his purchase of Target securities but fails to explain how that is possible given that the first alleged misstatement—the 2022 Proxy—was issued *two weeks after* Plaintiff's purchase.

8

**C.    The 2022 Proxy Accurately Disclosed All Information and Shareholders Voted in Favor of Each of the Board's Vote Solicitations**

The 2022 Proxy set out Target's "core corporate governance practices" (Ex. A at 8-9) and solicited votes in favor of the election of Target's Board of Directors (the "Board"), a "non-binding advisory" approval of Target's executive compensation plan, and a non-binding advisory rejection of a shareholder proposal to amend the bylaws to remove a limitation on board nominations.  (*Id.* at 5, 67.)  The Complaint alleges that the 2022 Proxy contained misstatements related to the Board's oversight of ESG and DEI-related risks, Target's reasons for implementing its ESG and DEI mandates, and Target's executive compensation plan (the "Alleged Misstatements").[3]

**Risk Statements.**    Plaintiff alleges that the 2022 Proxy misled investors regarding the Board's risk oversight.  The 2022 Proxy explained that the Board delegated oversight of certain specific risks to various of its committees.  (*Id.*)

One of the many types of risks that the 2022 Proxy stated the Board oversaw were risks related to Target's sustainability and ESG matters.  (*Id.*)  The 2022 Proxy explained that "[g]iven the breadth of ESG matters for a company of [Target's] size and scale, oversight of those issues is allocated throughout the Board and its Committees." (*Id.* at 15.)  Among other responsibilities, the Board was responsible for overseeing "Top ESG risks," "Reputation management," and "Crisis management and response," and the GS Committee was responsible for overseeing "Social and

---

[3] The Alleged Misstatements are listed in Annex A for ease of the Court's review.

political issues and risks not allocated to other Committees." (*Id.* at 15-16.)  This allocation matches those in the respective Board Committee charters.  (¶¶ 107-08.)

The 2022 Proxy further disclosed that, in determining which ESG matters to prioritize, Target engages with and considers the perspectives of "a diverse group of stakeholders around the world." (Ex. A at 15.)  The 2022 Proxy explained that these "stakeholders" include "the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who make our work possible." (*Id.*)

The 2022 Proxy did not guarantee that the Board or its Committees would perfectly identify and eliminate every possible risk.  Instead, the 2022 Proxy stated that Target's "risk management capabilities are *intended* to increase the likelihood of desired business outcomes." (*Id.*)  The risk factors disclosed in Target's 2021 Annual Report, which was included with the proxy materials (*see id.* at 71), disclosed that reputational risks related to Target's ESG and DEI matters could potentially lead to boycotts.  (Ex. D at 7.)

**Reason Statements.**  Plaintiff also alleges that the 2022 Proxy contained three statements that "represented that Target adopted ESG and DEI mandates in order to advance shareholder value." (¶ 179.)  None of these statements, however, discussed or related to ESG or DEI mandates whatsoever.

Specifically, Plaintiff points to a statement in the 2022 Proxy that discussed the Board preference for maintaining flexibility in Target's leadership structure, stating:

> We do not have an express policy on whether the roles of Chair of the Board and CEO should be combined or separated. Instead, ***the Board prefers to maintain the flexibility to determine which leadership structure best serves the interests of Target and our shareholders based on the evolving needs of the company***. We currently have a combined Chair of the Board and CEO leadership structure.

(¶ 182; Ex. A at 10.)  This statement referred to serving the interest of the Company *and* its shareholders.

Plaintiff also points to a statement regarding the Audit & Risk Committee's evaluation of related party transactions, which stated:

> In determining whether to approve any [related party] transaction, the independent directors or relevant Committee must consider, in addition to other factors deemed appropriate, the material facts of the transaction and whether the transaction is on terms no less favorable to Target than those involving unrelated parties.  The Audit & Risk Committee must prohibit any transaction it determines to be inconsistent ***with the interests of Target and its shareholders***.

(*Id.* at 17.)  This statement also referred to the interests of Target *and* its shareholders.

Finally, Plaintiff points to a statement discussing the Board's approach to capital allocation, which provided:

> Our disciplined and balanced approach to capital allocation is based on the following priorities, ranked in order of importance: (1) Investing in our business – Fully invest in ***opportunities to profitably grow our business, create sustainable long-term value***, and maintain our current operations and assets . . . . (*Id.*)

None of these statements set forth Target's reasons for implementing its ESG and DEI mandates; nor do they assert that the mandates were implemented to promote shareholder value.  Moreover, the Reason Statements emphasize Target's commitment to generating long-term, sustainable growth and value.  The Complaint ignores that focus on generating long-term value for both Target and its shareholders.

11

**Compensation Statements.**    Finally, Plaintiff alleges that the 2022 Proxy misstated that Target's executive compensation plan aligned with advancing shareholder value because it failed to disclose that executives' compensation was linked to progress on Target's ESG and DEI goals.  (¶ 194.)  Plaintiff specifically alleges that the 2022 Proxy "failed to describe the STIP component of executive compensation with specificity or in connection to its executive compensations principles."  (¶ 210.)  But the 2022 Proxy clearly described the full framework for executive compensation and how the Short-Term Incentive Plan ("STIP")[4] fit in that framework.  It further disclosed that the STIP bonus included a factor related to progress on three-year diversity goals—the exact detail Plaintiff alleges was concealed.

For context, the 2022 Proxy contained a 20-page "Compensation Discussion and Analysis" section.  (Ex. A at 33-52.)  Within that section was a major subsection that laid out Target's "framework for executive compensation."  (*Id.* at 40-47.)[5]  The framework subsection began with a prominent table laying out each of the four elements of executive compensation: a fixed base salary and three performance-based incentive programs, including the STIP.  (*Id.* at 40.)  With respect to the STIP component Plaintiff alleges was misleadingly described, the table highlighted that incentive targets are tied to both "the achievement of key financial measures" *and* performance on "identified strategic initiatives important to driving sustainable, durable, and profitable sales growth."  (*Id.*)  The table explained that the latter category

---

[4] The term STIP is defined in Appendix A to the 2022 Proxy at page A-2.

[5] This subsection is also identified in the 2022 Proxy's table of contents.  (*See id.* at 7.)

(which included progress on DE&I goals, as set forth below) was assessed via use of a "team scorecard."  (*Id.*)

Beginning on the very next page, the 2022 Proxy explained that performance was divided into two categories: "financial" and "team scorecard," with target weights of 67% and 33%, respectively.  (*Id.* at 41.)  The 2022 Proxy then explained each of the financial and team scorecard components along with performance against those metrics in the 2021 fiscal year.  Working in order, the 2022 Proxy first explained the financial component performance.  (*Id.* at 41-42.)  It then explained the team scorecard assessment.  (*Id.* at 43.)  Among the five primary factors in that assessment was "advanc[ing] *progress on three-year DE&I goals.*"  (*Id.*)  Performance against each factor was summarized in a bulleted list.  (*Id.*)  And the second bullet in that list identified that there had been "[p]ositive *progress on three-year enterprise DE&I goals*" in the 2021 fiscal year.

On June 8, 2022, Target held the 2022 shareholder vote at the Annual Shareholder Meeting, where shareholders elected Target's Board, voted in favor of the non-binding advisory executive compensation plan, and voted against the non-binding advisory director nomination proposal.  (¶¶ 231, 270.)

### D.  The 2023 Proxy Continued To Warn About ESG-Related Risks

On May 1, 2023, Target issued the 2023 Proxy in advance of its 2023 Annual Shareholder Meeting.  The 2023 Proxy sought votes in favor of the election of the Board, a "non-binding advisory" approval of executive compensation, and a non-binding advisory rejection of a shareholder proposal.  (Ex. B at 5, 68, 70.)  The 2023

Proxy contained substantially similar Risk Statements, Reason Statements, and Compensation Statements as the 2022 Proxy. (*Id.* at 10, 14-15, 18, 43.)

The 2023 Proxy also cautioned investors that it contained forward-looking statements based on Target's "current assumptions and expectations" and incorporated the Risk Factors disclosed in Target's Annual Report for Fiscal Year 2022. (*Id.* at 80.) Among the forward-looking statements identified as potentially being "materially different" from Target's "actual results" were the "***intended results of risk oversight and risk management efforts*** . . . ***our sustainability and ESG plans and goals***, our executive compensation program, and the Board's leadership structure, composition, policies, and practices. . . ." (*Id.*)

### E. In May 2023, Target Launched Its Annual Pride Collection and Experienced Backlash

In May 2023, Target released its yearly LGBTQ+ Pride-themed collection. (¶ 70.) Target's Pride collection had been subject to criticism in years past, but in 2023, certain groups reacted more strongly, calling for a boycott. (¶ 90; Ex. F.) The Complaint does not specify when (within the month of May 2023) the 2023 Pride Collection became available or when calls for a boycott began.

### F. In Mid-May 2023, Target's Stock Price Declined

On May 17, 2023, Target's stock price closed at $160.96. (Ex. G; *see also* ¶ 259.) After May 17, 2023, Target's stock price gradually declined. (Ex. G.)

The Complaint does not specify when Target's stock price dropped relative to the release of the 2023 Pride Collection and ensuing backlash. The Complaint alleges,

however, that the release of the 2023 Pride Collection was *prima facie* evidence that the Board was not overseeing social and political risk related to its ESG and DEI initiatives (¶¶ 161-62), revealing to investors that the Proxies had misled investors as to the Board's oversight of those risks.  (¶ 227.)

### G.  Shareholders Reelected the Board After Discussing the Backlash

On June 14, 2023—at least one month after the 2023 Pride Collection was released and the Complaint alleges that the misstatements in the Proxies were revealed—Target held its 2023 Annual Shareholder Meeting.  (Ex. H.)  Given the intense focus on the backlash from the 2023 Pride Collection at the time, the Board's oversight of social and political issues and risks was a central issue of the directors' reelection.  (¶ 237.)  Nevertheless, by an overwhelming majority, shareholders voted in favor of re-electing the Board, approved the executive compensation plan, and rejected the independent chairman proposal.  (Ex. H.)

