## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

BRIAN CRAIG, CAROL BOWE, INSPIRE ADVISORS, LLC, STEVEN COOK, AND LAURA THOMPSON,

       *Plaintiffs*,

v.

TARGET CORPORATION, BRIAN C. CORNELL, DAVID P. ABNEY, DOUGLAS M. BAKER, JR, GEORGE S. BARRETT, GAIL K. BOUDREAUX, ROBERT L. EDWARDS, MELANIE L. HEALEY, DONALD R. KNAUSS, CHRISTINE A. LEAHY, MONICA C. LOZANO, GRACE PUMA, DERICA W. RICE, and DMITRI L. STOCKTON,

       *Defendants*.

No.: 2:23-cv-599-JLB-KCD

## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFFS' AMENDED COMPLAINT

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................. 2

    A.    Target Has Long Publicly Embraced DEI and ESG, While Warning Investors About the Risk of Backlash from Some Stakeholders. ................................................................... 2

        1.    Backlash to Target's Public Support Has Been Widely Reported. .......................................................... 3

        2.    Target Has Consistently Warned Investors of Potential Risks. ................................................................. 4

    B.    Shareholders—Including Plaintiffs—Knew About the Risks, Warned Target About Them, and Purchased Target Shares Anyway. .......................................................................... 4

    C.    The Five Categories of Alleged Misstatements Are Truthful. ............... 5

        1.    The Risk Warnings Clearly Warned Investors About Potential Negative Reactions to ESG/DEI Initiatives, Including Boycotts. .................................................... 5

        2.    The Oversight Statements Accurately Described Delegation of Oversight Responsibilities. ................................... 7

        3.    The Value Statements Accurately Described Various Principles and Policies; They Did Not Mention ESG/DEI Mandates. ................................................................. 8

        4.    The Compensation Statements Clearly Disclosed that Progress on Diversity Goals Was a Component of Executive Compensation. ........................................ 9

        5.    The Backlash Statements on May 24, 2023 Accurately Described the Backlash, Including Threats and Target's Merchandising Changes. ........................................ 9

    D.    None of the Alleged Misstatements Caused Artificial Price Inflation. ......................................................................... 11

1.  Target's Stock Price Is Not Linked to Any Corrective Disclosure. ...................................................... 11

2.  After the "Truth" Was Revealed, Shareholders Discussed the 2023 Pride Collection and Backlash—and Reelected the Board Anyway ........................................................ 12

3.  In August 2023, Target Announced Q2 Earnings Addressing Negative Reactions to the 2023 Pride Collection, and Its Stock Rose in Response. ........................... 13

ARGUMENT ................................................................... 15

I.  PLAINTIFFS' SECTION 10(B) CLAIM SHOULD BE DISMISSED ....... 15

A.  The AC Fails To Plead Material Misstatements or Omissions. .......... 16

1.  Plaintiffs Fail To Plead Falsity of The Risk Warnings. ............. 17

2.  Plaintiffs Fail To Plead Falsity of Oversight Statements. .......... 24

3.  Plaintiffs Fail To Plead Falsity of the Value Statements. ......... 27

4.  Plaintiffs Fail To Plead Falsity of the Compensation Statements. ................................................................. 30

5.  Plaintiffs Fail To Plead Falsity of the Backlash Statements. ..... 32

B.  The AC Fails to Plead a Strong Inference of Scienter. ...................... 33

1.  Plaintiffs Fail To Plead a Strong Inference of Scienter as to Cornell. ................................................................. 34

2.  Plaintiffs Fail To Plead a Strong Inference of Scienter as to Target. .................................................................... 39

C.  The AC Fails To Plead Loss Causation. .......................................... 40

1.  The 2023 Pride Collection Backlash Did Not Cause Cognizable Losses. ................................................. 40

2.  The Q2 2023 Earnings Call Did Not Cause Cognizable Losses. ................................................................... 44

II.  PLAINTIFFS' SECTION 14(A) CLAIM SHOULD BE DISMISSED ....... 46

A.    The AC Fails To Plead a Strong Inference of Scienter As to Defendants. ................................................................... 47

B.    The AC Fails To Plead Transaction or Loss Causation. .................... 48

CONCLUSION ................................................................. 50

LOCAL RULE 3.01(g) CERTIFICATION ........................................ 50

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013),
   *aff'd*, 556 F. App'x 93 (2d Cir. 2014)............................................................20, 21

*Barr v. Matria Healthcare, Inc.*,
   324 F. Supp. 2d 1369 (N.D. Ga. 2004)...............................................................33

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988).......................................................................................16, 21

*Bhatt v. Tech Data Corp.*,
   2018 WL 6504375 (M.D. Fla. Dec. 11, 2018) ....................................................17

*Bondali v. YumA Brands, Inc.*,
   620 F. App'x 483 (6th Cir. 2015) .......................................................................22

*Borochoff v. GlaxoSmithKline PLC*,
   2008 WL 2073421 (S.D.N.Y. May 9, 2008),
   *aff'd sub nom. Avon Pension Fund v. GlaxoSmithKline PLC*, 343
   F. App'x 671 (2d Cir. 2009) ...............................................................................38

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) ...........................................................................3

*California Public Employees' Retirement System v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ..................................................................26, 33, 46

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) ...................................................................*passim*

*Castaneda v. Amazon.com, Inc.*,
   2023 WL 4181275 (N.D. Ill. June 26, 2023).......................................................32

*Chen v. China Green Agric. Inc.*,
   2022 WL 3868111 (S.D.N.Y. Aug. 30, 2022),
   *aff'd*, 2023 WL 8599368 (2d Cir. 2023)...............................................................42

v

*In re Chicago Board Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845 (N.D. Ill. 2020), *aff'd sub nom. Barry v. Cboe Glob. Markets, Inc.*, 42 F.4th 619 (7th Cir. 2022)................................................................37

*Chiarenza v. IBSG Int'l, Inc.*, 2010 WL 3463304 (S.D. Fla. Sept. 2, 2010) ......................................................47

*In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106 (Del. Ch. 2009) ...........................................................27

*City of Pontiac General Employees' Retirement System v. Schweitzer-Mauduit Intern, Inc.*, 806 F. Supp. 2d 1267 (N.D. Ga. 2011) ...............................................................39

*Durgin v. Mon*, 415 F. App'x 161 (11th Cir. 2011) .....................................................47

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010)...........................................................*passim*

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783 (11th Cir. 2010) .............................................46, 48, 49

*In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008) ..............................................25

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282 (11th Cir. 2011) .................................................42, 44

*Garber v. Legg Mason, Inc.*, 347 F. App'x 665 (2d Cir. 2009) ......................................................21

*Garcia v. J2 Glob., Inc.*, 2021 WL 1558331 (C.D. Cal. Mar. 5, 2021)..........................................32

*Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006) .................................................5, 34

*General Electric Co. v. Cathcart*, 980 F. 2d 927 (3d Cir. 1992) ..............................................................49

*In re Greenlane Holdings, Inc. Sec. Litig.*,
  511 F. Supp. 3d 1283 (S.D. Fla. 2021) ................................................................20

*Guo v. Mahaffy*,
  2020 WL 5798531 (D. Colo. Sept. 29, 2020) .....................................................24

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002) ................................................................................21

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) .............................................................................20

*Hattaway v. Apyx Med. Corp.*,
  2023 WL 4030465 (M.D. Fla. June 15, 2023) .........................................17, 20, 21

*Henningsen v. ADT Corp.*,
  161 F. Supp. 3d 1161 (S.D. Fla. 2015),
  *aff'd sub nom. IBEW Loc. 595 Pension & Money Purchase
  Pension Plans v. ADT Corp.*, 600 F. App'x 850 (11th Cir. 2016) .....................24

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
  2015 WL 4469143 (D.N.J. July 22, 2015) .....................................................37, 38

*In re Home Loan Servicing Sols., Ltd. Sec. Litig.*,
  2016 WL 10592320 (S.D. Fla. June 6, 2016) ......................................................46

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012) .............................................................................44

*Indiana Public Retirement System v. Pluralsight, Inc.*,
  45 F.4th 1236 (10th Cir. 2022) ......................................................................22, 23

*In re Initial Pub. Offering Sec. Litig.*,
  399 F. Supp. 2d 298 (S.D.N.Y. 2005),
  *aff'd sub nom. Tenney v. Credit Suisse First Bos. Corp.*, 2006 WL
  1423785 (2d Cir. May 19, 2006) .........................................................................43

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
  564 U.S. 135 (2011) .............................................................................................16

*Rubenstein ex rel. Jefferies Fin. Grp. Inc. v. Adamany*,
  2023 WL 6119810 (2d Cir. Sept. 19, 2023) ........................................................49

*Kadel v. Flood*,
427 F. App'x 778 (11th Cir. 2011) ....................................................40

*Karth v. Keryx Biopharms., Inc.*,
6 F.4th 123 (1st Cir. 2021)...........................................................24

*Knurr v. Orbital ATK, Inc.*,
272 F. Supp. 3d 784 (E.D. Va. 2017) ........................................37, 48

*Lee v. Frost*,
2021 WL 3912651 (S.D. Fla. Sept. 1, 2021)........................27, 32, 46

*MacPhee v. MiMedx Grp., Inc.*,
73 F.4th 1220 (11th Cir. 2023) ..........................................40, 41, 42, 45

*Malin v. Ivax Corp.*,
17 F. Supp. 2d 1345 (S.D. Fla. 1998),
*aff'd*, 226 F.3d 647 (11th Cir. 2000).................................................37

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
543 F. Supp. 3d 96 (D. Md. 2021),
*aff'd*, 31 F.4th 898 (4th Cir. 2022)...............................................17, 22

*McDowell v. Bracken*,
317 F. Supp. 3d 1162 (S.D. Fla. 2018),
*aff'd*, 794 F. App'x 910 (11th Cir. 2019) ........................................48

*McDowell v. Bracken*,
794 F. App'x 910 (11th Cir. 2019) ..................................................50

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005) ...........................................................43

*In re Metris Cos., Inc. Sec. Litig.*,
428 F. Supp. 2d 1004 (D. Minn. 2006)............................................35

*Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr. v. Welbilt, Inc.*,
2020 WL 905591 (M.D. Fla. Feb. 6, 2020)...........................38, 47, 48

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ................................................*passim*

*Milazzo v. The First Liberty Ins. Corp.*,
   2021 WL 5843073 (M.D. Fla. Dec. 9, 2021) ....................................................16

*Miyahira v. Vitacost.com, Inc.*,
   2011 WL 13136262 (S.D. Fla. Dec. 8, 2011)...................................................39

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) ...............................................................*passim*

*In re Mylan N.V. Sec. Litig.*,
   2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023)...................................................43

*In re New Energy Sys. Sec. Litig.*,
   66 F. Supp. 3d 401 (S.D.N.Y. 2014) ...............................................................44

*In re Ocwen Fin. Corp. Sec. Litig.*,
   2017 WL 11680454 (S.D. Fla. June 14, 2017)..................................................33

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension
   Fund*,
   575 U.S. 175 (2015)...............................................................................28, 31, 32

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ............................................................................44

*Owens v. Jastrow*,
   789 F.3d 529 (5th Cir. 2015) ....................................................................37, 48

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
   297 F.3d 1182 (11th Cir. 2002) .......................................................................15

*In re Paypal Holdings, Inc. S'holder Deriv. Litig.*,
   2018 WL 466527 (N.D. Cal. Jan. 18, 2018).....................................................49

*In re PetroChina Co. Ltd. Sec. Litig.*,
   120 F. Supp. 3d 340 (S.D.N.Y. 2015) ..............................................................27

*Philadelphia Financial Mgmt. of S.F., LLC v. DJSP Enterprises, Inc.*,
   572 F. App'x 713 (11th Cir. 2014) ...................................................................32

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) .......................................................................28, 33

*Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings
Inc.*, 2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017),
*aff'd*, 735 F. App'x 11 (2d Cir. 2018)............................................................17, 21

*Raul v. Rynd*,
929 F. Supp. 2d 333 (D. Del. 2013)....................................................................31

*In re Rhodia S.A. Sec. Litig*,
531 F. Supp. 2d 527 (S.D.N.Y. 2007) ..........................................................43, 44

*Sapssov v. Health Mgmt. Assocs., Inc.*,
608 F. App'x 855 (11th Cir. 2015) ....................................................................40

*Smallen v. W. Union Co.*,
2019 WL 1382823 (D. Colo. Mar. 27, 2019),
*aff'd*, 950 F.3d 1297 (10th Cir. 2020)...............................................................23

*In re Spectrum Brand. Inc. Sec. Litig.*,
461 F. Supp. 2d 1297 (N.D. Ga. 2006)..........................................................26, 27

*In re Security Capital Assurance Ltd. Sec. Litig.*, 729 F. Supp. 2d 569
(S.D.N.Y. 2010).............................................................................................43, 44

*Simeone v. Walt Disney Co.*,
302 A.3d 956, 971 (Del. Ch. 2023) ...................................................................30

*Teachers' Retirement System of Louisiana v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ..............................................................................16

*In re Technical Chemicals Sec. Litig.*,
2000 WL 1222025 (S.D. Fla. July 3, 2000) ......................................................38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).........................................................................3, 15, 34

*In re The Home Depot, Inc. S'holder Deriv. Litig.*,
223 F. Supp. 3d 1317 (N.D. Ga. 2016)...............................................................46

*Thompson v. RelationServe Media, Inc.*,
610 F.3d 628 (11th Cir. 2010) ...........................................................................39

*In re Tupperware Brands Corp. Sec. Litig.*,
2023 WL 5091802 (11th Cir. Aug. 8, 2023) ......................................................39

*U.S. v. Millennium Physician Grp.*,
  2023 WL 2022232 (M.D. Fla. Feb. 15, 2023) ...................................................47

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991) ...................................................................................28, 50

*West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
  2008 WL 4838671 (D. Colo. Nov. 6, 2008) ......................................................46

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017) .......................................................................22, 23

*Hastey ex rel. YRC Worldwide, Inc. v. Welch*,
  449 F. Supp. 3d 1053 (D. Kan. 2020) ...............................................................49

**Statutes**

15 U.S.C. § 78u-4(b) ...................................................................................................34

15 U.S.C. § 78u-5(c) ...................................................................................................22

**Other Authorities**

17 C.F.R. § 229.105(b) ...............................................................................................20

Defendants respectfully move this Court for an Order dismissing the action with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## INTRODUCTION

In their Amended Complaint ("AC"), Plaintiffs accuse Defendants of securities fraud concerning statements Target Corporation ("Target") made with respect to ESG (environmental, social, and governance) and DEI (diversity, equity, and inclusion) initiatives.  Specifically, Plaintiffs allege that Target's 2021 and 2022 SEC filings did not warn investors of the risk of consumer boycotts from backlash against Target's ESG/DEI initiatives, including its 2023 Pride Collection.  This theory fails for many reasons; most fundamentally: Target *repeatedly* warned investors of the risk, and Plaintiffs *concede* that they knew of that risk, and even warned Target about it.  Target shareholders could not have been materially misled by an alleged failure to tell them what Plaintiffs admit they already knew.  Because Plaintiffs' grievance is, at bottom, not with any supposed lies in Target's disclosures, but with Target's business judgment, they fail to plead almost every element of their claims under Sections 10(b) and 14(a) of the Securities Exchange Act of 1934.