**ARGUMENT**

## I.    PLAINTIFF'S SECTION 10(B) CLAIM SHOULD BE DISMISSED

Only "purchasers" or "sellers" of securities impacted by the alleged fraud have standing for a private right of action for a Section 10(b) claim.  *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731-32 (1975).  For a plaintiff with standing to successfully plead securities fraud under Section 10(b), the plaintiff must allege (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance on the misstatement or omission;

(5) economic loss; and (6) loss causation. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008).

Because the Complaint alleges securities fraud, Plaintiff must satisfy three escalating pleading standards. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019). As with any claim, Plaintiff must satisfy the federal notice-pleading requirements of Federal Rule of Civil Procedure 8(a)(2) and may not rely on "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002). Plaintiff must additionally satisfy "the heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special pleading requirements imposed by the Private Securities Litigation Reform Act of 1995." *Carvelli*, 934 F.3d at 1317-18. Rule 9(b) requires a plaintiff to state with particularity "(1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud." *Id.* at 1318.

The PSLRA further imposes the "most stringent pleading requirement in American civil law." *McCauley v. City of Chicago*, 671 F.3d 611, 625 (7th Cir. 2011). Congress created those "exacting" requirements "[a]s a check against abusive litigation." *Tellabs*, 551 U.S. at 313. Specifically, the PSLRA elevated the pleading standards for securities cases in two additional ways. *First*, under the PSLRA, a complaint must specify "each statement alleged to have been misleading," and "the

reason or reasons why the statement is misleading." *Carvelli*, 934 F.3d at 1318.[6] *Second*, "with respect to each act or omission alleged," the complaint must state "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," i.e., an "intent to defraud or severe recklessness on the part of the defendant." *Id.* (citing 15 U.S.C. § 78u–4(b)(1)(B), (2)(A)). "Failure to meet any of the three standards will result in a complaint's dismissal." *Id.*

Plaintiff fails to meet the requisite pleading standards under every element.[7]

### A.   Plaintiff Does Not Have Standing To Bring Claims Under Section 10(b)

As a threshold matter, the Complaint fails because Plaintiff does not have standing to bring a claim under the statutory text of Section 10(b). Under that provision, plaintiffs are "limited to actual purchasers and sellers of securities." *See Blue Chip Stamps*, 421 U.S. at 730. To have standing, the allegedly fraudulent misstatement must have occurred *prior* to the plaintiff's purchase or sale. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1267 (11th Cir. 2006) (citation omitted) ("Standing is established by allegations that plaintiffs bought or sold shares of the stock in question within a reasonable period of time *after* the allegedly fraudulent conduct occurred to support an

---

[6] These heightened standards "are not technical pleading rules by which unwary plaintiffs can be trapped; they go to the heart of separating claims based simply on market risks from claims based on actual fraud." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 189 (4th Cir. 2007).

[7] The Complaint is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action" and "asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against" and thus must be dismissed as an improper shotgun pleading. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1322-23 (11th Cir. 2015).

inference of reliance."); *Winer Fam. Tr. v. Queen*, 503 F.3d 319, at 325 (3d Cir. 2007) (same); *Gross v. Summa Four, Inc.*, 93 F.3d 987, 993 (1st Cir. 1996) (same).

Here, Plaintiff's Section 10(b) claim suffers from an unfixable defect: his only purchase occurred on April 11, 2022 (¶ 25)—**two weeks before** the Defendants' first Alleged Misstatements were made on April 25, 2022 (when the 2022 Proxy was issued).  (*See supra* § B.)  Thus, Plaintiff does not have standing to bring a claim under Section 10(b).  *Garfield*, 466 F.3d at 1267; *Winer Family Trust*, 503 F.3d at 325.

## B.    The Complaint Fails To Plead Transaction Causation or Reliance

For the same reason, Plaintiff cannot satisfy two further necessary elements: (1) transaction causation, i.e., that the purchase is "in connection with" alleged deceit and (2) reliance.

To adequately plead the "in connection with" element, the "actionable conduct must occur before the investors become 'purchasers of securities.'"  *Roberts v. Peat, Marwick, Mitchell & Co.*, 857 F.2d 646, 652 (9th Cir. 1988); *see also Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008) (same).  That is because transaction causation requires a showing that "the misrepresentations or omissions cause[d] the plaintiff to engage in the transaction in question."  *Robbins v. Kroger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997).  A statement made *after* purchasing cannot have impacted the decision to purchase.  Thus, where the only alleged misstatements are after all purchases, Section 10 claims must be dismissed.  *See Roer v. Oxbridge, Inc.*, 198 F. Supp. 2d 212, 226 (E.D.N.Y. 2001) (collecting cases).  That is the case here.

Similarly, Plaintiff cannot plead reliance: the purportedly misleading statements Plaintiff alleges he relied on in purchasing Target securities ***had not been made at the time of his purchase***. Because Plaintiff purchased two weeks before the first allegedly misleading statement, he could not possibly have relied on any alleged misrepresentations. Thus, Plaintiff's Section 10(b) claim must fail. *Stoneridge*, 552 U.S. at 159; *Stark Trading v. Falconbridge Ltd.*, 552 F.3d 568, 573 (7th Cir. 2009).[8]

### C. The Complaint Fails To Plead Material Misstatements or Omissions[9]

Plaintiff's Section 10(b) claim should be dismissed for the additional independent reason that he fails to plead any material misstatement or omission.[10]

As stated above, Plaintiff must satisfy three pleading standards: the federal notice-pleading requirement under Rule 8(a)(2), the fraud pleading standard found in Rule 9(b), and the heightened pleading requirements of the PSLRA. *Carvelli*, 934 F.3d at 1317-18. To adequately plead a material misstatement or omission under these standards, Plaintiff must specify with particularity (1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made; and (3) the content of the statements or omissions

---

[8] Plaintiff cannot plead around this defect by claiming a presumption of reliance. (¶ 276.) At bottom, "[n]o member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times." *Stoneridge*, 552 U.S. at 159. Plaintiff's purported reliance on the presumption as to omissions fails for an additional reason. The presumption does not apply where, as here (*see* ¶ 275), plaintiff pleads mixed claims of misrepresentations and omissions. *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 756 (11th Cir. 1984); *see also Fernau v. Enchante Beauty Prods., Inc.*, 847 F. App'x 612, 623 (11th Cir. 2021).

[9] The same analysis applies to 14(a) claims. *See Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988).

[10] To the extent Defendants did not make a challenged statement, they cannot be held liable. *See Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135 (2011). Here, Ms. Puma was not a Target director when the 2022 Proxy was issued and thus cannot be held liable for statements made therein.

and the reason or reasons why they were misleading. *Id.* at 1318. Plaintiff cannot rely on vague allegations or resort to speculation or conjecture to fill in gaps. *In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1311 (N.D. Ga. 2006).

Here, Plaintiff fails to adequately plead a material misstatement for at least three reasons: (1) Plaintiff mischaracterizes the *content* of each Alleged Misstatement and fails to show that what they *actually* said was false or misleading; (2) Plaintiff fails to plead particularized facts inconsistent with the Alleged Misstatements; and (3) all of the Alleged Misstatements are immaterial or nonactionable as a matter of law.

### 1. Plaintiff Fails To Plead Falsity of Risk Statements

Plaintiff first takes issue with statements in the Proxies regarding the Board's oversight of ESG and DEI-related risks, which he contends were false because the Board was either (i) not overseeing social and political risk (¶ 100), or (ii) was only overseeing one side of such risk (¶ 102). These allegations fail for two reasons. *First*, Plaintiff mischaracterizes the content of the Risk Statements (i.e., they did not guarantee oversight of all risks). *Second*, Plaintiff does not plead particularized facts showing that the Board acted contrary to his interpretation (i.e., he does not plead facts showing that the Board did not oversee all social and political risks).

#### a. Plaintiff Mischaracterizes the Content of the Risk Statements: They Did Not Guarantee Oversight of All Social and Political Risks.

Plaintiff alleges that the Risk Statements "communicated" that the Board oversaw "*any* material risk" (¶ 138 (emphasis in original)) and "risks of all kinds" (¶ 176) related to Target's ESG and DEI mandates. But the actual Risk Statements

did not say that. Instead, they refer to the *allocation* of responsibilities for overseeing risk between the Board and its committees. Specifically, they stated that "[g]iven the breadth of ESG matters for a company of [Target's] size and scale, oversight of those issues is *allocated* throughout the Board and its Committees" (Ex. A at 15; Ex. B at 15) and then described the allocation of oversight, including that the GS Committee was responsible for overseeing "[s]ocial and political issues and risks *not allocated* to other Committees" (*id.* at 16). The Risk Statements did *not* state that the Board oversaw "any" material risk or "risks of all kinds," as Plaintiff alleges, and they did not guarantee that the Board or its committees would perfectly monitor and defend against every conceivable risk. *See Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1189 (S.D. Fla. 2015) (dismissing claims where "[t]he actual content of [the defendant's] statement was quite different from what Plaintiffs alleged"), *aff'd sub nom. IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 600 F. App'x 850 (11th Cir. 2016); *Guo v. Mahaffy*, 2020 WL 5798531, at *9 (D. Colo. Sept. 29, 2020) (falsity determination "requires analyzing the proxy statement's explicit language, not what might be inferred from it"); *Kaufman v. Allemang*, 70 F. Supp. 3d 682, 695 (D. Del. 2014) (proxy not misleading where it did not guarantee the result the plaintiff claimed).