To plead a Section 10(b) claim, a plaintiff must allege, among other things: (1) a material misrepresentation or omission (i.e., "falsity"); (2) scienter; and (3) loss causation.  Section 14(a) claims that sound in fraud, like this one, must plead each of

---

[1] Defendants have separately moved to transfer this action to the District of Minnesota.  (*See* Dkt. 68.)  Defendants respectfully request the Court decide the Motion to Transfer prior to addressing this motion; transfer would obviate the need for this Court to rule on this motion to dismiss.

these elements too.  And because Section 14(a) is about protecting shareholder votes, a plaintiff must further plead that the items voted on directly caused the alleged harm.

These elements are also subject to heightened and exacting pleading standards, which were created by Congress to prevent abuses of securities litigation that risked harming the entire U.S. economy.  Specifically, pleading falsity requires the identification of specific statements (not inferences or interpretations) and alleging particularized *facts* (not speculation) showing how each alleged misstatement was materially false or misleading.  Pleading scienter also requires identifying *facts* and further requires that those facts generate a "strong inference"—at least as compelling as any opposing inference—of fraudulent intent.

The AC fails to plead falsity, scienter, and loss causation with respect to each alleged misstatement.  It also fails to plead Section 14(a) transaction or loss causation. These failures are unsurprising because ultimately what Plaintiffs are unhappy with is Target's business judgment about merchandising.  But disagreeing with Target's business judgment does not give rise to an actionable claim under the securities laws. The Court should thus dismiss the AC with prejudice.

## BACKGROUND

### A. Target Has Long Publicly Embraced DEI and ESG, While Warning Investors About the Risk of Backlash from Some Stakeholders.

As part of its strategy to drive long-term growth, Target has, for many years, publicly affirmed its commitment to ESG/DEI initiatives.  (*See* Ex. A at 2, 7; Ex. B at 2, 8; Ex. G.)  As part of that commitment, Target offers merchandise to its diverse

customer base, including (for over a decade) LGBTQ+ pride-themed merchandise in connection with Pride Month around the month of June ("Pride Collections"). (*See* Ex. E; ¶¶[2]9, 135, 144; Ex. E.) Target has also repeatedly stated publicly its support for the LGBTQ+ community. (*See, e.g.*, ¶144.)[3]

### 1. Backlash to Target's Public Support Has Been Widely Reported.

From the outset, Target's annual Pride Collections have inspired both public support and backlash, including public calls for boycotts. (*See* ¶¶165-67, 181-83 (backlash to Target's 2012, 2018, and 2021 and 2022 Pride Collections, respectively).)

Target has, likewise, received both praise and backlash for other actions it has taken in support of the LGBTQ+ community. For example, in 2016, after Target announced that it would permit customers to use the bathroom that corresponds with their gender identity in response to North Carolina's transgender bathroom ban, pro-LGBTQ+ groups "rallied around" Target in support (¶148), while others (including Plaintiffs[4]) pledged to boycott Target (¶¶172-74).

---

[2] References to "¶" are to the Amended Complaint (Dkt. 52) (the "AC"). References to "Ex." are to the exhibits to the declaration of Alexander Rodney, executed [January 26, 2024]. Under the PSLRA, courts must consider the complaint in its entirety, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The exhibits cited herein consist of SEC filings, evidence on which Plaintiffs rely, and matters that are subject to judicial notice. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999). Unless otherwise indicated, citations are omitted, and emphasis is added.

[3] *See also, e.g.*, ¶9 ("Target adopted an early version of its Pride Month campaigns. . . in 2015."); ¶138 ("In August 2014, Target announced it had signed an amicus brief 'in support of marriage equality.'"); ¶141 (In 2015, Target publicly endorsed the federal Equality Act, stating that "Target proudly stands with the LGBT community"); ¶142 (In 2015, Target announced that "it would be 'deepening its longstanding support' of the Human Rights Campaign"); ¶178 (Target continued to embrace DEI after 2016 backlash to Target's response to North Carolina's transgender bill).

[4] Plaintiff Inspire Advisors LLC's CEO, Robert Netzly, posted on Facebook on May 5, 2016, encouraging a boycott of Target. (*See* Ex. H.)

### 2.  Target Has Consistently Warned Investors of Potential Risks.

Target has repeatedly warned investors about potential reputational risks posed by its involvement (or lack of involvement) in initiatives that reflect social or environmental stances, including LGBTQ+ issues.

For example, Target's 2018, 2019, and 2020 Annual Reports cautioned investors that Target's "continued success is dependent on positive perceptions of Target" and that "[n]egative reputational incidents" could "result in consumer boycotts" and "could adversely affect our business through lost sales."  (Ex. I at 5; Ex. J at 4; Ex. K at 5.)  Target further warned that one potential source of reputational harm that could cause boycotts was its "position or perceived lack of position on social, environmental, public policy or other sensitive issues," which "could harm [its] reputation with certain groups or guests."  (*Id.*)  The 2021 and 2022 Annual Reports further elaborated on these risks.  (*Infra* §C.1.)

### B. Shareholders—Including Plaintiffs—Knew About the Risks, Warned Target About Them, and Purchased Target Shares Anyway.

As the AC admits, shareholders "repeatedly warned Target that its ESG/DEI initiatives and LGBT activism would cause it to lose customers." (¶15.)  Indeed, the risks were so well known that Plaintiffs reached out to Target about them.  (*See* ¶33.)  Nonetheless Plaintiffs purchased Target stock.

Plaintiffs' earliest alleged purchases of Target stock were in November 2018 (¶33), after seven years of highly publicized Pride collections and continuing backlash from conservative groups in response to those collections and other initiatives,

including attempts to organize boycotts (*supra* §A.1).[5]  All other Plaintiffs purchased Target stock in 2022 and 2023 (*see* ¶¶31-32, 34-35), after another half decade of the same and following years of risk disclosures that identified the risk that Target's ESG/DEI initiatives could pose (*supra* §A.2).

**C. The Five Categories of Alleged Misstatements Are Truthful**.

The AC alleges five categories of alleged misstatements.  When considered in their totality, none are false or misleading.[6]

**1. <u>The Risk Warnings</u> Clearly Warned Investors About Potential Negative Reactions to ESG/DEI Initiatives, Including Boycotts**.

Target issued its 2021 Annual Report on March 9, 2022, and its 2022 Annual Report on March 8, 2023.  The AC alleges that the Annual Reports failed to disclose the specific risk of backlash to Target's ESG/DEI initiatives. (¶¶278-89.)  The Annual Reports themselves show otherwise.  Contrary to Plaintiffs' allegations, both reports specifically addressed reputational risks from Target's ESG/DEI initiatives.  In fact, the 2021 Annual Report *expanded* upon Target's prior warnings of the risks from its positions on ESG issues, additionally warning of risks that could arise due to its DEI positions:

> Our reputation is based in large part on perceptions, both about us and others with whom we do business . . . . Target's responses to crises and ***our position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I)***, and any perceived lack of transparency about those matters, ***could harm our reputation***.  While reputations may take decades to build, negative incidents

---

[5] Plaintiffs do not explain how Inspire, who purchased its stock over three years *before* the first alleged misstatement, has standing.  *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1267 (11th Cir. 2006).

[6] The alleged misstatements are listed in Annex A for ease of the Court's review.

involving us or others with whom we do business can quickly erode trust and confidence *and can result in consumer boycotts*, workforce unrest or walkouts, government investigations, or litigation. . . . *Negative reputational incidents could adversely affect our business and results of operations, including through lost sales*, loss of new store and development opportunities, or team member retention and recruiting difficulties.

(Ex. A at 7.)  Aside from that expansion specifying that the ESG positions that could result in "consumer boycotts" included Target's DEI positions, Target's risk disclosures in the 2021 Annual Report were virtually identical to the risk disclosure it made in each of the prior three years.

The 2022 Annual Report *further expanded* the scope of Target's disclosure of risk related to its positions on ESG/DEI policies.  Specifically, Target warned:

> [*S*]*takeholder expectations regarding environmental, social, and governance matters continue to evolve and are not uniform.* We have established, and may continue to establish, various goals and initiatives on these matters, *including with respect to diversity, equity, and inclusion topics.* We cannot guarantee that we will achieve these goals and initiatives. *Any failure, or perceived failure, by us to* achieve these goals and initiatives or to otherwise *meet evolving and varied stakeholder expectations could adversely affect our reputation* and result in legal and regulatory proceedings against us. *Any of these outcomes could negatively impact our results of operations and financial condition.*

(Ex. B at 8.)  Target's expanded language made clear that "stakeholders" had evolving and non-uniform positions on DEI and ESG issues.  Target has repeatedly defined "stakeholders" to include, among others, customers (which Target refers to as guests) and investors (i.e., stockholders).  (Exs. C at 15; D at 15; EE at 2.)  Target explained that it could face adverse reactions from those stakeholders based not only on a "failure, or perceived failure" to meet Target's ESG/DEI goals, but also as a result of failing to meet their "evolving and varied" expectations.  (Ex. B at 8.)  And as with Target's prior risk disclosures, Target specifically warned that "*consumer boycotts*" were

among the potential negative outcomes Target could suffer if it experienced reputational harm, including by failing to meet the expectations of stakeholders, which could impact Target's business, "including through lower sales." (*Id.*)

### 2. **The Oversight Statements** Accurately Described Delegation of Oversight Responsibilities.

In 2022 and 2023, in advance of the Annual Shareholder Meetings, Target mailed the 2022 and 2023 Proxies which each solicited votes in favor of the election of Target's Board of Directors (the "Board"), a "non-binding advisory" approval of Target's executive compensation plan, and a non-binding advisory rejection of a shareholder proposal, among other items. (Exs. C at 5; 67, D at 5, 68-69.)

The AC alleges that the Proxies misled investors regarding the Board's oversight of ESG/DEI-related risks (the "Oversight Statements"). But the Oversight Statements described the allocation of risk oversight amongst the Board and its committees (Exs. C at 15; D at 15); they did not guarantee that the Board or its Committees would perfectly identify and eliminate every possible risk.

One of the many types of risks that the Proxies stated the Board oversaw were risks related to ESG matters. (*See* Exs. C at 14-16; D at 14-16.) In addition, the Proxies explained that the Board delegated oversight of certain risks to various of its committees. (*Id.*) Specifically, the Board's Governance and Sustainability Committee (the "GSC") was responsible for overseeing "Social and political issues and risks not allocated to other Committees." (*Id.*) This allocation accurately reflects those in the respective Board Committee charters. (¶¶315-16.) Further, the Proxies accurately

reiterated reputational risks related to Target's ESG/DEI matters, including potential

boycotts, by attaching a copy of Target's Annual Reports.  (Exs. C at 71; D at 73.)

### 3. **The Value Statements Accurately Described Various Principles and Policies; They Did Not Mention ESG/DEI Mandates**.

Plaintiffs also allege that the Proxies contained three statements that

"represented that Target adopted ESG and DEI mandates to advance shareholder

value" (the "Value Statements").  (¶362.)  But the AC does not identify any statement

in either Proxy that makes that claim.  Nor do any of the statements cited by Plaintiffs

discuss or relate to ESG or DEI mandates in any way:

Plaintiffs first point to a statement that discussed the Board preference for

maintaining flexibility in Target's leadership structure, stating:

> *The Board prefers to maintain the flexibility to determine which leadership structure best serves the interests of Target and our shareholders based on the evolving needs of the company*.

(Exs. C at 10; D at 10.)  Then, Plaintiffs point to a statement regarding the Audit

& Risk Committee's evaluation of related party transactions, which stated:

> The Audit & Risk Committee must prohibit any transaction it determines to be inconsistent *with the interests of Target and its shareholders*.

(Exs. C at 17; D at 17.)  Finally, Plaintiffs point to a statement discussing the Board's

approach to capital allocation, which provided:

> Our disciplined and balanced approach to capital allocation is based on the following priorities, ranked in order of importance: (1) Investing in our business – Fully invest in *opportunities to profitably grow our business, create sustainable long-term value*, and maintain our current operations and assets . . . .

(*Id.*)  Plaintiffs do not allege that any of these statements as written are false.  Nor do

they allege how any of these statements relate to ESG/DEI mandates.

8

**4.** <u>**The Compensation Statements**</u> **Clearly Disclosed that Progress on Diversity Goals Was a Component of Executive Compensation**.

Plaintiffs also allege that the Proxies misstated that Target's executive compensation plan aligned with advancing shareholder value because it failed to disclose that executives' compensation incentivized pursuit of Target's ESG/DEI goals (the "Compensation Statements"). (¶379.) Plaintiffs specifically allege that the Proxies "failed to describe the STIP component of executive compensation with specificity or in connection to its executive compensation principles." (¶395.)

This again contradicts the plain language of the Proxies. Both clearly described the full framework for executive compensation (Exs. C at 40-47; D at 42-48) and how the Short-Term Incentive Plan ("STIP")[7] fit in that framework. It further disclosed that the STIP bonus included two factors, one of which included progress on DEI goals—the exact detail Plaintiffs allege was concealed. (Exs. C at 43; D at 44.) This was all set out clearly in a section titled "Compensation Discussion and Analysis," explaining Target's executive compensation structure and "long-standing belief" that executive compensation should reflect performance. (Exs. C at 33-52; D at 36-52.)

**5.** <u>**The Backlash Statements**</u> **on May 24, 2023 Accurately Described the Backlash, Including Threats and Target's Merchandising Changes**.

In May 2023, Target released its yearly LGBTQ+ Pride-themed collection (the "2023 Pride Collection"). (¶208.) Target's Pride collections had been subject to criticism in years past, but in 2023, certain groups reacted more strongly, and those

---

[7] Despite Plaintiffs' claim that the Proxies do not define the term STIP (¶384), it is defined in Appendix A to the 2022 and 2023 Proxies on page A-2.

groups' calls for a boycott gained more traction than in years prior (¶¶227-29), including by threatening Target employees (*see* ¶248).