Here, Plaintiff does not contend that the *allocation* of risk oversight set forth in the Risk Statements is false or misleading. In fact, Plaintiff *admits* that it matches the allocation of oversight responsibility set forth in the respective Board Committee

charters.[11]  (*See supra* § C; ¶¶ 107-08).   Plaintiff thus fails to allege that the plain language of the Risk Statements was false or misleading.  *See Drucker v. Just for Feet Inc.*, 2000 WL 36733071, at *3-4 (N.D. Ala. Sept. 29, 2000) (citing *Basic*, 485 U.S. at 239 n.17) (statements not actionable when actual statement not alleged to be inaccurate); *see also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571, 577-81 (S.D.N.Y. 2014) ("true statements" are not actionable), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

      b.  Plaintiff Fails to Plead Particularized Facts Showing that the Board Acted Contrary to His Interpretation of the Risk Statements:  i.e., that it Failed to Oversee Social and Political Risks.

Plaintiff's allegations as to the Risk Statements also fail because he has not alleged any facts, let alone the particularized facts required by the PSLRA, showing that the Board was not engaged in oversight.  Instead, Plaintiff bases his theory that risk oversight was focused only on certain progressive interest groups on the alleged fact that Target (i) was engaging with those groups and identified risks associated with failing to meet stakeholder expectations; and (ii) engaged in certain merchandising decisions.  Neither is inconsistent with oversight of social and political risks.

      i.  Engagement with Certain Stakeholders Does Not Evidence Insufficient Oversight of Political and Social Risks.

Plaintiff alleges that, rather than oversee social and political issues and risks arising from Target's pursuit of ESG mandates, the Board and SG Committee

---

[11]  Plaintiff mistakenly alleges that the Proxies state that oversight of ESG and DEI-related social and political risks is the exclusive province of the GS Committee.  But both Proxies state that the GS Committee is allocated the responsibility for overseeing "[s]ocial and political issues and risks ***not allocated to other committees***." (Ex. A at 16; Ex. B at 16.)

(i) engaged with "stakeholders" (which Plaintiff defines narrowly as "nonprofit activists and organizations" (¶ 145)) regardless of the social or political issues or risks they created (¶ 113) and (ii) focused only on meeting their expectations (¶ 140).

To reach this conclusion, Plaintiff takes several speculative leaps. First, Plaintiff points to Target's public disclosure of its engagement with progressive groups (¶¶ 145-51). Plaintiff then speculates that the purpose of Target's engagement with stakeholders is to adopt ESG and DEI mandates regardless of the social or political risks they create for Target. (¶ 146.) Thus, Plaintiff concludes, the Board does not oversee social or political risks related to its ESG and DEI mandates (¶ 160), or, at a most, only oversees them from one side of the political spectrum (¶ 164). This sort of speculation and conjecture is precisely what the PSLRA proscribes. *Spectrum Brands*, 461 F. Supp. at 1311; *Garfield*, 466 F.3d at 1265 ("[C]laims of securities fraud cannot rest on speculation and conclusory allegations."). Target's *implementation* of ESG and DEI priorities is not the same as the Board's *oversight* of risks related to those priorities. Because Plaintiff's allegations only address the former, they cannot prove the falsity of statements as to the latter. *See Lee v. Frost*, 2021 WL 3912651, at *11-12 (S.D. Fla. Sept. 1, 2021) (board's lack of diverse membership did not show it failed to follow antidiscrimination policy).

Similarly, Plaintiff points to the risk factors in Target's annual reports that identify a risk associated with failure to meet "stakeholder expectations." (¶ 142.) Plaintiff speculates that the *identification* of that risk must mean that Target's oversight was *limited* to only that risk. But identifying risks related to meeting stakeholder

expectations does not mean that Target was *only* overseeing those risks to the exclusion of all others. *Lee*, 2021 WL 3912651, at *11-12.

In any event, Plaintiff's definition of "stakeholder" as "nonprofit activists and organizations" (¶ 145) is **contrary to the plain language of the Proxies** (and Target's other disclosures), which define "stakeholders" to include investors, guests (i.e., customers), team members, vendors, suppliers, and nonprofits. (*See supra* § C.1; Ex. A at 22; Ex. B at 23; Ex. I at 66.) Engagement with stakeholders and oversight of risks related to their expectations is therefore consistent with the broad oversight of social and political risk that Plaintiff alleges Target promised. This is because Target defines stakeholders to include a wide array of groups across the political spectrum, including Target's customers, which Plaintiff *concedes* are exactly the group Target should have been monitoring for risk. (¶ 145.)

In all events, even if Target's engagement with stakeholders or disclosure of risk relating to them were tantamount to overseeing only the risk associated with failure to meet their expectations, that was *disclosed* in Target's public filings, so the investors therefore could not have been deceived. *See Henningsen*, 161 F. Supp. 3d at 1183-84.

      ii.    Merchandising Decisions Do Not Evidence Insufficient Oversight of Social and Political Risk.

Plaintiff alleges that "the uniquely controversial LGBT-Pride Campaign" is *prima facie* evidence of the Board's lack of oversight of social and political issues and risks. (¶ 162.) But, again, rather than pleading facts demonstrating that the Board failed to *engage* in risk oversight, as required under the requisite pleading standards,

Plaintiff speculates that they did not do so based solely on the *result* of certain business decisions.   Such speculation does not state a claim under the securities laws. *See Spectrum Brands*, 461 F. Supp. 2d at 1311.

Plaintiff's allegations boil down to: (i) Defendants knew there was risk of backlash related to its ESG and DEI initiatives, and (ii) despite this risk, Target offered its 2023 Pride Collection, therefore (iii) Target was not monitoring risks related to ESG and DEI initiatives.   This is backwards reasoning:  the mere fact that Defendants knew about a risk is not evidence that they were not overseeing it.   *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 128 (Del. Ch. 2009) (directors' knowledge of signs of current and future deterioration of market did not mean "the board's oversight mechanisms were inadequate").   Nor does the fact that Target released a collection that resulted in backlash show that the Board failed to *consider* risk associated with that decision.   Courts routinely reject these sorts of conclusory, post-hoc allegations. *See, e.g.*, *Lee*, 2021 WL 3912651, at *11-12 (absence of diverse members did not show company's diversity and anti-discrimination policies were false; showing of actual discrimination was required); *Arora v. HDFC Bank Ltd.*, 2023 WL 3179533, at *5-6 (E.D.N.Y. May 1, 2023) (internal control failure did not show prior statements regarding effectiveness of those controls were false; "specific allegations about how or why those controls were ineffective" were required); *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015) (similar).[12]

---

[12] As a fallback, Plaintiff alleges that Target has engaged in a "campaign" to ban four conservative books, which Plaintiff alleges indicates a risk oversight failure or that the Board's oversight is only

In the end, Plaintiff disagrees with Target's decision to launch the 2023 Pride Collection. But that, at most, is a claim of corporate mismanagement, not a securities claim. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (quoting *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971)) (§ 10(b) does not "regulate transactions which constitute no more than internal corporate mismanagement").

### 2. Plaintiff Fails To Plead Falsity of the Reason Statements

Plaintiff next alleges that three statements conveyed that Target adopted its ESG and DEI mandates to advance shareholder value. (¶¶ 179-93.) Plaintiff says this was false because they were adopted to advance "stakeholder" interests. Again, Plaintiff defines stakeholders as limited to progressive activists, whose interests he believes are contrary to the advancement of shareholder value. (*Id.*)

Statements of reason for decisions are actionable only if they "misstate the speaker's reasons ***and also*** mislead about the stated subject matter." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095 (1991). Meeting this standard is "no small task" for investors given the requirement that they plead particularized and material facts demonstrating falsity. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). Here, Plaintiff's allegations fail for two key reasons. *First*, Plaintiff mischaracterizes the content of the Reason Statements (i.e., the Reason

---

"from one side of the spectrum." (¶¶ 169, 171, 177.) Plaintiff fails to allege particularized facts showing that this "campaign" actually exists. Even if this allegation were not pure speculation, it does not show any oversight failure. To the contrary, Plaintiff alleges that Target established "guidelines" to inform merchandising decisions in the wake of both conservative and liberal backlash, which *proves* that Target monitored risk from *both* sides of the political spectrum. (¶ 172.)

Statements do not even mention ESG and DEI mandates).  *Second*, Plaintiff does not plead particularized facts showing that anything was contrary to his interpretation of the statements (i.e., he does not plead facts that show that Target adopted those mandates for different reasons).

a. Plaintiff Mischaracterizes the Content of the Reason Statements: They Do Not Mention ESG or DEI Mandates.

As set forth above, Plaintiff must state with particularity not only which statements were made and when, where and by whom, but he must also plead the *content* of the statements.  *Carvelli*, 934 F. 3d at 1318.  Here, Plaintiff mischaracterizes the content of the Reasons Statements, which do not *mention* ESG or DEI mandates.  Instead, they concern:

- the Board's preference for leadership structure; specifically, that "the Board *prefers* to maintain the flexibility to determine which leadership structure best serves the interests of *Target and* our shareholders."  (¶ 182 (citing Ex. A at 10; Ex. B at 10).)

- Target's policy on "related persons" transactions; specifically, that the "Audit & Risk Committee must prohibit any transaction it determines to be inconsistent with the interests of *Target and* its shareholders."  (¶ 183; Ex. A at 17; Ex. B at 18.)

- the Board's "approach to capital allocation"; specifically, that the Board's first of many priorities is "Investing in our *business*," which includes "*creat[ing] sustainable long-term value*."  (¶ 184 (citing Ex. A at 17; Ex. B at 17).)

Moreover, the first two statements refer to the interests of both the company *and* its shareholders (not exclusively shareholders).  And the third does not even mention shareholders at all.  **Plaintiff does not allege that any of these statements as written are false.**  He does not allege, for example, that the Board did not, in fact, prefer the flexibility in the first statement, that the Audit Committee's policy was not as described

27

in the second statement, or that Target had an approach to capital allocation that was different from what was described in the third statement.

   b.   Plaintiff Fails to Plead Particularized Facts Showing That the Board Adopted ESG/DEI Mandates for Different Reasons: i.e., Not to Advance Shareholder Value.

Plaintiff has not alleged facts demonstrating that any Defendant pursued policies they believed were not oriented toward generating long-term shareholder value, which is required to show falsity. *See Va. Bankshares*, 501 U.S. at 1095. Plaintiff's attempts to do so fail.