On May 24, 2023, Target issued a statement addressing the backlash. (*Id.*) Target disclosed that "[s]ince introducing" the 2023 Pride Collection, Target had "experienced threats impacting our team members' sense of safety and well-being while at work." (*Id.*) As a result of the "volatile circumstances" created by the backlash, Target was "removing items that have been at the center of the most significant confrontational behavior." (*Id.*) That same day, Target's CEO, Brian Cornell, sent an internal employee email—which was later published by Business Insider—thanking them for their "patience and professionalism" and for "steadfastly representing [Target's] values" in the face of "angry, abusive and threatening calls" that can be "difficult and even frightening [] interactions." (¶251.) He also stated that Target decided to take unspecified actions "to keep our team safe" while continuing to "honor our commitment and connection to the LGBTQIA+ community." (*Id.*)

The AC alleges that these Backlash Statements, in which Cornell and Target stated that Target made changes to the 2023 Pride Collection out of concern for employees' sense of safety and wellbeing, were mere "pretext" to downplay the effects of the boycotts. (¶¶258, 305.) But Plaintiffs' own allegations demonstrate that the backlash included threats to Target and its employees. For example, the AC admits that customers called and emailed Target "accusing the company of 'grooming' and 'indoctrinating' kids" (¶255). As the AC acknowledges, the violence and threats

against Target's employees were also widely reported.[8]

**D. None of the Alleged Misstatements Caused Artificial Price Inflation**.

The AC alleges that "Target's common stock was artificially inflated as a direct result" of the alleged misstatements.  (¶431.)  Plaintiffs allege that this was shown by an alleged "sharp drop" in Target's stock price following the backlash revealing the truth allegedly concealed by the misstatements.  (¶433.)  But the AC has not pled when that revelation took place, let alone a proximate and sharp drop in Target's stock price.  And while the AC also alleges that the August 16, 2023 earnings call caused Target's stock to enter a seven-week slide (¶446), the facts show that Target's stock price rose in the days following that earnings call, and did not materially drop below its August 15, 2023 trading price until over a month later.  (Ex. O.)

**1.  Target's Stock Price Is Not Linked to Any Corrective Disclosure**.

The AC alleges that the release of the 2023 Pride Collection was *prima facie* evidence that the Board was not overseeing social and political risk  (¶351), and that the ensuing backlash revealed that Target's statements in the Annual Reports and Proxies were false and misleading (¶¶434-435).  But the AC does not allege *when* this "truth" was allegedly "revealed," i.e., when the 2023 Pride Collection was released or when the calls for consumer boycotts began.  Instead, the AC alleges that the drop

---

[8] *See, e.g.*, Ex. L (noting Target received "threats and transphobic commentary") (cited in ¶27); Ex. M (noting that "people emboldened by escalating homophobia and stigmatization of the LGBTQ+ community destroyed the displays and confronted store workers") (cited in ¶209); Ex. N (noting that "people have confronted workers in stores, knocked down Pride merchandise displays and put threatening posts on social media") (cited in ¶227).

occurred sometime during an unidentified period of "long-lasting and growing consumer boycotts" (¶434), with the stock decline spanning four weeks, from May 17, 2023 to June 14, 2023 (¶439). In support of this allegation, the AC points to a May 18, 2023 blog post indicating that "The Target boycott continues" and calling on readers to "join with the 1.57 million others who have pledged to boycott Target." (¶436; Ex. P.) The link readers were encouraged to click on to join the boycott leads to a webpage indicating that the boycott was "launched in April 2016." (Ex. Q.) The AC also points to a public statement and internal email from May 24, 2023, that respectively indicated that Target had been experiencing threats "[s]ince introducing this year's collection and that the actions being taken "follow[ed] many difficult days of deliberation." (¶¶248, 437; Exs. E; F.)

The date of the alleged "revelation" is important because, prior to May 17, 2023, Target's stock price actually rose. For example, on May 4, 2023, Target's stock price closed at $152.53. (Ex. O.) Over the next five trading days, it rose every day, closing on May 11, 2023, at $158.87. (*Id.*) The next week saw Target's stock price continue on an upward trajectory, closing at $160.96 on May 17, 2023. (*Id.*; ¶230.) It was not until after May 17, 2023, that Target's stock price began to gradually decline. (Ex. O.)

### 2. After the "Truth" Was Revealed, Shareholders Discussed the 2023 Pride Collection and Backlash—and Reelected the Board Anyway.

On June 14, 2023—at least one month after the 2023 Pride Collection was released and consumer backlash began, which the AC alleges "revealed" the long-known and disclosed risk of anti-ESG backlash—Target held its Annual Shareholder

Meeting.  (Ex. R.)  As the AC alleges, given the intense focus on the backlash from the 2023 Pride Collection at the time, the Board's oversight of social and political issues and risks was a central issue of the directors' reelection.   (¶461.) Yet by an overwhelming majority, shareholders voted to re-elect the Board, approve the executive compensation plan, and reject an independent chairman proposal.  (Ex. R.)

### 3. In August 2023, Target Announced Q2 Earnings Addressing Negative Reactions to the 2023 Pride Collection, and Its Stock Rose in Response.

On August 15, 2023, Target's stock price closed at $125.05.  (Ex. O.)  The next morning, before the market opened, Target announced its Q2 earnings (which covered the period of the backlash), disclosing that Target's second quarter earnings and adjusted earnings per share were more than four times higher than one year before, but that second quarter comparable sales declined 5.4%.  (Ex. S.)

In an earnings call also held the morning of August 16, 2023, Cornell addressed the negative guest reaction to Target's 2023 Pride Collection, reiterating that Target "quickly made changes" in response to the "threats and aggressive actions that affected [Target's team members'] sense of safety and well being while at work."  (Ex. T at 4.) Building on Cornell's statements, Target's Chief Growth Officer, Christina Hennington, stated that Target "anticipated some of the headwinds at play throughout the second quarter, including the continued pullback in discretionary spending," but that "[o]ther headwinds were incremental, including the strong reaction to this year's Pride assortment."  (*Id.* at 5.)  She further stated that "the reaction is a signal for us to pause, adapt and learn so that our future approach to these moments balances

celebration, inclusivity and broad-based appeal." (*Id.* at 6.)

The AC alleges that Ms. Hennington's statement revealed that Target's removal and relocation of several pieces of the 2023 Pride Collection was not just to respond to employee threats (as Target had previously disclosed in May 24, 2023, as part of the Backlash Statements) (¶¶239, 445), and further revealed that Target had concealed its "true risk management[,] oversight procedures, and material risks to its value" (¶447). But her statement neither disputed (nor addressed at all) Cornell's reiteration of the fact—previously conveyed in the Backlash Statements—that Target's merchandise relocation decisions were driven by concerns about employee safety based on the threats Target had been receiving as part of the 2023 Pride Collection backlash, nor did it speak to the Board's management or oversight of risk.

The AC also alleges that following the Q2 Earnings Release and Call, Target's stock price eventually fell from $125.05 to $105.01 (¶446), demonstrating that it was a further "partial corrective disclosure" (AC IX.1, ¶434). But immediately following the Release, Target's stock rose, closing nearly 3% above the opening price at $128.75. (Ex. O.) It rose again the following day, closing at $130.11 and again the next day, closing at $131.21. (*Id.*) On Monday, August 21, 2023, Target's stock price reached a high of $131.74 (Ex. U) but then began to gradually decline for the next several months (Ex. O). Even during that decline, Target's stock traded near or above the levels prior to the Q2 Earnings Call for another month. (*See id.* (closing at $124.77 on September 14, 2023).) Following Target's Q3 Earnings Release the morning of November 15, 2023, Target's stock price jumped nearly 18%, back up to levels higher

than it had traded at in early August and has continued to rise since then.  (*Id.*)

## ARGUMENT

## I. <u>PLAINTIFFS' SECTION 10(B) CLAIM SHOULD BE DISMISSED</u>

To successfully plead securities fraud under Section 10(b), a plaintiff must adequately allege, among other things: (1) a material misrepresentation or omission; (2) made with scienter; and (3) loss causation.  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008).

Claims for securities fraud must satisfy three escalating pleading standards. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019).  As with any claim, Plaintiffs must satisfy the pleading requirements of Federal Rule of Civil Procedure 8 and may not rely on "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts."  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).  Plaintiffs must also satisfy "the heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special pleading requirements imposed by the Private Securities Litigation Reform Act of 1995."  *Carvelli*, 934 F.3d at 1317-18.  Rule 9(b) requires a complaint to state with particularity "(1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud."  *Id.* at 1318.

Further, Congress created the PSLRA's "exacting" requirements "[a]s a check against abusive litigation."  *Tellabs*, 551 U.S. at 313.  Specifically, the PSLRA elevates

the pleading standards in two ways. *First*, a complaint must specify "each statement alleged to have been misleading," and "the reason or reasons why the statement is misleading." *Carvelli*, 934 F.3d at 1318.[9] *Second*, "with respect to each act or omission alleged," the complaint must state "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," i.e., an "intent to defraud or severe recklessness on the part of the defendant." *Id.* Failure to meet any of the three standards requires a complaint's dismissal. *Id.*

Plaintiffs fail to plead facts showing that any of the alleged misstatements were materially false or misleading (*infra* §I.A), made with scienter (*infra* §I.B), or caused Plaintiffs to suffer losses (*infra* §I.C). Each of these failures requires dismissal.

**A. The AC Fails To Plead Material Misstatements or Omissions.**[10]

Plaintiffs' Section 10(b) claim should be dismissed because it fails to plead facts showing that any alleged misstatement was materially false or misleading.

As set forth above, Plaintiffs must plead falsity with specificity under the three escalating pleading standards. Plaintiffs cannot rely on speculation or conjecture. *Carvelli*, 934 F.3d at 1332; *see also Milazzo v. The First Liberty Ins. Corp.*, 2021 WL 5843073, at *3 (M.D. Fla. Dec. 9, 2021) (Rule 9(b) not satisfied by "conclusory

---

[9] These heightened standards "are not technical pleading rules by which unwary plaintiffs can be trapped; they go to the heart of separating claims based simply on market risks from claims based on actual fraud." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 189 (4th Cir. 2007).

[10] The same analysis applies to 14(a) claims. *See Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988). To the extent Defendants did not make a challenged statement, they cannot be held liable. *See Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135 (2011). Here, Ms. Puma was not a Target director when the 2022 Proxy was issued and thus cannot be held liable for statements made therein.

allegations") (Badalamenti, J.).

    **1. Plaintiffs Fail To Plead Falsity of The Risk Warnings**.

    Plaintiffs first allege that the Annual Reports were misleading because they omitted the risk of adverse customer and stockholder reactions to (i) Target's ESG/DEI mandates in general (¶¶281, 283, 287, 293, 296); and (ii) Target's Pride collections specifically (¶¶281, 283, 293, 297).[11]  Both allegations fail.

    a.  <u>The Risk Warnings Disclosed the Risk of Adverse Reactions.</u>

       i.  *Target Disclosed That Its ESG/DEI Initiatives Could Cause Adverse Reactions Which Could Impair Financial Results.*

    Plaintiffs allege that Target failed to disclose the known risk of adverse customer and stockholder reactions to its ESG/DEI mandates in general.  (¶¶281, 296.)  To the contrary, Target has disclosed that very risk since at least the 2018 Annual Report and further expanded upon those warnings in the Risk Warnings.  (*See supra* §§A.2, B.)  A securities fraud claim cannot be premised on the failure to disclose a risk that was actually disclosed.  *See Bhatt v. Tech Data Corp.*, 2018 WL 6504375, at *5 (M.D. Fla. Dec. 11, 2018); *Hattaway v. Apyx Med. Corp.*, 2023 WL 4030465, at *10 (M.D. Fla. June 15, 2023); *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24, 2017), *aff'd*, 735 F. App'x 11 (2d Cir. 2018).

---

[11] Plaintiffs also allege that the Risk Warnings were misleading because they failed to mention that the Board was not monitoring the known risk of adverse customer reactions.  (¶¶282, 298.)  But Plaintiffs fail to plead particularized facts demonstrating that the Board was not monitoring this risk.  (*See infra* §I.A.3.b.)  The AC also implies that investors were misled into believing that the Board would perfectly predict and address all possible reputational risk.  (*See, e.g.*, ¶¶350-51.)  But as a matter of law, a general warning of risk does not imply that no risk will ever materialize or that any particular steps are being taken to manage it.  *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 128 (D. Md. 2021), *aff'd*, 31 F.4th 898 (4th Cir. 2022).

**2021 Risk Warning.**  As the AC acknowledges (¶¶278, 284), the 2021 Risk Warning cautioned that Target's success is dependent on positive perceptions and that "broad access to social media makes it easy for *anyone* to provide public feedback that can influence [those] perceptions."  (Ex. A at 7.)  Target then specifically cautioned that its ESG/DEI positions "could harm [its] reputation" which could "result in consumer boycotts" and "adversely affect [Target's] business and results of operations." (*Id.*)  That warning *expanded* upon Target's prior warnings by specifying that ESG-related risks included DEI-related risks.  (*See supra* §C.1.)

Plaintiffs claim that this disclosure was misleading because it did not specify the risk of reputational harm due to backlash by customers and stockholders who disagree with Target's ESG/DEI positions.  (¶281.)  But Target did not limit the potential sources of reputational harm it warned about in reaction to its ESG/DEI initiatives. Instead, Target was explicit that *anyone* could generate publicity through social media that could cause such a harm.  A reasonable investor would understand that the 2021 Risk Warning warned of risks of adverse reactions from both those who oppose and support Target's ESG/DEI policies, particularly since reasonable investors were aware of the public history of anti-ESG boycotts documented in the AC (*supra* §A.2).

**2022 Risk Warning.**  Plaintiffs further claim that "[u]nlike the 2021 Annual Report, the 2022 Annual Report made no mention of 'ESG' or 'DEI' in its discussion of reputational risks that could lead to 'consumer boycotts'" (¶286) or of "any risks whatsoever caused by Target's ESG/DEI mandates."  (¶287.)  Yet in the very next

18

sentence of the AC, Plaintiffs *admit* that the 2022 Annual Report disclosed "risks stemming from Target's ESG/DEI mandates." (*Id.*) They quibble that Target limited its disclosure of those risks to a failure to "achieve" its "ESG/DEI mandates" (*id.*), but even that more limited claim is untrue.