*First*, Plaintiff interprets a statement by Mr. Cornell, Target's CEO, that Target's DEI commitments were "the right thing for society" as an "admission" that Target's ESG and DEI mandates were designed to serve "stakeholder" interests, which he again misconstrues as limited to progressive groups. (¶¶ 186-87.) But Plaintiff omits the portions of Mr. Cornell's statement in which he explains that DEI initiatives are "good business decisions" that have "***fueled much of our growth over the last nine years***," resulting in "***benefits for our shareholders***." (Ex. J.) In other words, rather than admitting that Target puts DEI initiatives above the interest of shareholders, Mr. Cornell explained how DEI initiatives serve shareholders. Nor did Mr. Cornell use the word "stakeholders" at all and, in any event, Target defines stakeholders to include shareholders, which rules out Plaintiff's interpretation. (*See supra* §§ C, I.C.1.b.i.)[13]

---

[13] Plaintiff likewise interprets a statement by Target's Chief Diversity Officer, Kiera Fernandez, during a panel discussing DEI initiatives, as revealing that "Target's DEI goals *drove Target's business*" (¶ 189),

*Second*, Plaintiff asserts that Target's ESG and DEI mandates were delegated to Target officials with "disabling personal conflicts of interest," as purported evidence that the mandates were adopted for ulterior reasons. (¶ 190.) But **Plaintiff does not identify any statement by Defendants regarding the delegation of the authority to implement Target's ESG and DEI mandates**, let alone allege that any such statement was false. In any event, Plaintiff identifies no legally cognizable conflict of interest. The only alleged "conflict" is the service of certain Target executives on the board (or as treasurer) of a non-profit. (¶ 191.)[14] Courts recognize corporate officers' and directors' ability to "change hats" and sit on multiple boards. *See Pledger v. Reliance Tr. Co.*, 2019 WL 10886802, at *13 (N.D. Ga. Mar. 28, 2019) (citing *United States v. Bestfoods*, 524 U.S. 51, 69 (1988)); *Lanfear v. Home Depot Inc.*, 718 F. Supp. 2d 1364, 1382 (N.D. Ga. 2010) (dismissing conflict of interest claim based on dual corporate roles), *aff'd* 679 F.3d 1267 (11th Cir. 2012).

### 3. Plaintiff Fails To Plead Falsity of the Compensation Statements

Plaintiff alleges that the Proxies represented that executive compensation plans were designed to align executives' incentives with maximizing shareholder value. (¶ 194.) Plaintiff alleges that this was false because the executive compensation plan

---

which Plaintiff interprets as an admission that she was acting contrary to shareholder interests. But Ms. Fernandez did not say that DEI goals drive Target's business. Instead, she spoke about the importance of integrating DEI "*in a way* that truly drives your business." (¶¶ 66, 189.) In other words, Ms. Fernandez's actual statement promotes implementing DEI initiatives as a path to business growth, which promotes shareholder interests.

[14] Plaintiff's allegation that a commitment to "racial equity" was a conflict is illogical. (¶ 192.) Plaintiff makes no allegation that touches on racial diversity, so even if this could be a conflict (and it cannot), it would have no relevance to this action.

took into consideration progress on DEI goals, which Plaintiff asserts is contrary to maximizing shareholder value. (*Id.*) To the extent Plaintiff interprets the Compensation Statements as falsely stating Defendants' *opinion* that the compensation plans aligned executives' incentives with maximizing shareholder value, that is nonactionable under the Supreme Court's ruling in *Omnicare*.

Under *Omnicare*, a defendant may be liable for a statement of opinion if (1) the speaker did not hold the belief professed, (2) a supporting fact supplied with the belief were untrue, or (3) the speaker omits information that makes the statement misleading to a reasonable investor. 575 U.S. at 185, 194. To the extent that Plaintiff interprets the Compensation Statements as stating that the plans, in fact, aligned executives' incentives with maximizing shareholder value, he must state with particularity how the contents of those statements were false. *Carvelli*, 934 F.3d at 1318. Under either standard, this theory fails for two key reasons.

*First*, Plaintiff mischaracterizes the content of the Compensation Statements (i.e., the Proxies clearly disclosed that progress on DEI goals was a factor in calculating executive compensation). *Second*, Plaintiff does not plead particularized facts showing that anything that was contrary to his interpretation of the statements. He does not plead facts showing that Defendants did not believe that the compensation plans aligned with maximizing shareholder value, nor does he plead that the Compensation Statements embedded untrue facts or omitted information that made the statements misleading to a reasonable investor.

30

a.    Plaintiff Mischaracterizes the Compensation Statements: They Clearly Disclosed that Progress on DEI Goals Was a Factor in Calculating Executive Compensation.

Plaintiff cannot allege that the Proxies misled investors into believing that progress on DEI goals was not a factor in executives' compensation because the **Proxies disclosed just that**.    Specifically, the Proxies disclosed that (i) executive compensation was comprised of a fixed base salary and three performance-based incentive plans (Ex. A at 40; Ex. B at 42); (ii) one of the performance-based plans, the STIP, took into account financial measures *and* progress on certain strategic initiatives the Board believed were linked to shareholder value in determining compensation (Ex. A at 40; Ex. B at 42); and (iii) one of those strategic initiatives was "positive progress on three-year enterprise DE&I goals" (Ex. A at 43; Ex. B at 44).    Plaintiff *admits* all of this.    (*See* ¶ 198 ("[A] close reading of the 2023 Proxy reveals that substantial sums of executives' compensation . . . were based on Target's own internal and subjective assessment of executives' performance along DEI metrics.").)    Because the Proxies disclosed the truth, Plaintiff cannot claim he was misled.    *See Raul v. Rynd*, 929 F. Supp. 2d 333, 344-45 (D. Del. 2013) (dismissing claim proxy misled as to whether the company had "adopted a strict pay-for-performance policy" where the proxy disclosed "five goals, of which 'pay for performance' is but one").

Plaintiff tries to escape this fact by claiming that the true disclosures were "[b]uried within multiple layers of the 2023 Proxy and scattered from its discussion of executive compensation principles." (¶ 198.) But the relevant disclosure is right where a reasonable investor would expect executive compensation to be discussed: in the

section titled "Compensation Discussion and Analysis" and the subsection explaining "Our framework for executive compensation." (Ex. A. at 36-52; Ex. B at 33-52.) More specifically, the sub-subsection explaining the factors that were taken "into consideration" when determining a scorecard payout is contained beneath a large, bolded subheading titled "Fiscal [2021/2022] team scorecard assessment." (Ex. A at 43; Ex. B at 44.) Nothing was buried. The securities laws presume reasonable investors are aware of all company-disclosed facts. *See Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013) ("The efficient market theory . . . is a Delphic sword: it cuts both ways. The Investors cannot contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs . . . .").[15]

       b.    Plaintiff Fails to Plead Particularized Facts Contrary to His Interpretation: i.e., that Defendants Believed Compensation Was Misaligned with Shareholder Value.

Even if the Proxies had failed to disclose the factors contributing to executive compensation (which they did not), Plaintiff pleads ***no facts*** showing Defendants believed there was a misalignment between the compensation plan and maximizing shareholder value, or that it was in fact misaligned. In the absence of pleading any

---

[15] In any event, the Proxies reflect that financial performance (unrelated to Target's DEI and ESG goals) had a significant impact on executive compensation. The 2022 Proxy indicated a 130% team scorecard payout for Fiscal 2021 bonuses, i.e., from late January 2021 to late January 2022. (Ex. A at 43.) But the 2023 Proxy indicated only a 75% scorecard payout for Fiscal 2022, with the notable negative factor being an "[o]verall decrease in enterprise market share in 2022." (Ex. B at 44.)

such facts, Plaintiff cannot satisfy the strict pleading requirements of the PSLRA and *Omnicare*. *Omnicare*, 575 U.S. at 194; *see also Lee*, 2021 WL 3912651, at *12.

### 4. The Alleged Misstatements Are Immaterial or Otherwise Nonactionable

Even if any of the Alleged Misstatements were misleading (and they are not), Plaintiff fails to plead how *any* of them are material: i.e., that they would be "viewed by the reasonable investor" as "significantly alter[ing] the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

### a. The Alleged Misstatements Are Immaterial Puffery and No Reasonable Investor Would Have Relied on Them.

As an initial matter, statements about compliance efforts, the quality of systems, and controls are classic puffery—i.e., they are the sort of vague, generalized, and optimistic comments that a reasonable investor would not view as important to his investment decision. *See Carvelli*, 934 F.3d at 1320.

Here, the Risk Statements are vaguer and more generalized than statements the Eleventh Circuit has previously held to be puffery. *See id.* at 1321 (statements about efforts towards compliance are immaterial puffery); *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enter., Inc.*, 572 F. App'x 713, 717 (11th Cir. 2014) (statements on overall quality of a company's practices "do not assert specific, verifiable facts that reasonable investors would rely on"). The same is true for the Reason Statements and Compensation Statements and the inference Plaintiff draws from them (i.e., that the ESG and DEI mandates and compensation plan promote shareholder value). *See Cambridge Ret. Sys. v. MEDNAX, Inc.*, 2019 WL 4893029, at * 17 (S.D. Fla. Oct. 3,

2019) (statements based on corporate optimism or opinions, feelings, beliefs, hopes and wants of management do not give rise to securities claims).

> b. The Complaint Acknowledges that the "Revelation" Had No Impact on Investor Decision-Making and Therefore the Alleged Misstatements Were Not Material to Investors.

The Complaint itself demonstrates that the allegedly concealed "facts" are immaterial. The Complaint alleges that: (i) the release of the 2023 Pride Collection and ensuing backlash was *prima facie* evidence that the Board was not overseeing social and political risk related to Target's ESG and DEI initiatives (¶¶ 162-63) and (ii) "revealed" to investors that the Proxies has misled them as to the Board's oversight of those risks (¶¶ 227, 258). The Complaint also acknowledges that *after* that "revelation," the 2023 Pride Collection was an area of "intense focus" at the "2023 Annual Meeting," and a "central issue of the directors' reelection" (¶¶ 236-37). If this "revelation" were material, it should have impacted voting behavior. Nevertheless, investors continued to elect the Board, support executive compensation, and vote against the shareholder proposal by an overwhelming majority. (*See* Ex. H.)