The 2022 Risk Warning ***expanded*** on Target's prior disclosure. As before, the 2022 Risk Warning cautioned that Target's success is dependent on its positive reputation. (Ex. B at 8.) It also added a paragraph immediately thereafter expounding on specific ESG/DEI-related risks and cautioning that stakeholder expectations— including those of customers and shareholders (*supra* §C.1)—regarding ESG/DEI "continue to evolve and are not uniform." (*Id.*) Target then stated that it has "established, and may continue to establish, various [ESG/DEI] goals and initiatives" and warned that "***[a]ny failure***, or perceived failure" by Target to "***meet evolving and varied***" expectations of stakeholders through these goals and initiatives could harm Target's reputation and "negatively impact [Target's] results of operations and financial condition." (*Id.*)

      ii.  *Target Was Not Required to Call Out Specific Pride Collection Risk Because Its ESG/DEI Warnings Already Encompassed that Risk.*

Plaintiffs further contend that the Risk Warnings were misleading because Target did not specifically warn of the "known risk" of adverse reactions to Target's Pride Collections (¶¶281, 297).[12] But companies are not required to warn of every

---

[12] The AC misleadingly claims that other companies "disclosed when they engage in 'Pride Month' campaigns" (¶275), implying that those disclosures were made *in advance*. In fact, they were historical

19

specific risk. *See Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999). "[W]hen an investor has been warned of risks of a similar significance to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Id.* And where a disclosure covers a category of risk, it is not misleading simply because it does not identify the specific instance within that category that ultimately occurred.[13] *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013), *aff'd*, 556 F. App'x 93 (2d Cir. 2014); *see also Hattaway*, 2023 WL 4030465, at *11 (dismissing claim where "it [was] not clear that [a purported risk] was anything beyond (let alone materially beyond) what [d]efendants disclosed in combination with their general risk disclosures"). A complaint fails to state a claim "if no reasonable investor could have been misled about the nature of the risk when he invested." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002); *Hattaway*, 2023 WL 4030465, at *11.

Here, Target's ***repeated*** disclosure of the risk of adverse reactions in response to its ESG/DEI initiatives (*supra* §I.A.1.a.i) encompassed the *specific* risk of negative reactions to particular instances of those initiatives, including Target's annual Pride Collections. Indeed, Plaintiffs concede that the Pride Collections were part of Target's ESG/DEI initiatives. (AC at 22, 88; ¶¶61, 289.) Where investors were already aware

---

summaries of events that had already taken place. (*See* Ex. V (describing past Pride month); Ex. W (retrospective of move to virtual Pride month); Ex. X (describing prior year's Pride month).)

[13] This is consistent with Item 105, which requires concise explanations of risks, not picayune details regarding ways that risk might manifest. *See* 17 C.F.R. §229.105(b). The disclosures here, which described the *category* of applicable risk and were organized in compliance with Item 105 are not actionable. *See In re Greenlane Hldgs., Inc. Sec. Litig.*, 511 F. Supp. 3d 1283, 1314 (S.D. Fla. 2021).

of the risk of backlash to Target's Pride Collections (*supra* §B), there is no possibility they could have been misled by the Risk Warnings into thinking that those collections were exempt from the reference to ESG/DEI initiatives or that such risk did not exist. *See Bank of Am.*, 980 F. Supp. 2d at 579; *Halperin*, 295 F.3d at 359.

> b. Even If Target Had Failed to Warn of ESG/DEI Risks, Any Such Omission Would Not be Material as Shareholders Knew of Those Risks.

Even if Plaintiffs' misreading were correct, and the Risk Warnings had omitted the risk of negative reactions to Target's ESG/DEI initiatives, the AC would still fail to plead that the Risk Warnings were materially misleading.

An omission is material only if, in light of the facts existing at the time, a reasonable investor, exercising due care, would have been misled by it. *Carvelli*, 934 F.3d at 1317. In assessing if an investor would be misled, courts consider the "total mix" of information available to investors. *Basic*, 485 U.S. at 231. Thus, when evaluating risk disclosures, courts consider not only the disclosures themselves, but also "information already in the public domain and facts known or reasonably available to the shareholders." *La Quinta*, 2017 WL 4082482, at *5 (quoting *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009)). Where the allegedly undisclosed risk was publicly known, its omission is not actionable. *Carvelli*, 934 F.3d at 1321-22; *Hattaway*, 2023 WL 4030465, at *10.

Here, the AC is emphatic that investors—*including Plaintiffs*—were aware of the risk of backlash against Target's ESG/DEI initiatives, including Pride Collections. (*Supra* §B.) The AC expends 93 paragraphs documenting Target's public history of

supporting the LGBTQ+ community over the past decade and publicly known backlash to that support.[14]  Thus, reasonable investors were aware that Target's future ESG/DEI initiatives (including Pride Collections) carried backlash risk as well.

### c. The Risk Warnings Are Inactionable Forward-Looking Statements Because Plaintiffs Have Not Pled That Defendants Possessed Foreknowledge of the Backlash to the 2023 Pride Collection.

Finally, Plaintiffs contend that the Risk Warnings were misleading because Target and Cornell were "aware" that backlash to the 2023 Pride Collection was "likely" to occur.  (¶291.)  But the Risk Warnings are forward-looking statements subject to the PSLRA's statutory safe harbor, which renders forward-looking statements inactionable in various circumstances, including where plaintiffs fail to plead *actual knowledge* of falsity.  15 U.S.C. §78u-5(c)(1)(B); *Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (risk disclosures "are inherently *prospective* in nature").  Because humans cannot see the future, this is a difficult burden to meet.  Courts thus rarely find risk disclosures to be actionable.  *See Marriott*, 543 F. Supp. 3d at 128.  Consistent with the PSLRA safe harbor, risk disclosures are only actionable where they disclose as a potential risk an outcome that has already "materialized or [i]s virtually certain to occur." *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1255 (10th Cir. 2022).  In other words, risk disclosures are actionable only if plaintiffs show that the speaker *knew* that the disclosed *potential risk* was already occurring or virtually certain to occur.  *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 243 (3d Cir. 2017).

---

[14] *See* ¶¶14-15, 18-19, 33, 111-87, 194-97, 203, 276, 402-04, 414, 420.

Here, Plaintiffs do not and cannot contend that *at the time* the Risk Warnings were *issued*, on March 9, 2022, and March 8, 2023, Target or Cornell knew that backlash to the 2023 Pride Collection was occurring or was virtually certain to occur. The AC admits that backlash to the 2023 Pride Collection remained "two months away" when the 2022 Annual Report was issued. (¶¶284, 289.)  The AC does not allege Target or Cornell had any private, advanced knowledge of that backlash.

The AC also does not allege that Target or Cornell knew that backlash to the 2023 Pride Collection was virtually certain to occur.  It alleges only that they were "aware" that backlash was "***likely***" based on boycotts Target experienced in 2016 due to its response to North Carolina's transgender bathroom ban and prior backlash to previous Pride Collections.  (¶291.)  This falls far short of the required showing of *actual knowledge* of falsity.  *See Pluralsight*, 45 F.4th at 1255-56; *Smallen v. W. Union Co.*, 2019 WL 1382823, at *13 (D. Colo. Mar. 27, 2019) (plaintiffs failed to plead that it was a near certainty that risk would materialize), *aff'd*, 950 F.3d 1297 (10th Cir. 2020).

In any event, the existence of a particular reaction to a prior event does not show that a similar reaction to a later event is virtually certain to occur.  *See Williams*, 869 F.3d at 243 (past sales drop from ending distributor relationship did not by itself make future sales drop from terminating different distributor inevitable).  Here, the AC itself makes clear that backlash to the 2023 Pride Collection was far from inevitable.  Target released a Pride Collection every year between 2016 and 2023, several of which resulted in backlash, including calls to instigate boycotts (¶¶165, 182-85), but Plaintiffs do not allege that any impacted Target's sales or financial condition.  No alleged fact

shows Target or Cornell expected 2023 to be different.  *See Karth v. Keryx Biopharms., Inc.*, 6 F.4th 123, 139 (1st Cir. 2021) (that defendants experienced issues at time of risk disclosure did not mean risk was virtually certain to occur in the future).[15]

### 2. Plaintiffs Fail To Plead Falsity of Oversight Statements.

Plaintiffs allege that the Proxies misleadingly stated that "the Board monitored 'social and political issues and risks' arising from the company's ESG mandates" because Target allegedly did not monitor those risks or, at most, monitored only risk from one side of the political spectrum.  (¶¶307, 309.)  This fails for two reasons.

### a. Plaintiffs Mischaracterize the Content of the Oversight Statements.

Plaintiffs misleadingly allege that the Oversight Statements "communicated" that the Board oversaw "*any* material risk" (¶339) and "risks of all kinds" (¶360) related to Target's ESG/DEI mandates.  But statements are not false because Plaintiffs construe them to say something other than what they *actually* say.  *See Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1189 (S.D. Fla. 2015), *aff'd sub nom. IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 600 F. App'x 850 (11th Cir. 2016); *Guo v. Mahaffy*, 2020 WL 5798531, at *9 (D. Colo. Sept. 29, 2020) (courts must analyze "the proxy statement's explicit language, not what might be inferred from it").

Here, what the Oversight Statements actually refer to is the *allocation* of

---

[15] The AC attempts to address this by alleging that (1) the 2023 Pride Collection was "more extreme" than years prior (¶289) and (2) Target chose not to include certain merchandise it believed did not "fit" in the collection (¶292).  Both attempts fail.  *First*, the AC does not plead the contents of past Pride Collections and therefore fails to allege with particularity that the 2023 one was more extreme.  *Second*, Target's decision to exclude merchandise it believed would not be "a good fit" does not show that it knew backlash was certain to occur.  *Karth*, 6 F.4th at 139-40 (taking steps to address supply issues defeated allegations that defendants knew supply shortages were virtually certain to occur).

responsibilities for overseeing risk between the Board and its committees.  (*Supra* §§C.2, C.3.)   The Oversight Statements did *not* guarantee that the Board would perfectly monitor every conceivable risk.  *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008) (statement describing risk management program could not mislead investors into believing that company "had an effective compliance program that would root out any impropriety").   Moreover, Plaintiffs do not contend that the *allocation* of risk oversight set forth in the Oversight Statements is misleading.   Plaintiffs *admit* that the allocation described matches the respective Board Committee charters. (*See supra* §C.2; ¶¶315–16).   Plaintiffs thus fail to allege falsity of the Oversight Statements' plain language.   *See FBR*, 544 F. Supp. 2d at 359 (dismissing claim where no allegation that description of risk management program was false).

### b.   In Any Event, Plaintiffs Fail to Plead Particularized Facts Showing that the Board Failed To Oversee Social and Political Risks.

Plaintiffs' allegations also fail because they have not alleged any facts, let alone with particularity, showing that the Board was engaged in one-sided (or no) oversight. Instead, Plaintiffs contend that oversight was focused only on certain progressive groups because they allege Target engaged (i) with those groups and identified risks from failing to meet stakeholder expectations; and (ii) in certain merchandising decisions.   Neither shows what risks the Board oversaw or that they were one-sided.

### i.   *Engagement with Certain Stakeholders Does Not Evidence Insufficient or One-Sided Oversight of Political and Social Risks.*

First, Plaintiffs point to Target's public disclosure of its engagement with "stakeholders," which Plaintiffs define narrowly as only progressive groups.   (¶¶75,

346-47.)  Plaintiffs then claim that Target's engagement with these groups is not oversight of "social or political issues or risks" because, Plaintiffs speculate, the purpose of such engagement is to adopt ESG/DEI mandates regardless of the social or political risks they create for Target.  (¶347.)  But the fact that Target engages with certain groups says nothing about Target's oversight of risk.  Plaintiffs' speculation about the reasons for engaging with those groups is precisely what the PSLRA proscribes.  *See In re Spectrum Brand. Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1311 (N.D. Ga. 2006); *see also Cal. Pub. Empls.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 156 (3d Cir. 2004) (rejecting "inferences stemming from unparticularized allegations").

In any event, Plaintiffs' definition of "stakeholder" as "nonprofit activists and organizations" is ***contrary to the plain language of the Proxies*** (and Target's other disclosures), which define "stakeholders" as including customers and shareholders (*supra* §C.1), which Plaintiffs *concede* are the groups as to which Target should have been overseeing risk.  (¶346.)   Thus, oversight of risks related to stakeholders' expectations is consistent with the oversight that Plaintiffs allege Target promised.

ii.  *Merchandising Decisions Do Not Evidence Insufficient or One-Sided Oversight of Social and Political Risk.*

Second, Plaintiffs allege that "the uniquely controversial 2023 LGBT-Pride Campaign" is *prima facie* evidence of the Board's lack of oversight.  (¶351.) But, again, rather than pleading facts demonstrating that the Board failed to oversee risk, Plaintiffs speculate that the Board did not do so based solely on the *result* of certain business decisions.   Such speculation does not state a claim under the securities laws.

*See Spectrum Brands*, 461 F. Supp. 2d at 1311.[16]

The mere fact that Defendants knew about a risk is not evidence that they were not overseeing it.  *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 128 (Del. Ch. 2009) (knowledge of signs of current and future deterioration of market did not mean "the board's oversight mechanisms were inadequate").  Nor does the fact that Target released a collection that resulted in backlash show that the Board failed to *consider* risk associated with that decision.  Courts routinely reject these sorts of conclusory, post-hoc allegations.  *See, e.g.*, *Lee v. Frost*, 2021 WL 3912651, at *11-12 (S.D. Fla. Sept. 1, 2021) (absence of diverse members did not show company's diversity and anti-discrimination policies were false; showing of actual discrimination was required); *Arora v. HDFC Bank Ltd.*, 2023 WL 3179533, at *5-6 (E.D.N.Y. May 1, 2023) (internal control failure did not show prior statements regarding effectiveness of those controls were false); *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015) (similar).

### 3.  Plaintiffs Fail To Plead Falsity of the Value Statements.

Plaintiffs next allege that three statements (¶¶365-67) conveyed that Target adopted its ESG/DEI mandates to advance shareholder value.  (¶362.)  Plaintiffs say this was false because the mandates were adopted to advance "stakeholder" interests—which, again, Plaintiffs unilaterally define as progressive activists, whose interests

---

[16] Plaintiffs allege that Target had a campaign to ban conservative books, which they allege shows that the Board's oversight was one-sided.  (¶¶157-61, 358, 361.)  Plaintiffs fail to allege particularized facts showing that this "campaign" exists.  Nor does this allegation show any oversight failure.

Plaintiffs say are in conflict with shareholder value.  (¶¶346, 359, 369, 375, 378.)

Statements about *why* decisions were made are actionable only if they "misstate the speaker's reasons ***and also*** mislead about the stated subject matter."  *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095 (1991).  Meeting this standard is "no small task" given the requirement that plaintiffs plead particularized facts demonstrating falsity.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).  Here, Plaintiffs' allegations fail for two key reasons.

> a.  Plaintiffs Mischaracterize the Content of the Value Statements: They Do Not Mention ESG or DEI Mandates.

The AC claims that the Value Statements say that Target adopted ESG/DEI mandates to advance shareholder value (¶362), but the Value Statements do not *mention* ESG or DEI mandates at all.  (*Supra* §C.3.)  Moreover, the first two refer to the interests of the company *and* its shareholders (not solely shareholders) and the third does not even mention shareholders.  (*See id.*)  Statements are not false simply because Plaintiffs decide to misinterpret their meaning (*supra* §I.A.2.a) and ***Plaintiffs do not allege that any of these statements as written are false*** (*supra* §C.3).  Thus, they are not actionable.  *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 430 (2d Cir. 2023).