> c. Forward-Looking Statements Are Protected by the PSLRA.

To the extent Plaintiff interprets any of the Alleged Misstatements as promising or predicting future risk monitoring or advancement of shareholder value, they would be inactionable forward-looking statements. *Carvelli*, 934 F.3d at 1324, 1324 n.9. They were accompanied by meaningful cautionary language and thus fall within the PSLRA's safe harbor. *See* 15 U.S.C. § 78u-5(c)(1). Specifically, the 2023 Proxy incorporated Target's 2022 Annual Report and the 2022 Proxy was mailed with the

2021 Annual Report. As set forth above, both annual reports cautioned investors about risks related to Target's ESG and DEI efforts, including the potential for boycotts, in the Risk Factors. (*See supra* § A, Ex. D at 7; Ex. E at 8.)

### D.   The Complaint Fails To Plead a Strong Inference of Scienter

The Complaint should also be dismissed because Plaintiff fails to plead with particularity facts giving rise to a strong inference that Defendants acted with scienter. 15 U.S.C. § 78u-4(b)(2); *Tellabs*, 551 U.S. at 323.

To plead scienter, Plaintiff must show that *each* Defendant in question acted with a mental state embracing intent to deceive, manipulate or defraud or with severe recklessness. *See Mizzaro*, 544 F.3d at 1238. Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations" that "involve not merely simple or even inexcusable negligence, but extreme departure from the standards of ordinary care, and that present a danger of misleading" investors. *Id.* (quoting *Bryant*, 187 F. 3d at 1282 n.18). The "inference of scienter must be more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 309. It must be "cogent and *at least as compelling as any opposing inference* one could draw from the facts alleged." *Id.* at 324.

Plaintiff cannot satisfy this exacting standard. He tries to do so through group pleading, pointing to supposed "red flags," and selective quotation from Mr. Cornell's public statements. All fail.

### 1. This Circuit Rejects Group Pleading of "Notice" and "Opportunity" Based on Position and Receipt of Proxies

The Complaint is devoid of particularized factual allegations as to *each Defendant*, which are necessary to support a strong inference of scienter. *Mizzaro*, 544 F.3d at 1238; *see also Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr. v. Welbilt, Inc.*, 2020 WL 905591, at *4 (M.D. Fla. Feb. 6, 2020); *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 364-65 (5th Cir. 2004).

Instead, Plaintiff alleges that "Defendants" as a group "knew" or "should have," "would have," or "must have" known the Proxies were misleading fails as a matter of law.[16] But these sorts of conclusory allegations that defendants knew, should have known, or acted with severe recklessness fail to support an inference of scienter. *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1273 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010); *see also In re Recoton Corp. Sec. Litig.*, 358 F. Supp. 2d 1130, 1147 (M.D. Fla. 2005); *Welbilt*, 2020 WL 905591, at *4.

Similarly, Plaintiff attempts to plead scienter based on Defendants' positions within Target, tenure on the Board, and having been provided with copies of the Proxies containing the Alleged Misstatements. (¶¶ 214, 217.) But a pleading of scienter may not rest on the inference that defendants must have been aware of the

---

[16] *See, e.g.*, ¶ 213 ("Defendants had constructive knowledge"); ¶ 214 ("the Director Defendants knew"); ¶ 215 ("Defendants were also aware or should have been aware of red flags"); ¶ 216 ("Defendants would specifically have been on notice"); ¶ 217 ("Defendants Cornell, Edwards, Healey, Knauss, and Rice knew"); ¶ 219 ("Defendants would have also been on notice"); ¶ 221 ("Defendants would have been on notice"); ¶ 222 ("Defendants had or should have had notice"); ¶ 225 ("Defendant Target had notice and the Director Defendants had or should have had notice").

misstatement based on their positions within the company. *Jabil*, 595 F. Supp. 2d at 1273; *see also Durgin v. Mon,* 415 F. App'x 161, 165 (11th Cir. 2011). Nor does receipt by a defendant of anticipated disclosures containing alleged misstatements support an inference of scienter. *Welbilt*, 2020 WL 905591, at *4.

### 2. Awareness of Previous Backlash Risk Does Not Raise Suspicions that Target Was Failing to *Oversee* Risk

Next Plaintiff points to public information that he refers to as "red flags," which he says put Defendants on notice of falsity. Specifically, Plaintiff identifies conservative backlash resulting from a statement Target made in opposition to a North Carolina bill concerning separate gender bathrooms in 2016 (¶¶ 216-18), boycotts resulting from other companies' marketing campaigns (¶¶ 219-21), and the rise of state ESG-backlash legislation (¶ 222). These do not give rise to any inference of scienter.

*First*, they are all public knowledge. "Red flags" refer to non-public knowledge of "*suspicious* events creating reason for doubt" as to the truth of statements. *S.E.C. v. Prince*, 942 F. Supp. 2d 108, 145 (D.D.C. 2013) (citation omitted). Where, as here, the alleged red flag is publicly known, any inference of scienter is weakened. *Knurr v. Orbital ATK, Inc.*, 272 F. Supp. 3d 784, 802-03 (E.D. Va. 2017); *Owens v. Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015).

*Second*, none of the alleged "red flags" has any linkage at all with the alleged fraud. They do not raise suspicions that Target's Board was not monitoring social and

political risk; they simply describe examples of such risk.[17]   Nor do they raise suspicions regarding Target's reasons for adopting ESG mandates or whether Target's incentive compensation was designed to align with shareholder value.  The lack of any connection between the "red flags" and the alleged deceit defeats any inference of scienter.  *See Jabil*, 595 F. Supp. 2d at 1286-87 (red flag must correspond to the alleged deceit); *In re Faro Techs. Sec. Litig.*, 2007 WL 430731, at *16 (M.D. Fla. Feb. 3, 2007).

Moreover, backlash to Target's response to the 2016 North Carolina bathroom bill—seven years ago—is too distant to raise suspicions about the falsity of statements in 2022 and 2023.  *See Welbilt*, 2020 WL 905591, at *5 (stale information cannot serve as red flag); *Jabil*, 595 F. Supp. 2d at 1286 (same); *see also Chiarenza v. IBSG Int'l, Inc.*, 2010 WL 3463304, at *5 (S.D. Fla. Sept. 2, 2010) (same).[18]  (¶ 218.)

### 3.  Scattershot Allegations as to Mr. Cornell Undercut Scienter

Plaintiff makes two scattershot arguments regarding Mr. Cornell.  But both fail.  First, Plaintiff refers to a statement signed by 181 CEOs, including Mr. Cornell, in 2019.  (¶ 223.)   Plaintiff says that, because that statement pledged to make "a fundamental commitment to all of our stakeholders" (which Plaintiff claims came at

---

[17] *Compare* ¶ 213 ("the [Proxies] misled investors by falsely and misleadingly (i) reassuring investors that the Board *oversaw social and political issues and risks arising from Target's ESG and DEI goals*"), *with* ¶ 221 (claiming "Target faced risk of backlash"); ¶ 222 (noting "growing 'anti-ESG' backlash by consumers and governments"); ¶¶ 216-20 (identifying risk outcomes).

[18] Plaintiff also alleges that Defendants were on notice of the risk of the 2023 Pride Campaign because "Target delegated the execution of business strategy to officers" with "disabling conflicts of interest" (¶ 225).  But that cannot support a strong inference of scienter either.  *First*, Plaintiff identifies no legally cognizable conflict.  (*Supra* § I.C.2.b.)  *Second*, Plaintiff does not plead that any Defendant was aware of either those non-existent conflicts or that alleged delegation.  *Third*, there is no plausible connection between the persons charged with executing a business strategy and the Board's *oversight* of risk.

the expense of a "traditional dut[y] to shareholders"), Mr. Cornell somehow demonstrated "knowledge of risks relating to prioritizing stakeholder over shareholder benefit." (*Id.*)  As with the Proxies, Mr. Cornell specifically committed himself to "[g]enerating long-term value for shareholders." (Ex. K.)  In any event, Plaintiff does not identify *how* this statement demonstrates knowledge of risk oversight (or risk at all), ESG or DEI initiatives, or executive compensation.

Second, Plaintiff alleges that Mr. Cornell "had a motive to mislead Target's investors . . . because his compensation was based in part on [t]he advancement of subjective DEI goals." (¶ 226.)  But ordinary incentive compensation is not probative of scienter as a matter of law. *Jabil*, 595 F. Supp. 2d at 1275; *In re Metris Cos., Inc. Sec. Litig.*, 428 F. Supp. 2d 1004, 1013 (D. Minn. 2006).  In any event, most of Mr. Cornell's executive compensation was based on financial performance—not the advancement of ESG and DEI initiatives.[19]  (*See* Ex. A at 43; Ex. B at 45.)  It defies logic to contend that Mr. Cornell had an incentive to boost DEI to the detriment of financial performance, and therefore to the detriment of his overall incentive compensation.

### 4.  Plaintiff Fails to Plead Scienter as to Target

Because corporations have no state of mind of their own, courts look to the state of mind of their agents. *In re Tupperware Brands Corp. Sec. Litig.*, 2023 WL 5091802, at *3-5 (11th Cir. Aug. 8, 2023).  Accordingly, to plead scienter with respect to Target, Plaintiff must allege facts sufficient to establish a strong inference that someone who

---

[19] 67% of his bonus was purely financial and the "Team Scorecard" weighted several financial factors, including market share performance and growth in same-day services.  (Ex. A at 43; Ex. B at 44.)

is "responsible for the allegedly misleading statements [also] must have known about the fraud." *Mizzaro*, 544 F.3d at 1254.  Here, as discussed above, Plaintiff's allegations against the Individual Defendants fail to create a strong inference of scienter, and Plaintiff does not make any allegations of scienter for anyone else who was responsible for the Alleged Misstatements.  Thus, there can be no inference of scienter as to Target. *See Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010).