> b.  Plaintiffs Fail to Plead Facts Showing That ESG/DEI Mandates Were Adopted for Ulterior Reasons.

Plaintiffs have not alleged facts demonstrating that any Defendant pursued policies they believed were not oriented toward generating long-term shareholder value.  Instead, Plaintiffs rely solely on statements taken out of context, none of which support the inference that Target valued the expectations of non-shareholder

stakeholders over shareholder value.  To the contrary, those statements show that Target saw stakeholder engagement as a means to promote shareholder value.

*First*, Plaintiffs point to a 2019 Business Roundtable Statement of a Corporation signed by 181 CEOs, including Cornell ("BRT Statement") (¶69) and say this proves that Cornell committed "to manage Target in alignment with 'stakeholder' value" (¶70), which is "beyond what would be called for by shareholder value maximization" (¶69).  But, as noted in an article by corporate law scholars cited by the AC on this very point, BRT itself explains that rather than "abandoning shareholders," the BRT Statement reflects "that for ***corporations to be successful***, durable ***and return value to shareholders***, they need to consider the interests . . . of a wide range of stakeholders." (Ex. Z at 128 (cited in ¶69).)  Cornell's signature represents a commitment to ***pursue shareholder value*** by supporting Target's stakeholders.  (Ex. Y at 1.)

*Second*, Plaintiffs selectively quote from Cornell's statement that Target's DEI commitments were "the right thing for society," which they gloss as an "admission" that Target's ESG/DEI mandates were designed to serve "stakeholder" interests to the detriment of shareholders.  (¶¶369-70.)  But Cornell's full statement explains that DEI initiatives are "good business decisions" that have "***fueled much of our growth over the last nine years***," resulting in "***benefits for our shareholders***."  (¶404.)  In other words, Cornell explained how DEI initiatives *serve* shareholders.[17]

---

[17] Plaintiffs likewise interpret a statement by Target's Chief Diversity Officer, Kiera Fernandez, during a panel discussing DEI initiatives, as revealing that "Target's DEI goals *drove Target's business*" (¶372), which Plaintiffs interpret as an admission that she was acting contrary to shareholder interests.  But Fernandez spoke about the importance of integrating DEI "*in a way* that truly drives your business."

*Finally*, Plaintiffs assert that Target delegated implementation of its ESG/DEI mandates to officials with "disabling personal conflicts of interest," which Plaintiffs claim show the mandates were adopted for improper reasons. (¶375.) But ***Plaintiffs do not allege Target misled investors as to who implemented the mandates***. Nor do they identify any legally cognizable conflict. The only alleged "conflict" is service on the board or as treasurer of a non-profit. (¶376.)[18] But "[i]nvolve[ment] with a non-profit organization does not itself create a conflict." *Simeone v. Walt Disney Co.*, 302 A.3d 956, 971 (Del. Ch. 2023).

### 4. Plaintiffs Fail To Plead Falsity of the Compensation Statements.

Plaintiffs allege that the Proxies misrepresented that executive compensation plans were designed to align executives' incentives with maximizing shareholder value, but were instead "designed to substantially incentivize executives to pursue Target's DEI mandates." (¶379.) Plaintiffs allege that this was false because one factor in bonus compensation was progress on DEI goals. (¶383.) This claim fails.

The Compensation Statements are textbook opinion statements because they describe Target's beliefs. (Ex. D at 39 ("***We believe*** executive compensation should be directly linked to performance and long-term value creation for our shareholders.").) Opinion statements are actionable only if (1) the speaker did not hold the belief professed, (2) a fact supplied with the belief was untrue, or (3) they omit information

---

(¶¶87, 372.) In other words, Fernandez said that DEI initiatives create business growth, which means they promote shareholder interests.

[18] Plaintiffs' allegation that commitment to "racial equity" is a conflict is an illogical red herring. (¶377.) This case has nothing to do with race and committing to racial equity is not a conflict.

that makes the statement misleading to a reasonable investor. *Omnicare*, 575 U.S. at 185, 194. Even if the statements were averments that executive compensation was "directly linked to performance and long-term value creation for our shareholders" (¶380), Plaintiffs would still need to state with particularity how they were not so linked. *Carvelli*, 934 F.3d at 1318.

### a. The Compensation Statements Disclosed DEI Was a Component.

Plaintiffs cannot allege that the Proxies misled investors into believing that executive compensation did not factor progress on DEI goals because the ***Proxies disclosed just that***. (*Supra* §C.4.) Plaintiffs *admit* this. (*See* ¶383 ("[A] close reading of the 2023 Proxy reveals that substantial sums of executives' compensation . . . were based on Target's own internal and subjective assessment of executives' performance along DEI metrics.").) Because the Proxies disclosed the truth, Plaintiffs cannot claim they were misled. *See Raul v. Rynd*, 929 F. Supp. 2d 333, 344-45 (D. Del. 2013) (proxy not misleading as to whether the company had "a strict pay-for-performance policy" where it disclosed "five goals, of which 'pay for performance' is but one").

Plaintiffs try to escape this fact by claiming that the true disclosures were "[b]uried within multiple layers of the 2023 Proxy and scattered from its discussion of executive-compensation principles." (¶383.) But the relevant disclosure is right where a reasonable investor would expect Target to discuss executive compensation: in the section explaining "[o]ur framework for executive compensation." (*See supra* §C.4.) In any event, the Eleventh Circuit presumes that investors are aware of all company-disclosed facts. *See Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013).

### b. In Any Event, Plaintiffs Fail to Plead that Defendants Believed Compensation Was Misaligned with Shareholder Value.

Plaintiffs plead ***no facts*** showing Defendants believed there was a misalignment between the compensation plans and maximizing shareholder value. Plaintiffs thus cannot satisfy the strict pleading requirements of the PSLRA and *Omnicare.* 575 U.S. at 194; *see also Lee*, 2021 WL 3912651, at *12.

### 5. Plaintiffs Fail To Plead Falsity of the Backlash Statements.

Plaintiffs allege that the Backlash Statements offered "a false and misleading reason" for Target's removal of certain merchandise to downplay the risks and harms Target was facing because of the consumer boycotts. (¶300.) To recap, the Backlash Statements explained that Target received threats due to the backlash against the 2023 Pride Collection that impacted its employees' "sense of safety and well-being" and, in response, Target was making adjustments to its merchandise displays. (*Supra* §C.5.)

The AC asserts these statements were false because there were no threats to employee safety. (¶¶252-56, 258-59.) But the AC supports this only by reference to conclusory assertions and unsupported opinions by anonymous internet posters. (¶¶254, 256-58, 260-61.) Opinions are not the "specific facts" the PSLRA and Rule 9(b) require. *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enterprises, Inc.*, 572 F. App'x 713, 717 (11th Cir. 2014); *Castaneda v. Amazon.com, Inc.*, 2023 WL 4181275, at *8 (N.D. Ill. June 26, 2023) ("[A] list of anonymous and unsubstantiated user comments badly flunks Rule 9(b)."); *Garcia v. J2 Glob., Inc.*, 2021 WL 1558331, at *15 (C.D. Cal. Mar. 5, 2021) ("unsupported opinion" cannot "substitute for specific factual allegations");

*Barr v. Matria Healthcare, Inc.*, 324 F. Supp. 2d 1369, 1383 (N.D. Ga. 2004) (assertion of falsity did not make the statement false).  And the facts pled in the AC show the threats were real.[19]  The AC *admits* that customers called and emailed Target "accusing the company of 'grooming' and 'indoctrinating' kids." (¶255.)  The AC also cites articles detailing threats to Target and its employees.  (*See supra* n.8.)  True statements are not false or misleading.  *Philip Morris*, 89 F.4th at 430; *In re Ocwen Fin. Corp. Sec. Litig.*, 2017 WL 11680454, at *4 (S.D. Fla. June 14, 2017).

Plaintiffs also allege that retrospective statements acknowledging that backlash had occurred, and stating that Target planned to take steps in the future to mitigate backlash, "admitted" that the Backlash Statements were false. (¶¶262-68.)  But those supposed "admissions" reiterated what Target originally said—that employee safety and well-being drove Target's merchandise relocation decisions.  (*See* Ex. T at 4 ("[T]o protect the team in the face of these threatening circumstances, we quickly made changes . . . ."); Ex. AA ("We had to prioritize the safety of our teams. . . . And we made some changes.").)  That these "supposed 'admissions'" are "generally consistent with what Plaintiffs deem were Defendants' false statements and disclosures," shows that Plaintiffs' falsity allegations are "utterly without merit."  *Chubb*, 394 F.3d at 156; *see also Philip Morris*, 89 F.4th at 430.

### B.  The AC Fails to Plead a Strong Inference of Scienter.

Plaintiffs' Section 10(b) claim must also be dismissed because it fails to plead

---

[19] That a few of Target's 440,000 employees in its nearly 2,000 stores (Ex. B at 5, 15) may not have witnessed threats does not show that no employees did.  Plaintiffs' position is untethered from logic.

particularized facts supporting a strong inference that Cornell or Target acted with scienter. 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 323. To plead scienter, Plaintiffs must allege that Cornell and Target acted with an intent to deceive, manipulate or defraud, or with severe recklessness. *See Mizzaro*, 544 F.3d at 1238. Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations" that involve an "extreme departure from the standards of ordinary care, and that present a danger of misleading" investors. *Id.* The "inference of scienter must be more than merely plausible or reasonable," it must be "cogent and *at least as compelling as any opposing inference* one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Scienter must be pled with particularity; general, speculative, and conclusory allegations do not suffice. *Garfield v. NDC Health Corp.*, 466 F.3d 125, 1265 (11th Cir. 2006). Here, the AC's allegations rest entirely on speculation and cannot satisfy the PSLRA's exacting requirements.

### 1. Plaintiffs Fail To Plead a Strong Inference of Scienter as to Cornell.

Plaintiffs' scienter allegations as to Cornell are that he (i) had motive to mislead investors because of his compensation (¶399); (ii) knew he prioritized stakeholders over shareholders and was therefore aware that the Board did not oversee risk of backlash to the 2023 Pride Collection (¶¶400-01); and (iii) knew that the 2023 Pride Collection would cause backlash (¶¶402-08). Each theory fails.

#### a. Routine Compensation Cannot Support a Strong Inference of Scienter.

Plaintiffs first allege that Cornell had motive to mislead investors as to the risk of Target's ESG/DEI goals because his compensation was based in part on ESG/DEI

goals, which the 2023 Pride Collection served.  (¶399.)  But ordinary incentive compensation cannot establish scienter.  *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1275 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010); *In re Metris Cos., Inc. Sec. Litig.*, 428 F. Supp. 2d 1004, 1013 (D. Minn. 2006).  And the AC does not allege facts showing that the STIP's progress on diversity goals factor had anything to do with the 2023 Pride Collection.  (*See supra* §C.4.)  In any event, far more of Cornell's bonus was based on financial performance than progress on diversity goals.[20]  Thus, Cornell was not incented to boost diversity at the expense of financial performance, let alone to lie to shareholders about the risks of DEI initiatives.

### b. Cornell's Public Statements Regarding Stakeholders Do Not Show Knowledge that the Board Failed to Oversee Risk.

Plaintiffs next contend that Cornell *knew* that the Board failed to oversee risk related to Target's ESG/DEI initiatives based on certain public statements he made that use the term "stakeholders" years before any of the alleged misstatements.  (¶¶400-01.)  That contention is baseless, illogical conjecture and cannot show scienter.

*First*, Plaintiffs claim that Cornell's signing on to the BRT Statement in 2019 shows that "he and Target were committed to 'stakeholder' benefits" and that "Cornell knew that he, Target, and the Board would fail to oversee risks from groups excluded from Target's definition of 'stakeholders.'"  (¶400.)  This ignores that Target's definition of stakeholders *includes* customers and shareholders (*supra* §C.1) and that

---

[20] 67% was purely financial and the "Team Scorecard" weighted several financial factors, including market share performance and growth in same-day services.  (Ex. C at 43; Ex. D at 44.)

"*[g]enerating long-term value for shareholders*" was included in the five commitments of the BRT Statement.  (Ex. Y at 1.)  Nor does the BRT Statement involve any commitments to ESG/DEI policies or show that Cornell knew Target's Board was allegedly not overseeing risk.  It says nothing about risk oversight (or risk) at all.[21]

*Second*, Plaintiffs allege that Cornell's statement that "CEOs 'have to be the role models that drive change'" somehow shows that Cornell "was aware that he and Target's Board did not oversee risks of backlash to Target's ESG/DEI mandates." (¶401.)  This makes no sense.  *First*, that statement published in April 2021 related to the George Floyd protests, not Pride.  (¶401; Ex. BB.)  *Second*, that statement said nothing about ignoring risks.  (*Id.*)  And, even if it somehow revealed oversight failure (and that Cornell knew about it), that information was disclosed, so no one could have been deceived.  *Carvelli*, 934 F.3d at 1321-22.

        c.   Cornell's Awareness of Historic, Publicly Known Anti-ESG Backlash Does Not Show that He Intended to Deceive Investors.

Plaintiffs next allege that Cornell was "aware" of (i) Target's plans for the 2023 Pride Collection (¶¶405-06, 408) and (ii) certain historic instances of backlash against companies that showed support for the LGBTQ+ community (¶402-04), to suggest that Cornell knew there was a "heightened risk" of backlash to the 2023 Pride Collection (¶407).  None of this shows Cornell intended to deceive investors.

---

[21] The AC makes clear that Cornell and Target disclosed both their commitments and the policies enacted to support them.  (*See* ¶¶68-93.)  And it shows Cornell repeatedly reiterated his belief that stakeholder engagement aligns with shareholder value.  (*See, e.g.*, ¶404 ("[W]hen your team, your leadership represent the consumer you serve, I think good things happen. So I can see the benefits for our shareholders."); *id.* ("DE&I standpoints, it's adding value, it's helping us drive sales . . . .").

*First*, Plaintiffs point to certain historic events and the allegedly increasing hostility towards LGBTQ+ marketing as evidence that Cornell was aware of the risk of Target's LGBTQ+ initiatives. (¶¶402-04, 407.) But mere awareness of a risk does not show intent to deceive or severe recklessness. *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845, 863 (N.D. Ill. 2020), *aff'd sub nom. Barry v. Cboe Glob. Markets, Inc.*, 42 F.4th 619 (7th Cir. 2022). That is especially true here because the risk was disclosed and publicly known (*supra* §I.A.1.a, b), which *negates* any inference of scienter. *Owens v. Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015); *Knurr v. Orbital ATK, Inc.*, 272 F. Supp. 3d 784, 802-03 (E.D. Va. 2017).