In the end, Plaintiff's theory runs headlong into the warnings in Defendants' disclosures.  It defies common sense that Defendants would warn the public about the risks associated with the Company's position on ESG and DEI related issues if their intent was to mislead investors about a potential backlash to such issues. (*See supra* § A, Ex. D at 7; Ex. E at 8); *Kadel v. Flood*, 427 F. App'x 778, 780-81 (11th Cir. 2011) (disclosures replete with myriad warnings significantly undermine scienter inference).

### E.   The Complaint Fails To Plead Loss Causation

Plaintiff's Section 10(b) claim must be dismissed for the independent reason that he cannot plead loss causation.  To survive a motion to dismiss, a plaintiff must first establish that the he purchased his stock at an inflated price and then meet three additional requirements: "(1) identify a corrective disclosure (i.e., a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the alleged fraud); (2) show that the stock's price dropped soon after that corrective disclosure; and (3) eliminate other possible explanations for the price drop, such that the factfinder can infer that it is more probable than not that

it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a substantial amount of the price drop." *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1242 (11th Cir. 2023). The Complaint fails all four requirements.

### 1. Plaintiff Did Not Purchase Artificially Inflated Stock

A plaintiff must be able to prove that he "purchased securities at an artificially inflated price." *Robbins*, 116 F.3d at 1448; *Meyer*, 710 F. 3d at 1195 (impact of alleged misstatements must be "baked into the plaintiff's purchase price"). Here, Plaintiff's only purchase of Target stock was two weeks before any alleged misstatement could have caused inflation. (*See supra* § B.) There is no causal connection between Plaintiff's losses and the Alleged Misstatements.

### 2. 2023 Pride Collection Backlash Is Not a Corrective Disclosure

To plead a corrective disclosure in a Section 10(b) claim, the disclosure must (1) be corrective, and (2) disclose new information. *See Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 885, 862-63 (11th Cir. 2015); *Meyer*, 710 F.3d at 1197-98. Here, the Complaint fails on both fronts: there is no correction—no revelation of concealed facts—and no new information was disclosed.

The closest Plaintiff comes to alleging a corrective disclosure is alleging that "when Target launched the LGBT-Pride Campaign . . . Target's customers responded by boycotting the store," which allegedly revealed that "Defendants concealed the true financial condition of the Company, its true risk management and oversight procedure, and material risks to Target's value." (¶¶ 258, 261.) But neither the launch

of the 2023 Pride Collection nor the subsequent backlash plausibly revealed any prior concealment of those facts; they did not disclose any new information at all.[20]

Neither the launch of the 2023 Pride Collection nor the backlash against it said anything about Target's financials, its risk management and oversight procedures, or risks to its value.[21] For a disclosure to be corrective it must "relate back to the misrepresentation and not to some other negative information about the company." *MacPhee*, 73 F.4th at 1243-45. Here, the 2023 Pride Collection does not correct any purported falsehood in the Proxies, which never claimed Target would cease its annual practice of offering merchandise aimed at celebrating Pride Month. Nor does the ensuing boycott offer any correction—the Proxies did not claim conservative boycotts would never happen. *See id.* (disclosure of loss of distributor relationship and financial news did not correct alleged accounting misstatements).

Neither event disclosed any new information either. *First*, the 2023 Pride Collection was expected, and therefore not new. Repeating (and thereby confirming) previously established behavior does not reveal any new truth. *See id.* at 1246 ("confirmatory information" cannot be corrective). Here, Plaintiff admits that "Target

---

[20] Plaintiff does not attempt to identify any disclosure that could have corrected the Compensation Statements and therefore any alleged 10(b)(5) claim based on those purported misstatements fails. In any event, as explained above, the Complaint itself *admits* that the truth of Target's executive compensation formulas was disclosed *at the same time* as the alleged misstatements. (*See supra* § I.C.3.)

[21] Moreover, Target's post-launch statements demonstrate it continued to monitor and seek to manage risks associated with the 2023 Pride Collection. (*See* Ex. C (Target "remov[ed] items that have been at the center of the most significant confrontational behavior").) Consistent statements, like these, weigh against loss causation. *See Hattaway v. Apyx Med. Corp.*, 2023 WL 4030465, at *15 (M.D. Fla. June 15, 2023) (no loss causation where statements spoke to ongoing effort to remain in regulatory compliance and did not reveal regulatory avoidance).

was an early adopter of corporate LGBT initiatives." (¶ 7.) And Target had an established, more than decade-long practice of offering "an assortment of products aimed at celebrating Pride Month." (Ex. C.) Even if the 2023 Pride Collection were new information, Plaintiff does not identify *when* information about it was disclosed. *See Chen v. China Green Agric. Inc.*, 2022 WL 3868111, at *4 (S.D.N.Y. Aug. 30, 2022) (dismissing claim where Plaintiff did not "explain how or when the corrective information was disclosed to the market"). He relies exclusively on news articles discussing the collection, none of which say when it was released. News articles that merely repackage already-public information are not corrective disclosures. *Meyer*, 710 F.3d at 1197-98.

The possibility of a backlash against Target's DEI and ESG initiatives was not new information either. Target repeatedly warned of the risk of boycotts arising out of its ESG and DEI initiatives. (*See supra* §§ A, D.) And Plaintiff pleads that the risk of a conservative boycott arising from LGBTQ+ merchandising decisions was already publicly known. (¶¶ 217-22). Because the 2023 Pride Collection was expected and the risk of a conservative boycott was publicly known, the fact that the 2023 Pride Collection brought about such a boycott is not a corrective disclosure. *See MacPhee*, 73 F.4th at 1246; *Meyer*, 710 F.3d at 1198.

### 3. Plaintiff Has Not Pled a Stock Drop "Soon After" Any Alleged Corrective Disclosure

Plaintiff fails to plead a stock drop "soon after that corrective disclosure." *MacPhee*, 73 F.4th at 1242. The Complaint does not allege *when* the 2023 Pride

Collection was launched or *when* the customer backlash began.[22]  It thus does not adequately tie the timing of a stock drop to its purported corrective disclosure.  *Chen*, 2022 WL 3868111, at *4 ("Even if Plaintiff had alleged a corrective disclosure, he still would have failed to plausibly plead loss causation because he never identified when the disclosure happened . . . .").  Nor can Plaintiff claim losses from a decline in Target's stock price from his $229.31 purchase price on April 11, 2022, or its high of $241 per share that same month.  (¶ 259.)  Those declines preceded the alleged corrective disclosure.  *See Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1339 (S.D. Fla. 2004) (dismissing claims where 80% stock decline preceded corrective disclosure).

### 4. Plaintiff Has Not Pled that at Least a "Substantial Amount" of the Alleged Stock Drop Was Caused by Corrective Information

Because Plaintiff has failed to plead that the launch of the 2023 Pride Collection or backlash thereto are corrective disclosures, he also fails to plead that it was the correction of prior misstatements—"as opposed to other possible depressive factors— that caused at least a 'substantial' amount of the price drop."  *MacPhee*, 73 F.4th at 1242 (quoting *Meyer*, 710 F.3d at 1196-97).  Plaintiff alleges that "Target's stock price drop was 'primarily driven by customers and public reaction to in-store

---

[22] This is not just a failure of specificity.  Target's stock price ***rose*** following the actual disclosure of both the 2023 Pride Collection ***and*** the backlash against it.  That increase means the news of those events "cannot serve as a corrective disclosure."  *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 2016 WL 10592320, at *5 (S.D. Fla. June 6, 2016).  Specifically, the Complaint alleges a stock drop that began on or after May 17, 2023.  (¶ 25.)  But Target's 2023 Pride Collection was announced a week earlier, on May 10, 2023, and the backlash was evident as soon as two days later.  (*See, e.g.*, Ex. L.) On May 12, 2023, Target's stock price traded at $157.99 and rose to $160.57 the next trading day, May 15, 2023, and up to $160.96 by May 17, 2023.  (*See* Ex. G); *see In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 264-65 (3d Cir. 2005) (court may take judicial notice of reported stock price history).

promotions for the month of June.'" (¶ 87.) That reaction is not corrective. (*See supra* § I.E.2.) Because Plaintiff admits that the cause of the stock drop was a non-corrective depressive factor, he has not plausibly alleged that a substantial amount of the alleged stock drop was driven by correction of the alleged misstatements.

## II.  PLAINTIFF'S SECTION 14(A) CLAIM SHOULD BE DISMISSED

To state a Section 14(a) claim, a plaintiff must allege that defendants negligently prepared a proxy statement containing a material misstatement or omission that caused the plaintiff's injury. *Jabil*, 595 F. Supp. 2d at 1290. Section 14(a) claims are subject to the heightened PSLRA requirement that falsity be pled with particularity. *In re The Home Depot, Inc. S'holder Deriv. Litig.*, 223 F. Supp. 3d 1317, 1330 (N.D. Ga. 2016) (citing *Stoneridge*, 552 U.S. at 165). And where claims are grounded in allegedly fraudulent conduct, the PSLRA's heightened standards apply as to whether Plaintiff has adequately pled fraudulent intent. *Lee*, 2021 WL 3912651, at *4 n.3 (collecting cases); *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160-63 (3d Cir. 2004). Plaintiff must also allege that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. *Jabil*, 595 F. Supp. 2d at 1290. He fails on each element.

### A.  The Complaint Fails To Plead a Material Misstatement/Omission and Scienter

Plaintiff's Section 14(a) claims allege the same misstatements as his Section 10 claim. They are also subject to the same heightened pleading standards as to falsity, and therefore should be dismissed for the reasons explained in Section I.C of this brief.

*See Jabil*, 595 F. Supp. 2d at 1290 (dismissing Section 14(a) claims on falsity grounds for the same reasons explained in the analysis of Section 10 claims).