Plaintiffs further assert that Cornell was "aware" that teams were working on the 2023 Pride Collection and that, given its "patently offensive content," he would have been aware of the risk of backlash. (¶405.) But Plaintiffs' hyperbolic characterization of the 2023 Pride Collection is not a *fact* and cannot support an inference of scienter. *Malin v. Ivax Corp.*, 17 F. Supp. 2d 1345, 1360 (S.D. Fla. 1998), *aff'd*, 226 F.3d 647 (11th Cir. 2000) (characterization of content as "so outrageous" did not support a strong inference of scienter).[22]

*Second*, Plaintiffs cannot plead scienter based on Cornell's statements in May and November 2023 (after the alleged misstatements and the backlash) acknowledging

---

[22] Plaintiffs allege that Cornell's statement in the August 2023 earnings call that Target would "reconsider[] the mix of [] brands" referred to removing "offensive merchandise." (¶267.) But Cornell did not say Target had sold offensive merchandise, let alone that he recognized it was offensive before it was sold. (Ex. T at 4.) Even if he had, hindsight acknowledgement that some were offended does not show that Cornell knew backlash would occur in advance. *Hertz*, 2015 WL 4469143, at *19.

that backlash had occurred and that, in hindsight, there was a changed risk structure. (¶¶263-68, 407.)  Retrospective observations say nothing about a defendant's state of mind *when the statement was made*.  *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at *19 (D.N.J. July 22, 2015) (retrospective statements of reason why something occurred do not show scienter); *In re Tech. Chems. Sec. Litig.*, 2000 WL 1222025, at *7 (S.D. Fla. July 3, 2000) (rejecting "hindsight approach to alleging fraud").  Here, Cornell's statements are nothing more than retrospective observations of what happened,[23] which do not generate a strong inference of scienter.

*Finally*, Plaintiffs' Confidential Witness ("CW") allegations do nothing to bolster any inference of scienter.  The CW, who allegedly held a "senior marketing position" at Target (¶56), claims that the 2023 Pride Collection was a "big priority for Minneapolis" and that decisions about its content were made "at the senior-executive level" (¶202).  But the CW says nothing about Cornell specifically.[24]  The CW allegations are therefore impermissible group pleading.  *See Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr. v. Welbilt, Inc.*, 2020 WL 905591, at *4 (M.D. Fla. Feb.

---

[23] *See* Ex. AA ("when we started to hear [of threats], we knew we had to take action. . . . And we made some changes."), ("[W]e have spent a lot of time kind of listening . . . – and make sure as we go forward, we make the appropriate changes.") (cited in ¶¶252, 264, 266, 268, 407).  The AC also alleges that Cornell's prior retrospective recognition that Target "didn't adequately assess risk" of its 2016 statement on a bathroom bill supports scienter.  (¶402.)  But hindsight statements that a company "could have done more" do not show intent to miscommunicate risk.  *Borochoff v. GlaxoSmithKline PLC*, 2008 WL 2073421, at *9 (S.D.N.Y. May 9, 2008), *aff'd sub nom. Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671 (2d Cir. 2009).  In any event, the AC pleads facts showing that Target *was monitoring this risk*, because it took steps to address it.  (*See* ¶403 (going forward, "public pronouncements on hot-button issues" must go through Cornell).)

[24] The CW refers only to unidentified "senior executives," decisions made "at the senior-executive level," that "came from HQ," and "came down from the top."  (¶¶202-05.)

6, 2020) (rejecting group pleading); *Jabil*, 595 F. Supp. 2d at 1272 (same).[25]  Moreover, for a CW statement to be probative of scienter, the complaint must provide a detailed basis of the witness's first-hand knowledge because hearsay and gossip are not facts. *See Mizzaro*, 544 F.3d at 1239, 1247 n.2; *City of Pontiac Gen. Emps.' Ret. Sys. v. Schweitzer-Mauduit Intern, Inc.*, 806 F. Supp. 2d 1267, 1296-97 (N.D. Ga. 2011).  Here, the AC does not plead that the CW was involved in planning the 2023 Pride Collection.  It pleads only that the CW "oversaw" unidentified "marketing efforts for a large region of Target stores."  (¶56.)  The absence of a basis for the CW's statements renders them unreliable.[26]  *Mizzaro*, 544 F.3d at 1239-40; *City of Pontiac*, 806 F. Supp. 2d at 1296-97.

## 2.  Plaintiffs Fail To Plead a Strong Inference of Scienter as to Target.

Because corporations have no state of mind of their own, courts look to the state of mind of their agents.  *In re Tupperware Brands Corp. Sec. Litig.*, 2023 WL 5091802, at *3-5 (11th Cir. Aug. 8, 2023).  Accordingly, Plaintiffs must allege facts supporting a strong inference that someone who is "responsible for the allegedly misleading statements [also] must have known about the fraud."  *Mizzaro*, 544 F.3d at 1254. Plaintiffs fail to do so (*supra* §I.B.1), thus, they have not pled scienter as to Target.  *See Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010).  Moreover, repeatedly warning of a risk that transpired, as Target did here, rebuts any inference of

[25] In any event, the AC does not allege that anyone misled shareholders about the fact that Target would release an LGBTQ+-themed collection in 2023, as it had for the prior 11 years.  (*Supra* §B.)

[26] The CW's opinion that the 2023 Pride Collection was more "aggressive than previous years'" (¶203) and that Target's "mantra" was to "stick [its] nose so far out . . . at the risk of alienating certain customers" and "without thinking [if] this is going too far" (¶205) is "bereft of any facts" and cannot support scienter.  *Miyahira v. Vitacost.com, Inc.*, 2011 WL 13136262, at *7 (S.D. Fla. Dec. 8, 2011).

scienter.  *Kadel v. Flood*, 427 F. App'x 778, 780-81 (11th Cir. 2011); *see supra* §§A.2, C.1.

**C. The AC Fails To Plead Loss Causation**.

Plaintiffs' Section 10(b) claim must be dismissed for the independent reason that it does not plausibly plead loss causation.  To survive a motion to dismiss, a plaintiff:

> must: (1) identify a corrective disclosure, i.e., a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the alleged fraud; (2) show that the stock's price dropped soon after that corrective disclosure; and (3) eliminate other possible explanations for the price drop, such that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a substantial amount of the price drop.

*MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1242 (11th Cir. 2023).  The AC attempts to plead two corrective disclosures: (i) that the backlash to the 2023 Pride Collection revealed the alleged misstatements in the Annual Reports and Proxies (¶434); and (ii) that Target's Q2 2023 earnings call revealed financial harm from the 2023 Pride Collection and that Target removed certain merchandise for reasons other than safety (i.e., revealed the alleged falsity of the Backlash Statements).  (¶¶444-45.)  But neither revealed new, corrective information nor caused a stock drop.

**1. The 2023 Pride Collection Backlash Did Not Cause Cognizable Losses**.

a. The 2023 Pride Collection Backlash Was Not a Corrective Disclosure.

To plead a corrective disclosure, the disclosure must (1) be corrective, and (2) disclose new information.  *See Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 862-63 (11th Cir. 2015); *Meyer*, 710 F.3d at 1197-98.  The AC fails on both fronts.

Plaintiffs allege that the 2023 Pride Collection corrected the alleged

misstatements (other than the Backlash Statements) by revealing that "consumers were outraged and responding by boycotting Target."  (¶435.)  But for a disclosure to be corrective it must "relate back to the misrepresentation and not to some other negative information about the company."  *MacPhee*, 73 F.4th at 1243-45.  Plaintiffs nowhere allege that Target misled investors as to the existence of consumer "outrage," so the purported revelation of consumer outrage cannot be corrective.  *See id.* (disclosure of loss of distributor relationship did not correct alleged accounting misstatements).

In any event, repeating (and confirming) prior public behavior does not reveal any new truth.  *See id.* at 1246 ("confirmatory information" cannot be corrective).[27] The possibility of backlash against Target's DEI/ESG initiatives was not new.  Indeed, the Risk Warnings disclosed that those initiatives could spark negative reactions and boycotts.  (*Supra* §I.A.1.a.)  Thus, the backlash to the 2023 Pride Collection was consistent with Target's Risk Warnings; it did not reveal a concealed truth.  Moreover, the AC details prior public efforts by conservatives to organize boycotts of Target based on initiatives supporting LGBTQ+ individuals.  (*See supra* §I.A.1.a.i.)  Many of those efforts specifically related to Target's annual Pride Collections.  (*See id.*)  The fact that there was backlash against the 2023 Pride Collection therefore cannot have revealed a new truth.  *See MacPhee*, 73 F.4th at 1246; *Meyer*, 710 F.3d at 1198.

---

[27] Plaintiffs' reliance on news articles describing the ongoing existence of the backlash rather than its initiation also bars their claims.  (*See supra* § D.1.)  Those articles simply repackaged already public information, which cannot be corrective.  *Meyer*, 710 F.3d at 1197-98.

b.  <u>Plaintiffs Have Not Pled a Stock Drop "Soon After" Backlash Began.</u>

Plaintiffs fail to plead a stock drop "soon after that corrective disclosure." *MacPhee*, 73 F.4th at 1242.  This requirement exists because efficient markets "rapidly and efficiently translate[] public information into the security's price," *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011), as the AC alleges was true of Target's stock (¶514).[28]  Because "information released to the public is ***immediately*** digested and incorporated in the price of a security," pleading loss causation requires alleging ***when*** the corrective disclosure took place.  *Meyer*, 710 F.3d at 1197.

Here, the AC does not allege *when* the backlash to the 2023 Pride Collection began.  That fatal failure requires dismissal.  Defendants have identified only one instance of a securities complaint that failed to plead the timing of an alleged corrective disclosure—a *pro se* case subject to liberalized pleading standards inapplicable here— which was dismissed on that basis.  *Chen v. China Green Agric. Inc.*, 2022 WL 3868111, at *4 (S.D.N.Y. Aug. 30, 2022), *aff'd*, 2023 WL 8599368 (2d Cir. 2023).

To be sure, the AC alleges the stock drop began on May 17, 2023 (¶¶28, 230, 429).  But it has not (and cannot) plead that the backlash (i.e., the purported correction) began on May 17, 2023 (or even the day before).  Indeed, the AC avoids doing so because the backlash was discussed in the media (including on Plaintiffs' social media) by May 12, 2023, at the latest.  (*See, e.g.*, Ex. CC (post by Craig's wife and radio show co-host); Ex. DD (article linked in prior post).)  In the following days, Target's stock

---

[28] Having pled market efficiency to allege reliance (¶514), Plaintiffs cannot now "cast the theory aside when it no longer suits their needs for purposes of loss causation."  *Meyer*, 710 F.3d at 1199.

price *rose*.  On May 12, 2023, Target's stock price closed at $157.99 and rose to $160.57 the next trading day, May 15, 2023, and to $160.96 by May 17, 2023.  (*See* Ex. O.)[29]

### c.   The AC Fails to Plead Materialization of a Concealed Risk.

Plaintiffs plead as an alternative that the allegedly concealed risks "materialized" with the backlash.  (¶435.)  The Eleventh Circuit has never recognized the materialization of risk theory.  *Sappsov*, 608 F. App'x at 861 n.7.

Even in Circuits that do recognize it, however, courts make clear that it is not fundamentally different from a traditional corrective disclosure theory.  *See In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 303 (S.D.N.Y. 2005), *aff'd sub nom. Tenney v. Credit Suisse First Bos. Corp.*, 2006 WL 1423785 (2d Cir. May 19, 2006).  To be sure, a plaintiff can point to an event (instead of a corrective statement) that creates a link between what was allegedly concealed and the alleged harm.  But a plaintiff must still allege that a "misstatement or omission concealed *something* from the market that, *when disclosed*, negatively affected the value of the security."  *In re Mylan N.V. Sec. Litig.*, 2023 WL 2711552, at *35 (S.D.N.Y. Mar. 30, 2023) (emphasis in original).  Thus, a plaintiff must allege *when* the risk materialized, and that, upon materialization, it "caused the stock value to plummet."  *In re Rhodia Sec. Litig.*, 531 F. Supp. 2d 527, 546 (S.D.N.Y. 2007); *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010).  This is because markets digest new information "immediately,"

---

[29]  The Court may take judicial notice of stock prices.  *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 264-65 (3d Cir. 2005).  And the Court need not rely upon the fact that the backlash was reported well before May 17, 2023.  As discussed, Plaintiffs have not—and cannot—plead that the backlash began on or soon before May 17, 2023, which is what the securities laws require.

*Meyer*, 710 F.3d at 1197.  Immediacy is required to show that the alleged concealment proximately caused the alleged loss.  *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 726 (11th Cir. 2012); *FindWhat*, 658 F.3d at 1309.

Here, there was no concealed risk that could have materialized.  Target disclosed the risk of adverse reactions to its ESG/DEI initiatives, including Pride Collections, and of consumer boycotts; shareholders also knew of them.  (*Supra* §I.A.1.a.)  That backlash developed to the 2023 Pride Collection is an "idiosyncratic reaction" that cannot subject Target to liability.  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010); *see also In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 405 (S.D.N.Y. 2014) ("risk . . . was clear to the market" prior to stock drop).

The AC also fails to allege *when* the risk materialized (*supra* §I.C.1.b), or that Target's stock price plummeted immediately thereafter.  Instead, it alleges a gradual decline over the course of a month.  (¶¶435, 439.)  But a "slow, steady decline" cannot support loss causation.  *Rhodia*, 531 F. Supp. 3d at 547; *Sec. Cap.*, 729 F. Supp. at 602.  And when the backlash actually began, Target's stock price rose.  (*Supra* §I.C.1.b.)

## 2.  The Q2 2023 Earnings Call Did Not Cause Cognizable Losses.

Plaintiffs' second alleged corrective disclosure is the Q2 2023 earnings call that took place on August 16, 2023.  (¶444.)  Plaintiffs allege that this revealed that the 2023 Pride Collection "harmed the company's earnings" (*id.*) and that Target's removal of certain merchandise in May 2023 "aimed to mitigate strategic errors" (¶445).  In neither case do Plaintiffs allege a purported misstatement this information corrected.

*First*, Plaintiffs never allege that Target misled investors about whether the

backlash to the 2023 Pride Collection would cause financial harm.  In the Original Complaint (filed before the August 16 earnings call), Plaintiff Craig alleged the existence of those financial losses was already known.  (Dkt. 1 ¶¶24, 82-87.)  The AC repeats those allegations.   (¶¶230-36.)   Plaintiffs premise their prior corrective disclosure allegation on the theory that sometime in May or June of 2023, it was revealed that "Target was subject to immense and financially material consumer backlash." (¶434.)  Old news is not corrective.  *MacPhee*, 73 F.4th at 1246.  And even if the financial harm was news, it still is not corrective of anything.  (*Supra* §I.C.1.a.)