Plaintiff's Section 14(a) claim also fails to adequately plead fraudulent intent. Where the plaintiff chooses to pursue a fraud-based theory under Section 14(a), it is subject to the PSLRA's heightened pleading requirements for scienter. *Lee*, 2021 WL 3912651, at *4 n.3; *Chubb*, 394 F.3d at 160-63. Plaintiff's Section 14(a) claim clearly sounds in fraud.[23] And, as set forth above, he has failed to adequately plead fraudulent intent under the heightened PSLRA standard (or at all). (*See supra* § I.D.) Because Plaintiff's Section 14(a) claim rests on the same flawed falsity and scienter allegations as his Section 10(b) claim, it also should be dismissed.

## B.    The Complaint Fails To Plead Both Transaction and Loss Causation

Plaintiff also has not adequately pled any causal link between the Proxies and his alleged loss. Section 14(a) claims must show two types of causation: transaction and loss causation. *McDowell v. Bracken*, 317 F. Supp. 3d 1162, 1180 (S.D. Fla. 2018), *aff'd*, 794 F. App'x 910 (11th Cir. 2019). Transaction causation demands a showing that stockholders voted as they did "because of" the alleged misstatements. *Id.* Loss causation requires pleading "[t]he transaction at issue must be the source of the plaintiff's injury." *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783,

---

[23] *See, e.g.*, ¶ 59 ("Defendants *Knowingly Misled* Target Investors"); ¶ 214 ("Director Defendants *knew* that the adverse facts specified herein had not been disclosed."); ¶ 226 ("Defendant Cornell had a *motive to mislead* Target's investors"); ¶ 284 ("the speaker(s) *knew* the statement was false"). In any event, even if the standard were merely negligence, Plaintiff has made no allegations whatsoever regarding the diligence of the Defendants in preparing the Proxies. *See Gould v. Am.-Hawaiian S.S. Co.*, 535 F.2d 761, 777-78 (3d Cir. 1976) (negligence implies absence of "due diligence").

796-97 (11th Cir. 2010). In other words, the Complaint must show "that the plaintiff's real injuries" were caused by "the proxy solicitation" rather than "mismanagement of the corporation" or other unrelated causes. *Id.*

Here, Plaintiff alleges that the misstatements caused (i) the Board's reelection; (ii) the rejection of two shareholder proposals; and (iii) the approval of compensation plans. (¶ 227.) Plaintiff alleges that the actions of the reelected directors "subjected Target and Target shareholders to significant monetary and reputational damage" that might have otherwise been prevented. (*Id.*) Those allegations are insufficient.[24]

### 1. Plaintiff Fails To Plead Transaction Causation

To plead transaction causation, Plaintiff must plead that the alleged misstatements caused the voting outcomes he alleges harmed him. *McDowell*, 317 F. Supp. 3d at 1180. The Complaint shows that theory is implausible as a matter of law. The Complaint alleges that the launch of the 2023 Pride Collection and subsequent backlash revealed the allegedly concealed truth regarding the alleged misstatement. (¶ 258.) But *after* that alleged correction, stockholders voted in line with Board recommendations on each proposal Plaintiff claims they would have rejected had they known the truth. (*See supra* § G; *see also* ¶¶ 229, 246, 263.)

Specifically, the 2023 annual meeting and stockholder vote took place on June 14, 2023. Plaintiff alleges that meeting took place "amid the LGBT-Pride

---

[24] To the extent Plaintiff claims stock-drop losses under Section 14(a), that claim fails to plead loss causation for the same reasons his Section 10 claim fails on that element. (*See supra* § I.E.)

Campaign customer backlash," which prompted "the Target Board's purported oversight of social and political issues and risks [to be] a central issue of the directors' reelection." (¶¶ 236-37.) If Plaintiff's theory were plausible, one would expect that stockholders would have voted against the various proposals Plaintiff challenges. Instead, they approved the directors, voted in line with Board recommendations and against the Independent Chairman Proposal; and approved the executive compensation plan. (¶¶ 244, 248, 268-69.) The allegedly already-corrected misstatements could not have caused the 2023 voting outcomes. And the fact that stockholders voted as they did in 2023 makes it implausible that the same alleged misstatements had any impact on 2022 voting outcomes. As a result, Plaintiff has failed to plead that the misstatements caused the voting outcomes he complains of, let alone that they caused the 2023 Pride Collection to be launched.

In addition, Plaintiff cannot establish transaction causation as to the executive compensation or shareholder proposals because those votes were advisory and non-binding. (*See* Ex. A at 5, 67; Ex. B at 5, 68.) Plaintiff must plead that the Proxies "*directly authorize[]* the loss-generating corporate action." *Advanced Advisors G. P. v. Berman*, 2014 WL 12772264, at *14 (C.D. Cal. Sept. 16, 2014) (citation omitted). But the Supreme Court has held that there can be no causation in Section 14(a) claims based on non-binding shareholder votes. *Va. Bankshares*, 501 U.S. at 1099, 1105; *accord McDowell v. Bracken*, 794 F. App'x 910, 917 (11th Cir. 2019); *Rubenstein ex rel. Jefferies Fin. Grp. Inc. v. Adamany*, 2023 WL 6119810, at *3 (2d Cir. Sept. 19, 2023).

### 2. Plaintiff Fails To Plead Loss Causation

To plead loss causation, "the losses to the company must have resulted directly from the . . . Proxy Statement vote" rather than the alleged misstatements or omissions. *Lee*, 2021 WL 3912651, at \*12. Plaintiff cannot meet that standard.

Plaintiff's alleged injuries arise from the decision to launch the 2023 Pride Collection, not any voting outcome. Courts regularly dismiss claims alleging such indirect injuries, particularly ones alleged to arise from a series of events following director elections. *Jabil*, 594 F.3d at 797 ("the election of directors who violated [] policies only indirectly caused the shareholders' loss"); *Rubenstein*, 2023 WL 6119810, at \*4 (similar); *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992) (similar); *Lee*, 2021 WL 3912651, at \*13 (similar). Here, Plaintiff does not allege that any stockholder vote directly caused corporate action that harmed him. Instead, his theory is that the 2023 Pride Collection launch caused his harm. (¶ 259.) That was an ordinary-course business decision that was never subject to a stockholder vote. Thus, Plaintiff does not plead that a different voting outcome would have prevented his injuries.

Moreover, Plaintiff concedes that his alleged injury took place prior to Target's June 14, 2023 Annual Meeting. (*See* ¶ 236.) Thus, it is implausible that the election of different directors could have prevented Plaintiff's alleged injury. *In re JPMorgan Chase Deriv. Litig.*, 2014 WL 5430487, at \*24-25 (E.D. Cal. Oct. 24, 2014) (rejecting loss causation where allegedly harmful corporate decisions preceded challenged vote).

It is even less plausible that the advisory votes on the Independent Chairman, Director Nomination Proposals, or executive compensation proposal could have

altered Target's strategy with respect to the 2023 Pride Collection. *Va. Bankshares*, 501 U.S. at 1099, 1105; *McDowell*, 794 F. App'x at 917; *Rubenstein*, 2023 WL 6119810, at *3. The Complaint itself concedes that any such link is hypothetical, pleading only that different voting outcomes "could have prevented" his losses. (¶ 227.) Moreover, the Complaint is clear that Target's diversity initiatives long preceded the 2022 and 2023 votes. (*See* ¶ 7 ("Target was an early adopter of corporate LGBT initiatives."); ¶¶ 64-66.) Votes in 2022 and 2023 could not have impacted policies and business plans that had long been in place. *See JPMorgan*, 2014 WL 5430487, at *24.

## III.    PLAINTIFF'S SECTION 20(A) CLAIM SHOULD BE DISMISSED

Because Plaintiff has not pled Section 10 or 14(a) claims, "there is no underlying 'primary violation' on which to hang a § 20(a) claim." *Carvelli*, 934 F.3d at 1330.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiff's Complaint with prejudice.

## LOCAL RULE 3.01(G) CERTIFICATION

Pursuant to Local Rule 3.01(g), the undersigned certifies that counsel for Defendants have conferred with counsel for Plaintiff by telephone and email, and that Plaintiff opposes the relief requested in this motion.

Dated: November 7, 2023

Traci T. McKee
FAEGRE   DRINKER   BIDDLE   &
REATH LLP
1500 Jackson Street, Suite 201
Fort Myers, Florida 3390
Telephone: (239) 286-6910
traci.mckee@faegredrinker.com

Jeffrey P. Justman (*pro hac vice*)
FAEGRE   DRINKER   BIDDLE   &
REATH LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, Minnesota 55402
Telephone: (612) 766-7000
jeff.justman@faegredrinker.com

Sandra Grannum (*pro hac vice*)
FAEGRE   DRINKER   BIDDLE   &
REATH LLP
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7000
sandra.grannum@faegredrinker.com

*Attorneys for Defendants*

Respectfully submitted,

/s/ Sandra C. Goldstein
Sandra C. Goldstein, P.C. (*pro hac vice*)
Alexander Rodney (*pro hac vice*)
Jacob M. Rae (*pro hac vice*)
Ashley P. Grolig (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4779
sandra.goldstein@kirkland.com
alexander.rodney@kirkland.com
jacob.rae@kirkland.com
ashley.grolig@kirkland.com

51

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 7, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which provided electronic service upon all counsel of record.