*Second*, Plaintiffs mischaracterize what was purportedly revealed.  Plaintiffs allege that the August 16 earnings call revealed that merchandise was removed "to mitigate strategic errors," rather than to address concerns regarding employee safety. (¶445.)  But no one said that.  On May 24, Target said that threats from customers reacting to the 2023 Pride Collection had impacted its employees' sense of safety and well-being and that, in response to "volatile circumstances," it was removing certain merchandise that "ha[d] been at the center of the most significant confrontational behavior."  (*Supra* §C.5.)  On August 16, Cornell said much the same thing:

> [A]fter the launch of the [2023 Pride Collection], ***members of our team began experiencing threats*** and aggressive actions ***that affected their sense of safety and well being*** while at work. . . . So to protect the team in the face of these threatening circumstances, ***we quickly made changes, including the removal items that were at the center of the most confrontational behavior***.

(Ex. T at 4.)  That's not corrective; it conveys the same information as before.[30]

---

[30] Plaintiffs' only allegation regarding the content of this call refers to later statements by Target's Chief Growth Officer.  (¶239.)  But her statement referred only to the "strong reaction to this year's Pride

Moreover, Plaintiffs cannot show the August 16 earnings call caused a stock drop because Target's stock price *rose* in the days following the call.  As stated above (*supra* §I.C.1.b), markets digest information "immediately," *Meyer*, 710 F.3d at 1197, so when the "stock price actually increase[s] following a corrective disclosure, loss causation is not pled.  *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 2016 WL 10592320, at *5 (S.D. Fla. June 6, 2016); *see also W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 4838671, at *6 (D. Colo. Nov. 6, 2008).  Here, Target's stock price rose on August 16, 2023, and continued rising for several days.  (*Supra* §D.3.)  Even during the seven-week period of alleged decline, Target's stock did not consistently drop below its pre-earnings call level for a month.  (*Id.*)

## II.   PLAINTIFFS' SECTION 14(A) CLAIM SHOULD BE DISMISSED

To state a Section 14(a) claim, plaintiffs must allege that defendants negligently prepared a proxy statement containing a material misstatement that caused the plaintiff's injury.  *Jabil*, 595 F. Supp. 2d at 1290.  The PSLRA's heightened standards as to falsity apply, *see In re The Home Depot, Inc. S'holder Deriv. Litig.*, 223 F. Supp. 3d 1317, 1330 (N.D. Ga. 2016), and where claims sound in fraud (as here), the heightened scienter standard applies too.  *Lee*, 2021 WL 3912651, at *4 n.3 (collecting cases); *Chubb*, 394 F.3d at 160, 163.  Plaintiffs must also allege that the item voted on caused the alleged injury.  *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 797 (11th Cir. 2010).  The AC fails on each element.

---

assortment" as an "incremental," meaning unanticipated, "headwind."  (Ex. T at 5.)  That statement says nothing about why merchandise was removed and therefore cannot be corrective.

**A. The AC Fails To Plead a Strong Inference of Scienter As to Defendants**.[31]

Because Plaintiffs' Section 14(a) claim is based on the same allegedly misleading statements (¶¶307-17, 362-67, 379-80) and theory of deception (¶¶340-61, 369, 378, 388, 397) as their 10(b) claim, and the AC alleges that Defendants acted with fraudulent intent,[32] Plaintiffs must allege a strong inference of scienter as to each Defendant. But the AC is devoid of particularized factual allegations as to *each Defendant*, which are necessary to support that strong inference. *Mizzaro*, 544 F.3d at 1238; *see also U.S. v. Millennium Physician Grp.*, 2023 WL 2022232, at *5 (M.D. Fla. Feb. 15, 2023) ("lumping together" defendants failed Rule 9(b)) (Badalamenti, J.).

Instead, Plaintiffs allege that "Defendants" as a group "knew" or "should have" known that the Proxies were misleading. (*See, e.g.*, ¶411, 413-18.) Similarly, Plaintiffs allege scienter based on Defendants' positions within Target, tenure on the Board, and receipt of the Proxies. (¶¶411, 419-20.) But scienter may not rest on group pleading or inferences based on Defendants' positions. *Jabil*, 595 F. Supp. 2d at 1273; *see also Durgin v. Mon,* 415 F. App'x 161, 165 (11th Cir. 2011). Nor does receipt of the Proxies, on its own, support an inference of scienter. *Welbilt*, 2020 WL 905591, at *4.[33]

---

[31] Plaintiffs' Section 14(a) claim alleges the same misstatements as their Section 10 claim, are subject to the same pleading standards, and should be dismissed for the same reasons. (*Supra* §I.A., n.11.)

[32] *See, e.g.*, ¶3 (Defendants "***did not oversee or disclose*** the obvious risks . . ., ***but they told investors that they did***"); ¶5 (Board "falsely and misleadingly portray[ed] the risks of [Target's ESG/DEI] strategy to Target's shareholders ***in order to*** artificially inflate Target's stock price and secure the Board's re-election and insulate itself from accountability"); ¶411 ("Defendants ***knew*** that the adverse facts . . . ***were being concealed*** from the public" and that representations were "***materially false and misleading***.").

[33] The AC's more specific, but still inadequate, scienter allegations as to Cornell and Target also fail for the reasons explained in § I.B above. So do the allegations that Defendants were on notice of the risk of backlash because Target delegated its strategy execution to officers with "disabling conflicts of interest." (¶418), as explained further in § I.A.3.b above.

Plaintiffs also allege that Defendants were aware of "red flags," such as previous backlash and growing anti-ESG sentiment. (¶¶413-17, 420, 427.)  But the AC admits that both were publicly known, thus neither can be a "red flag" nor support scienter. *See Knurr*, 272 F. Supp. 3d at 802-03 (scienter not pled when based on public knowledge); *Owens*, 789 F.3d at 540 (public disclosure negates fraudulent inference).[34]

Finally, Plaintiffs allege certain Director Defendants knew that the Board failed to oversee social and political risk because of their alleged commitment to ESG/DEI initiatives and involvement with certain progressive groups.  (¶¶421-27.)  But the Directors' alleged pro-ESG/DEI stances do not speak to their risk oversight or raise a strong inference that any acted with fraudulent intent.  (*Supra* §I.B.1.b, c.)

## B.  The AC Fails To Plead Transaction or Loss Causation.

Plaintiffs also have not adequately pled any causal link between the Proxies and their alleged losses.  Section 14(a) claimants must show (i) transaction causation, i.e, that stockholders voted as they did "because of" the alleged misstatements, *McDowell v. Bracken*, 317 F. Supp. 3d 1162, 1180 (S.D. Fla. 2018), *aff'd*, 794 F. App'x 910 (11th Cir. 2019); and (ii) loss causation, i.e., that the transaction is the source of the plaintiff's injury.  *Jabil*, 594 F.3d at 796–97.  Plaintiffs can show neither.

The AC alleges that the misstatements caused (i) the Board's reelection (¶¶449-50); (ii) rejection of two shareholder proposals (¶474); and (iii) approval of

---

[34] Defendants' alleged knowledge of the 2016 boycotts (¶414) is also too distant to be a red flag.  *See Welbilt*, 2020 WL 905591, at *5 (stale information is not a red flag); *Jabil*, 595 F. Supp. 2d at 1286 (same); *Chiarenza v. IBSG Int'l, Inc.*, 2010 WL 3463304, at *5 (S.D. Fla. Sept. 2, 2010) (same).

compensation plans (¶491).  It then asserts that those events were an "essential link" to the 2023 Pride Collection and resulting losses.  (¶¶451, 484, 488, 492.)  But merely invoking the standard does not satisfy Section 14(a)'s requirements.  *Hastey ex rel. YRC Worldwide, Inc. v. Welch*, 449 F. Supp. 3d 1053, 1065 (D. Kan. 2020).

*First*, Plaintiffs do not allege that their injuries were the result of any voting outcome, but that the Proxies' solicitation of director re-election was an essential link to the release of the 2023 Pride Collection, which caused their alleged loss.  But Section 14(a) "requires that the votes solicited by a false proxy statement directly authorize the loss-generating corporate action."  *Hastey*, 449 F. Supp. 3d at 1065; *In re Paypal Holdings, Inc. S'holder Deriv. Litig.*, 2018 WL 466527, at *4 (N.D. Cal. Jan. 18, 2018); *accord Jabil*, 594 F.3d at 797; *Gen. Elec. Co. v. Cathcart*, 980 F. 2d 927, 933 (3d Cir. 1992).

Here, Plaintiffs do not allege that their votes directly authorized the 2023 Pride Collection.  They allege only that the elected directors subsequently "failed to oversee the Campaign's risks or mitigate those risks."  (¶¶457-58, 471-72.)  This sort of attenuated link is insufficient.  *Jabil*, 594 F.3d at 797 (no causation where the election of directors who violated [company] policies only indirectly caused the shareholders' loss"); *Rubenstein ex rel. Jefferies Fin. Grp. Inc. v. Adamany*, 2023 WL 6119810, at *3-4 (2d Cir. Sept. 19, 2023) (similar); *Cathcart*, 980 F. 2d at 933 (similar).

*Second*, the Supreme Court has held Section 14(a) causation cannot be based on non-binding shareholder votes and Plaintiffs thus cannot establish causation as to the executive compensation or shareholder proposals as a matter of law.  (*See supra* §C.2);

*Va. Bankshares*, 501 U.S. at 1099, 1105; *accord McDowell v. Bracken*, 794 F. App'x 910, 917 (11th Cir. 2019); *Rubenstein*, 2023 WL 6119810, at *3.

*Finally*, by the AC's own allegations, it is implausible to contend that the alleged misstatements in the Proxies altered the outcome of the 2023 Pride Collection. Plaintiffs allege that but for the misstatements in the Proxies, stockholders would have voted against re-electing the directors and the proposals. (¶¶449-51.) But the AC alleges that at least a month *after* Target's misstatements were revealed (¶230) and despite the Board's oversight being "a central issue of the directors' reelection" (¶¶460-61), shareholders elected the directors, voted in line with the Board's recommendations, and approved the executive compensation plan. (*Supra* §D.2.) Thus, Plaintiffs have failed to plead that the misstatements caused the voting outcomes they complain of, let alone that they caused the release of the 2023 Pride Collection.[35] *Va. Bankshares*, 501 U.S. at 1099, 1105; *McDowell*, 794 F. App'x at 917.

## CONCLUSION[36]

For the foregoing reasons, Defendants respectfully request that the Court enter an Order dismissing the AC with prejudice.

## LOCAL RULE 3.01(G) CERTIFICATION

Pursuant to Local Rule 3.01(g), Defense counsel have conferred with counsel for Plaintiffs by telephone; Plaintiffs oppose the relief requested in this motion.

---

[35] Given this, there is no reason to believe the alleged concealment would have caused shareholders to vote any differently in 2022 either.

[36] Plaintiffs have not pled Section 10 or 14(a) claims, thus "there is no underlying 'primary violation' on which to hang a §20(a) claim." *Carvelli*, 934 F.3d at 1330.

Date:  January 26, 2024

Traci T. McKee
FAEGRE  DRINKER  BIDDLE  &
REATH LLP
1500 Jackson Street, Suite 201
Fort Myers, Florida 33901
Telephone: (239) 286-6910
traci.mckee@faegredrinker.com

Jeffrey P. Justman (*pro hac vice*)
FAEGRE  DRINKER  BIDDLE  &
REATH LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, Minnesota 55402
Telephone: (612) 766-7000
jeff.justman@faegredrinker.com

Sandra Grannum (*pro hac vice*)
FAEGRE  DRINKER  BIDDLE  &
REATH LLP
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7000
sandra.grannum@faegredrinker.com

*Attorneys for Defendants*

Respectfully submitted,

/s/ Sandra C. Goldstein
Sandra C. Goldstein, P.C. (*pro hac vice*)
Alexander J. Rodney (*pro hac vice*)
Jacob M. Rae (*pro hac vice*)
Ashley P. Grolig (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4779
sandra.goldstein@kirkland.com
alexander.rodney@kirkland.com
jacob.rae@kirkland.com
ashley.grolig@kirkland.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 26, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which provided electronic service upon all counsel of record.

/s/ Sandra C. Goldstein
Sandra C. Goldstein, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4779
sandra.goldstein@kirkland.com

**ANNEX A – CHART OF ALLEGED MISSTATEMENTS EXACTLY AS SET OUT IN THE AC[1]**

| CATEGORY 1: RISK WARNINGS[2] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement | ¶ | Not False/ Misleading[3] | Forward-Looking | Reason/ Opinion | Puffery |
| 1 | "In the Risk Factors section of its 2021 Annual Report on Form 10-K, Target said the following regarding the risks stemming from its ESG/DEI mandates:<br><br>We believe that one of the reasons our shareholders, guests, team members, and vendors choose Target is the reputation we have built over many years for serving those constituencies and the communities in which we operate. ***To be successful in the future, we must continue to preserve Target's reputation.*** Our reputation is based in large part on perceptions, both about us and others with whom we do business, and broad access to social media makes it easy for anyone to provide public feedback that can influence perceptions of Target. It may be difficult to ***control negative publicity***, regardless of whether it is accurate. Target's responses to crises and ***our position or perceived lack of position*** on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation. While reputations may take decades to build, negative incidents involving us or others with whom we do business can quickly erode trust and confidence and can result in consumer boycotts, workforce unrest or walkouts, government | 278 | X | X | | |

---

[1] The alleged misstatements set forth in the quotation marks are quoted exactly as presented in the AC; all emphases and ellipsis are as they appear in the AC and all internal citations are those that the AC included. Some of Plaintiffs' quotations are excerpted and/or are lacking context. In particular, the AC omits a portion of the 2022 Risk Warning in its presentation of Statement #2. Defendants submit that each quote must be read in full context of the surrounding statements. Defendants have included the omitted portion of Statement #2 in blue text below and have also identified relevant surrounding context for each alleged misstatement in their motion to dismiss.

[2] The five categories of statements are based on Plaintiffs' categorization of alleged misstatements as set forth and referenced in paragraphs 269-397 of the AC.

In paragraph 278 of the AC, Plaintiffs group the 2021 Risk Warnings together under the umbrella: "In the 2021 Annual Report, Target Misrepresented and Failed to Disclose that It Was Subject to Increasing Risks of Consumer Backlash to Its ESG/DEI Initiatives."

In paragraph 286 of the AC, Plaintiffs group the 2022 Risk Warnings together under the umbrella: "In the 2022 Annual Report, Target Misrepresented and Failed to Disclose that It Was Subject to Risks from Customer Backlash to Its ESG/DEI initiatives."