/s/ Sandra C. Goldstein
Sandra C. Goldstein, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4779
sandra.goldstein@kirkland.com

**ANNEX A – CHART OF ALLEGED MISSTATEMENTS EXACTLY AS SET OUT IN THE COMPLAINT[1]**

| # | Statement Exactly as Set Out in the Complaint | ¶ | Not False/ Misleading | Forward-Looking[3] | Reason/ Opinion | Puffery |
|---|---|---|---|---|---|---|
| | **CATEGORY 1: RISK STATEMENTS[2]** | | | | | |
| 1 | "The 2023 Proxy described the Board's key role in risk oversight:<br><br>**Risk oversight**<br>Oversight of the various risks we face in implementing our strategy is an integral and continuous part of the Board's oversight of our business. The Board, each Committee, and management have specific roles and responsibilities with respect to those risks.<br><br>**The Board and its Committees**<br>The Board provides oversight of overall risks and seeks to ensure that our Leadership Team has processes in place to appropriately manage risk. Strategic risks are emphasized within that overall risk oversight responsibility because they are an integral and ongoing part of the Board's oversight of our business. For example, our principal strategic risks are reviewed as part of the Board's regular discussion and consideration of our strategy, including the development and monitoring of specific initiatives and their overall alignment with our strategy. Similarly, at every meeting the Board reviews the principal factors influencing our operating results, including the competitive environment, and discusses with our Leadership Team the major events, activities, and challenges affecting Target.<br><br>2023 Proxy at 14." | 104 | X | X | | X |

---

[1] The alleged misstatements are quoted exactly as presented in the Complaint; all emphases and ellipsis are as they appear in the Complaint and all internal citations are those that the Complaint included. Some of Plaintiff's quotations are excerpted and/or are lacking context. Defendants submit that each quote must be read in full context of the surrounding statements and have identified relevant surrounding context in their motion to dismiss.

[2] The three categories of statements are based on Plaintiff's categorization of alleged misstatements as set forth in paragraph 112 of the Complaint. In paragraph 112 of the Complaint, Plaintiff groups the Risk Statements together under the following umbrella: "[T]he 2022 Proxy and 2023 Proxy each falsely and misleadingly stated that the Board (i) oversaw social and political issues and risks arising from its adoption of ESG mandates . . . ." (¶ 112.)

[3] The Complaint, at times, treats the alleged misstatements as projections regarding the future rather than statements of present fact. (See ¶¶ 4, 18, 19.) To the extent the Court interprets any of the alleged misstatements as future-oriented, they are forward-looking, as explained in Section I.C.4.c of Defendants' motion to dismiss.

| CATEGORY 1: RISK STATEMENTS[2] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement Exactly as Set Out in the Complaint | ¶ | Not False/ Misleading | Forward-Looking[3] | Reason/ Opinion | Puffery |
| 2 | "The 2023 Proxy also emphasized the significance of "ESG matters" to the Board's risk oversight and described the allocation of oversight of those matters throughout the Board and its committees:<br><br>**Sustainability & ESG**<br>We engage with a diverse group of stakeholders around the world, including the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who make our work possible. Their perspectives are one of a variety of factors we consider as we analyze which ESG matters to prioritize in determining and evaluating our sustainability strategy . . . . Given the breadth of ESG matters for a company of our size and scale, oversight of those issues is allocated throughout the Board and its Committees:<br><br>**Board**<br>• Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)<br>• Sustainability and ESG risks (through oversight of our business strategy and top enterprise risks)<br>• Reputation management<br>• Crisis management and response<br><br>***<br>**Audit & Risk Committee**<br>• Supply chain ESG matters, including vendor human capital and responsible sourcing practices<br><br>***<br>**Governance & Sustainability Committee**<br>• Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)<br><br>***<br>• Social and political issues and risks not allocated to other Committees<br>• Philanthropy and community engagement<br>• Policies and practices regarding public policy advocacy and political activities<br><br>2023 Proxy at 15-16." | 105 | X | X | | X |

| CATEGORY 1: RISK STATEMENTS[2] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement Exactly as Set Out in the Complaint | ¶ | Not False/ Misleading | Forward-Looking[3] | Reason/ Opinion | Puffery |
| 3 | "The 2023 Proxy also described the allocation of "ESG matters"-oversight to Target's management, including to "instill ESG-related priorities into our business operations": <br><br> At the management level, our ESG matters are led and coordinated by our Senior Vice President, Corporate Responsibility who reports to a member of our Leadership Team and regularly engages with the Governance & Sustainability Committee and the full Board. The Senior Vice President, Corporate Responsibility is responsible for: <br><br> • conducting regular priority assessments to determine the topics of most significance to our stakeholders; <br> • collaborating with our Leadership Team to instill ESG-related priorities into our business operations, including product design and development, sourcing and supply chain operations, human capital management, and our new store development; and <br> • developing ESG-related goals and managing our ESG data, measurement, and reporting. <br><br> 2023 Proxy at 16." | 109 | X | X | | X |
| 4 | "In language substantially identical to the 2023 Proxy, the 2022 Proxy described the Governance & Sustainability Committee's oversight as follows: <br><br> **Governance & Sustainability Committee** <br> • Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting) <br> *** <br> • Social and political issues and risks not allocated to other Committees <br> • Philanthropy and community engagement <br> • Policies and practices regarding public policy and political activities <br><br> 2022 Proxy at 16." | 111 | X | X | | X |

| CATEGORY 2: REASON STATEMENTS[4] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement Exactly as Set Out in the Complaint | ¶ | Not False/ Misleading | Forward-Looking | Reason/ Opinion | Puffery |
| 5 | "The 2022 Proxy and 2023 Proxy both communicated that "the Board prefers to maintain the flexibility to determine which leadership structure best serves *the interests of Target and our shareholders*." 2022 Proxy at 10; 2023 Proxy at 10." | 182 | X | X | X | X |
| 6 | "The 2022 Proxy and 2023 Proxy also stated that the Board, through its Audit & Risk Committee, would, with respect to conflicted transactions between Target and its directors or executive officers, act to "prohibit any transaction it determines to be inconsistent with the interests of Target and its shareholders." 2022 Proxy at 17; 2023 Proxy at 18." | 183 | X | X | X | X |
| 7 | "The 2022 Proxy and 2023 Proxy stated that the Board's capital allocation strategy "[f]ully invest[s] in opportunities to profitably grow our business, create sustainable long-term value, and maintain our current operations and assets." 2022 Proxy at 17; 2023 Proxy at 17." | 184 | X | X | X | X |

[4] In paragraph 112 of the Complaint, Plaintiff groups the Reason Statements together under the following umbrella: "[T]he 2022 Proxy and 2023 Proxy each falsely and misleadingly stated that the Board . . . (ii) adopted ESG and DEI mandates as a means of increasing shareholder returns . . . ." (¶ 112.)

| CATEGORY 3: COMPENSATION STATEMENTS[5] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement Exactly as Set Out in the Complaint | ¶ | Not False/ Misleading | Forward-Looking | Reason/ Opinion | Puffery |
| 8 | "The 2023 Proxy outlined Target's "Executive compensation guiding principles," which provided, in full:<br><br>We believe executive compensation should be *directly linked to performance and long-term value creation for our shareholders*. With that in mind, three principles guide our compensation program:<br><br>• Deliver on our pay for performance philosophy in support of our strategy.<br>• Provide a framework that encourages *outstanding financial results* and shareholder returns over the long-term.<br>• Attract, retain, and motivate a premier management team to sustain our distinctive brand and its competitive advantage in the marketplace.<br><br>2023 Proxy at 39. The 2023 Proxy further elaborated on Target's "long-standing belief that our executive compensation should directly reflect our organization's performance *with substantial emphasis on creating long-term value for our shareholders. Id.* Target also attested that "[t]he pay programs described throughout [the 2023 Proxy] align with our pay for performance philosophy and are structured based on financial and operational performance and shareholder outcomes." *Id.* at 38." | 195 | X | X | X | X |

---

[5] In paragraph 112 of the Complaint, Plaintiff groups the Compensation Statements together under the following umbrella: "[T]he 2022 Proxy and 2023 Proxy each falsely and misleadingly stated that . . . (iii) Target's executive compensation plans aligned executives' incentives with maximizing shareholder value." (¶ 112.)

| CATEGORY 3: COMPENSATION STATEMENTS[5] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement Exactly as Set Out in the Complaint | ¶ | Not False/ Misleading | Forward- Looking | Reason/ Opinion | Puffery |
| 9 | "Under the heading "Pay for performance," a footnote described that Target's executive compensation included a component ambiguously (and innocuously) labeled "STIP" (an acronym the 2023 Proxy never defines, but which presumably stands for "Short Term Incentive Plan"). 2023 Proxy at 39.  The 2023 Proxy elaborated on the STIP component of executive compensation in a text box that followed immediately below this footnote, labeled with the subheading "How annual CEO pay is tied to performance": <br><br> The following pay elements are performance-based and represent a significant percentage of Annual TDC: <br><br> • STIP – Payouts range from 0% to 200% of goal depending on Sales, Incentive Operating Income, and the assessment of the team scorecard. <br><br> *Id.* at 40." | 199 | X | X | | |
| 10 | "In a following section under the heading "Incentive measures and actual performance," the 2023 Proxy further provided: "Our STIP is based on a combination of absolute *financial goals* and progress made toward key strategic priorities."  [2023 Proxy] at 41." | 200 | X | X | | X |
| 11 | "Tables accompanying this section and others provided further that the "Team scorecard" component of "STIP" receives a 33% "Weight." [2023 Proxy] at 41, 43." | 201 | X | X | | |
| 12 | "The 2022 Proxy stated the same "guiding principles" for executive compensation, including to "encourage[] outstanding financial results and shareholder returns over the long-term." 2022 Proxy 40." | 207 | X | X | | X |
| 13 | "The 2022 Proxy expressed Target's "long-standing belief that our executive compensation should directly reflect our organization's performance with substantial emphasis on the creation of long-term value for our shareholders." [2022 Proxy] at 37." | 208 | X | X | X | X |

| # | Statement Exactly as Set Out in the Complaint | ¶ | Not False/ Misleading | Forward-Looking | Reason/ Opinion | Puffery |
|---|---|---|---|---|---|---|
| **CATEGORY 3: COMPENSATION STATEMENTS**[5] | | | | | | |
| 14 | "The 2022 Proxy also stated that "[t]he pay programs described throughout our CD&A align with our pay for performance philosophy and are structured based on financial and operational performance and shareholder outcomes." [2022 Proxy] at 35." | 209 | **X** | **X** | | **X** |