[3] As set forth in the motion to dismiss, Defendants submit that none of the alleged misstatements or omissions are materially false or misleading.

| CATEGORY 1: RISK WARNINGS[2] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement | ¶ | Not False/ Misleading[3] | Forward-Looking | Reason/ Opinion | Puffery |
|  | investigations, or litigation. For example, we have a limited ability to end our relationship with CVS, which leases space to operate their clinics and pharmacies within our stores. If our guests have negative experiences with or unfavorably view CVS or other companies with whom we have relationships, it could cause them to reduce or stop their business with us. Negative reputational incidents could adversely affect our business and results of operations, including through lost sales, loss of new store and development opportunities, or team member retention and recruiting difficulties. <br><br> Target Corp., Annual Report (Form 10-K) at 7 (Mar. 9, 2022).❞ |  | X | X |  |  |
| 2 | ❝Unlike the 2021 Annual Report, the 2022 Annual Report made no mention of "ESG" or "DEI" in its discussion of reputational risks that could lead to "consumer boycotts." 2022 Annual Report at 8. A comparison is provided below, with the relevant removed language from the 2021 Report highlighted in red and underlined: <br><br> **2021 Annual Report "Consumer Boycott" Language** <br> To be successful in the future, we must continue to preserve Target's reputation. Our reputation is based in large part on perceptions . . . It may be difficult to control negative publicity, regardless of whether it is accurate. Target's responses to crises and our position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation. While reputations may take decades to build, negative incidents involving us or others with whom we do business can quickly erode trust and confidence and can result in consumer boycotts, workforce unrest or walkouts, government investigations, or litigation. <br><br> **2022 Annual Report "Consumer Boycott" Language** <br> To be successful in the future, we must continue to preserve Target's reputation. Our reputation is largely based on perceptions. It may be difficult to address negative publicity across media channels, regardless of whether it is accurate. Negative incidents involving us, our workforce, or others with whom we do business could quickly erode trust and confidence and result in consumer boycotts, workforce unrest or walkouts, government investigations, and litigation. | 286 | X | X |  |  |

| CATEGORY 1: RISK WARNINGS[2] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement | ¶ | Not False/ Misleading[3] | Forward-Looking | Reason/ Opinion | Puffery |
| | 2021 Annual Report at 7; 2022 Annual Report at 8. **"**<br><br>**Negative reputational incidents or negative perceptions of us could adversely affect our business and results of operations, including through lower sales, the termination of business relationships, loss of new store and development opportunities, and team member retention and recruiting difficulties.**<br><br>**In addition, stakeholder expectations regarding environmental, social, and governance matters continue to evolve and are not uniform.  We have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics.  We cannot guarantee that we will achieve these goals and initiatives.  Any failure, or perceived failure, by us to achieve these goals and initiatives or to otherwise meet evolving and varied stakeholder expectations could adversely affect our reputation and result in legal and regulatory proceedings against us.  Any of these outcomes could negatively impact our results of operations and financial condition.**<br><br>**Reputational harm can also occur indirectly through companies with whom we do business.  We have relationships with a variety of other companies, including Apple, CVS, Disney, Levi's, Starbucks, and Ulta Beauty.  If our guests have negative experiences with or view unfavorably any of the companies with whom we have relationships, it could cause them to stop shopping with us.[4]** | | X | X | | |

---

[4] The text set forth above in blue was omitted from the AC but is part of the 2022 Risk Warning and appears directly below the language excerpted by Plaintiffs.  Defendants have included it here to present the 2022 Risk Warning in its full context.

| CATEGORY 2: OVERSIGHT STATEMENTS[5] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement | ¶ | Not False/ Misleading | Forward- Looking | Reason/ Opinion | Puffery |
| 3 | "In nearly identical language, the 2022 Proxy and the 2023 Proxy each described the Board's key role in risk oversight:<br><br>**Risk oversight**<br><br>Oversight of the various risks we face in implementing our strategy is an integral and continuous part of the Board's oversight of our business. The Board, each Committee, and management have specific roles and responsibilities with respect to those risks.<br><br>**The Board and its Committees**<br><br>The Board provides oversight of overall risks and seeks to ensure that our Leadership Team has processes in place to appropriately manage risk. Strategic risks are emphasized within that overall risk oversight responsibility because they are an integral and ongoing part of the Board's oversight of our business. For example, our principal strategic risks are reviewed as part of the Board's regular discussion and consideration of our strategy, including the development and monitoring of specific initiatives and their overall alignment with our strategy. Similarly, at every meeting the Board reviews the principal factors influencing our operating results, including the competitive environment, and discusses with our Leadership Team the major events, activities, and challenges affecting Target.<br><br>2023 Proxy at 14." | 311 | X | X | | X |

---

[5] In paragraphs 311-12 of the AC, Plaintiffs group the Oversight Statements together under the following umbrella: "Target's Board Assured Investors of its Oversight of "Social and Political Issues and Risks" to Target's ESG/DEI Initiatives in the 2022 and 2023 Proxy Statements."

| 4 | "The 2022 Proxy and 2023 Proxy also each emphasized the significance of "ESG matters" to the Board's risk oversight and described the Board's allocation of oversight of those matters throughout the Board and its committees:<br><br>**Sustainability & ESG**<br>We engage with a diverse group of stakeholders around the world, including the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who make our work possible. Their perspectives are one of a variety of factors we consider as we analyze which ESG matters to prioritize in determining and evaluating our sustainability strategy. . . . Given the breadth of ESG matters for a company of our size and scale, oversight of those issues is allocated throughout the Board and its Committees:<br><br>**Board**<br>• Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)<br>• Sustainability and ESG risks (through oversight of our business strategy and top enterprise risks)<br>• Reputation management<br>• Crisis management and response<br><br>***<br>**Audit & Risk Committee**<br>• Supply chain ESG matters, including vendor human capital and responsible sourcing practices<br><br>***<br>**Governance & Sustainability Committee**<br>• Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)<br><br>***<br>• Social and political issues and risks not allocated to other Committees<br>• Philanthropy and community engagement<br>• Policies and practices regarding public policy advocacy and political activities<br><br>2023 Proxy at 15-16." | 312 | X | X | | X |

| # | Statement | ¶ | Not False/ Misleading | Forward-Looking | Reason/ Opinion | Puffery |
|---|-----------|---|-----------------------|-----------------|-----------------|---------|
| **CATEGORY 3: VALUE STATEMENTS[6]** | | | | | | |
| 5 | "The 2022 Proxy and 2023 Proxy both communicated that "the Board prefers to maintain the flexibility to determine which leadership structure best serves *the interests of Target and our shareholders*."  2022 Proxy at 10; 2023 Proxy at 10." | 365 | X | X | X | X |
| 6 | "The 2022 Proxy and 2023 Proxy also stated that the Board, through its Audit & Risk Committee, would, with respect to conflicted transactions between Target and its directors or executive officers, act to "prohibit any transaction it determines to be inconsistent with the interests of Target and its shareholders."  2022 Proxy at 17; 2023 Proxy at 18." | 366 | X | X | X | X |
| 7 | "The 2022 Proxy and 2023 Proxy stated that the Board's capital allocation strategy "[f]ully invest[s] in opportunities to profitably grow our business, create sustainable long-term value, and maintain our current operations and assets."  2022 Proxy at 17; 2023 Proxy at 17." | 367 | X | X | X | X |

---

[6] In paragraphs 365-67 of the AC, Plaintiffs group the Value Statements together under the following umbrella: "Target's Board Assured Investors that Target's ESG/DEI Initiatives Aimed to Increase Shareholder Value."

**CATEGORY 4: COMPENSATION STATEMENTS[7]**

| # | Statement | ¶ | Not False/ Misleading | Forward-Looking | Reason/ Opinion | Puffery |
|---|-----------|---|-----------------------|-----------------|-----------------|---------|
| 8 | "The 2023 Proxy outlined Target's "Executive compensation guiding principles," which provided, in full:<br><br>We believe executive compensation should be *directly linked to performance and long-term value creation for our shareholders*. With that in mind, three principles guide our compensation program:<br><br>• Deliver on our pay for performance philosophy in support of our strategy.<br>• Provide a framework that encourages *outstanding financial results* and shareholder returns over the long-term.<br>• Attract, retain, and motivate a premier management team to sustain our distinctive brand and its competitive advantage in the marketplace.<br><br>2023 Proxy at 39. The 2023 Proxy further elaborated on Target's "long-standing belief that our executive compensation should directly reflect our organization's performance *with substantial emphasis on creating long-term value for our shareholders. Id.* Target also attested that "[t]he pay programs described throughout [the 2023 Proxy] align with our pay for performance philosophy and are structured based on financial and operational performance and shareholder outcomes." *Id.* at 38." | 380 | X | X | X | X |

---

[7] In paragraphs 380, 384-86, 392-94 of the AC, Plaintiffs group the Compensation Statements together under the following umbrella: "Target's Board Claimed Executive Compensation Plans Were Designed to Align with Shareholder Value."

| # | Statement | ¶ | Not False/ Misleading | Forward-Looking | Reason/ Opinion | Puffery |
|---|-----------|---|-----------------------|-----------------|-----------------|---------|
| | **CATEGORY 4: COMPENSATION STATEMENTS[7]** | | | | | |
| 9 | "Under the heading "Pay for performance," a footnote described that Target's executive compensation included a component ambiguously (and innocuously) labeled "STIP" (an acronym the 2023 Proxy never defines, but which presumably stands for "Short Term Incentive Plan"). 2023 Proxy at 39.  The 2023 Proxy elaborated on the STIP component of executive compensation in a text box that followed immediately below this footnote, labeled with the subheading "How annual CEO pay is tied to performance": <br><br> The following pay elements are performance-based and represent a significant percentage of Annual TDC: <br><br> • STIP – Payouts range from 0% to 200% of goal depending on Sales, Incentive Operating Income, and the assessment of the team scorecard. <br><br> *Id.* at 40." | 384 | X | X | | |
| 10 | "In a following section under the heading "Incentive measures and actual performance," the 2023 Proxy further provided: "Our STIP is based on a combination of absolute *financial goals* and progress made toward key strategic priorities."  [2023 Proxy] at 41." | 385 | X | X | | X |
| 11 | "Tables accompanying this section and others provided further that the "Team scorecard" component of "STIP" receives a 33% "Weight." [2023 Proxy] at 41, 43." | 386 | X | X | | |
| 12 | "The 2022 Proxy stated the same "guiding principles" for executive compensation, including to "encourage[] outstanding financial results and shareholder returns over the long-term." 2022 Proxy at 40." | 392 | X | X | | X |
| 13 | "The 2022 Proxy expressed Target's "long-standing belief that our executive compensation should directly reflect our organization's performance with substantial emphasis on the creation of long-term value for our shareholders." [2022 Proxy] at 37." | 393 | X | X | X | X |

| CATEGORY 4: COMPENSATION STATEMENTS[7] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement | ¶ | Not False/ Misleading | Forward-Looking | Reason/ Opinion | Puffery |
| 14 | "The 2022 Proxy also stated that "[t]he pay programs described throughout our CD&A align with our pay for performance philosophy and are structured based on financial and operational performance and shareholder outcomes." [2022 Proxy] at 35." | 394 | X | X | | X |

| CATEGORY 5: BACKLASH STATEMENTS[8] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement | ¶ | Not False/ Misleading | Forward-Looking | Reason/ Opinion | Puffery |
| 15 | "On May 24, 2023, Target management issued a press release, "Target Statement on 2023 Pride Collection," in which it both announced changes to the LGBT-Pride Campaign due to consumer backlash and further doubled down on Target's commitment to it:<br><br>For more than a decade, Target has offered an assortment of products aimed at celebrating Pride Month. Since introducing this year's collection, we've experienced threats impacting our team members' sense of safety and well-being while at work. Given these volatile circumstances, we are making adjustments to our plans, including removing items that have been at the center of the most significant confrontational behavior. Our focus now is on moving forward with our continuing commitment to the LGBTQIA+ community and standing with them as we celebrate Pride Month and throughout the year.<br><br>Press Release, *Target Statement on 2023 Pride Collection*, Target (May 24, 2023)" | 248 | X | | X | |
| 16 | "Defendant Cornell also sent a companywide email addressing Target employees and "the LGBTQIA+ community" with a similar "safety"-related explanation for the changes:<br><br>This has been a very hard day for Target, and it follows many difficult days of deliberation and decision-making.<br><br>To our team in Stores: thank you for steadfastly representing our values. No one is better at working through uncomfortable situations in service to an inclusive guest experience.<br><br>What you've seen in recent days went well beyond discomfort, and it has been gut-wrenching to see what you've confronted in our aisles. | 251 | X | | X | |

---

[8] In paragraphs 300 and 301 (repeating and realleging paragraphs 248 and 251) of the AC, Plaintiffs group the Backlash Statements together under the umbrella: "Defendants Cornell and Target Misleadingly Downplayed the Severity of Consumer Backlash to the 2023 LGBT-Pride Campaign."

| CATEGORY 5: BACKLASH STATEMENTS[8] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement | ¶ | Not False/ Misleading | Forward-Looking | Reason/ Opinion | Puffery |
| | To our team in the service centers, thank you for your patience and professionalism through high volumes of angry, abusive and threatening calls. I recognize how difficult and even frightening those interactions can be, and thank you for the composure with which you've fielded those comments.<br><br>To the teams who have been working so hard on our plans for Pride - and now are showing incredible agility as we adjust - thank you. Your efforts will ensure we can still show up and celebrate Pride in meaningful ways.<br><br>To the LGBTQIA+ community, one of the hardest parts in all of this was trying to contemplate how the adjustments we're making to alleviate these threats to our team's physical and psychological safety would impact you and your wellbeing and psychological safety. We stand with you now and will continue to do so - not just during Pride Month, but each and every day.<br><br>Those were the two guiding principles when it came time for us to act: do all we can to keep our team safe, and do all we can to honor our commitment and connection to the LGBTQIA+ community.<br><br>From a host of difficult alternatives, we have sincerely sought the best path forward, finding ways to recognize Pride Month, while making adjustments to prioritize safety. As always, we're stronger together, and I want you to know that I'm committed to doing all I can, and all we can as a company, to support a culture across the country of care, empathy, equity and simple civility, in hopes that we'll not have to face these kinds of agonizing decisions in the future.<br><br>Thank you for the care you've shown each other, our frontline teams and the LGBTQIA+ community.<br><br>Dominick Reuter, *Target CEO defends the decision to remove Pride displays and pledges to support the LGBTQ community. Read his letter to employees.*, Bus. Ins. (May 25, 2023)" | | X | | X | |

| CATEGORY 5: BACKLASH STATEMENTS[8] | | | | | | |
|---|---|---|---|---|---|---|
| # | Statement | ¶ | Not False/ Misleading | Forward-Looking | Reason/ Opinion | Puffery |
| 17 | "Shortly after calls for consumer boycotts began Target took certain remedial measures to remove offensive merchandise to less prominent locations in displaying stores. Target and Defendant Cornell each issued statements explaining that Target did this because of "threats" to employee safety." | 300 | X | | X | |