**In The United States District Court**
**Middle District of Florida**
**Ft. Myers Division**

Brian Craig, Carol Bowe, Inspire
Advisors, LLC, Steven Cook, and Laura
Thompson,

    *Plaintiffs*,

    v.

Target Corporation, Brian C. Cornell,
David P. Abney, Douglas M. Baker, Jr.,
George S. Barrett, Gail K. Boudreaux,
Robert L. Edwards, Melanie L. Healey,
Donald R. Knauss, Christine A. Leahy,
Monica C. Lozano, Grace Puma, Derica
W. Rice, and Dmitri L. Stockton,

    *Defendants*.

No. 2:23-cv-00599-JLB-KCD
Honorable John Badalamenti

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED
COMPLAINT**

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ..................................................................1

II.    SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS .....................1

       A.    Target's Leadership Has Systematically Subjected Core Company
             Business to Stakeholder-Driven Social Activism...................................1

       B.    Target's Stakeholder-Driven Activism Culminated in Record Losses
             Caused by Customer Backlash to the 2023 LGBT-Pride Campaign ......2

       C.    Defendants Concealed the Risks of Customer Backlash Against
             Target's Stakeholder-Driven ESG/DEI Initiatives Like the Pride
             Campaign.................................................................................................4

III.   ARGUMENT .........................................................................................6

       A.    Defendants' Statements Were Materially False and Misleading
             Under Sections 10(b) and 14(a). ..........................................................7

             1.    The ESG/DEI Risk Statements Were Materially False
                   and Misleading. ...........................................................................8

             2.    The Social & Political Risk Oversight Statements Were
                   Materially False and Misleading. ...............................................16

             3.    The Shareholder Value Statements Were Materially False
                   and Misleading. ..........................................................................19

             4.    The Executive Compensation Statements Were Materially
                   False and Misleading. .................................................................21

             5.    The Employee Safety Statements Were Materially False
                   and Misleading. ..........................................................................23

       B.    Plaintiffs Sufficiently Plead the Remaining Section 10(b) Elements. ...25

             1.    Plaintiffs Allege a Strong Inference of Scienter. ........................25

             2.    Plaintiffs Allege Loss Causation.................................................32

       C.    Plaintiffs Sufficiently Plead the Remaining Section 14(a) Elements.....40

             1.    Plaintiffs Allege a Culpable State of Mind................................40

             2.    Plaintiffs Allege Transaction & Loss Causation.........................43

IV.    CONCLUSION ...........................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. SEC,*
    446 U.S. 680 (1980) ........................................................................41

*Acito v. IMCERA Grp., Inc.,*
    47 F.3d 47 (2d Cir. 1995) ...............................................................25

*In re AFC Enters., Inc. Sec. Litig.,*
    348 F. Supp. 2d 1363 (N.D. Ga. 2004) ...........................................26

*In re AGNC Inv. Corp.,*
    2018 WL 3239476 (D. Md. 2018) ...................................................43

*Aldridge v. A.T. Cross Corp.,*
    284 F.3d 72 (1st Cir. 2002).............................................................26

*In re Andrx Corp., Inc.,*
    296 F. Supp. 2d 1356 (S.D. Fla. 2003)...........................................15

*Bastian v. Petren Res. Grp.,*
    892 F. 2d 680 (7th Cir. 1990) .........................................................33

*Beckel v. Fagron Holding USA, Inc.,*
    2019 WL 5110828 (M.D. Fla. Jun. 24, 2019) ................................35

*Bellocco v. Curd,*
    2005 WL 2675022 (M.D. Fla. Oct. 20, 2005) ................................13

*In re BofI Holding, Inc. Sec. Litig.,*
    977 F.3d 781 (9th Cir. 2020) ..........................................................40

*In re BP p.l.c. Sec. Litig.,*
    843 F. Supp. 2d 712 (S.D. Tex. 2012).......................................18, 19

*Bryant v. Avado Brands, Inc.,*
    187 F.3d 1271 (11th Cir. 1999).................................................25, 29

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.,*
    394 F.3d 126 (3d Cir. 2004) ...........................................................41

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019)............................................................. 7, 14

*CFTC v. S. Tr. Metals, Inc.*,
894 F.3d 1313 (11th Cir. 2018)...................................................................35

*In re Citigroup Inc. Shareholder Derivative Litigation*,
964 A.2d 106 (Del. Ch. 2009) ............................................................. 5, 19

*Damian v. Montgomery Cnty. Bankshares, Inc.*,
981 F. Supp. 2d 1368 (N.D. Ga. 2013) ......................................................33

*Davidco Invs., LLC v. Anchor Glass Container Corp.*,
2006 WL 547989 (M.D. Fla. Mar. 6, 2006) ............................................. 9, 11

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ...................................................................................33

*Eastwood Enters., LLC v. Farha*,
2009 WL 3157668 (M.D. Fla. Sept. 28, 2009) ..........................................38

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
560 F. Supp. 2d 1221 (M.D. Fl. 2008) ......................................................41

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
595 F. Supp. 2d 1253 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783
(11th Cir. 2010) ............................................................ 26, 27, 43, 44, 45

*Emps. Ret. Sys. of City of St. Louis v. Jones*,
2021 WL 1890490 (S.D. Ohio May 11, 2021) ......................................17, 44, 45

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ................................................. 17, 18

*In re Fannie Mae 2008 Sec. Litig.*,
742 F. Supp. 2d 382 (S.D.N.Y. 2010)........................................................18

*FindWhat Inv. Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011)................................................. 8, 13, 15, 33, 36

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)........................................ 36, 37

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................28

*Galef v. Alexander*,
    615 F.2d 51 (2d Cir. 1980) ........................................................................ 43

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ..................................................................... 13

*Gen. Elec. Co. by Levit v. Cathcart*,
    980 F.2d 927 (3d Cir. 1992) ...................................................................... 44

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ................................................................... 39

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ...................................................................... 16

*Gruber v. Gilbertson*,
    628 F. Supp. 3d 473 (S.D.N.Y. 2022) ....................................................... 39

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) ................................................................... 12

*Hastey v. Welch*,
    449 F. Supp. 3d 1053 (D. Kan. 2020) ....................................................... 43

*In re Jiangbo Pharms., Inc. Sec. Litig.*,
    884 F. Supp. 2d 1243 (S.D. Fla. 2012) ....................................... 33, 34, 37

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ...................................................................... 25

*Kennedy v. Tallant*,
    710 F.2d 711 (11th Cir. 1983) ............................................................. 21, 22

*Knollenberg v. Harmonic, Inc.*,
    152 F. App'x 674 (9th Cir. 2005) .............................................................. 41

*Knurr v. Orbital ATK Inc.*,
    276 F. Supp. 3d 527 (E.D. Va. 2017) ........................................................ 41

*Kohn v. Am. Metal Climax, Inc.*,
    322 F. Supp. 1331 (E.D. Pa. 1970) ........................................................... 22

*Lee v. Frost*,
    2021 WL 3912651 (S.D. Fla. Sept. 1, 2021) ............................................. 42

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2014 WL 6661918 (N.D. Ga. Nov. 19, 2014) ......................................... 34

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) ............................................................... 39

*Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915 (11th Cir. 2020) ............................................... 35, 37

*Lynn Finkelstein & Co. v. Ball*, 2007 WL 9701156 (S.D. Fla. May 15, 2007) ..................................... 38

*MacPhee v. MiMedix Grp., Inc.* 73 F.4th 1220 (11th Cir. 2023) ......................................... 34, 35, 36

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, 2019 WL 5394011 (M.D. Fla. Oct. 16, 2019) ................. 8, 17, 33, 37, 38, 39, 40

*MBI Acquisition Partners v. Chronical Publ'g Co.*, 301 F. Supp. 2d 873 (W.D. Wis. 2002) ................................. 29

*McDowell v. Bracken*, 794 F. App'x 910, 912 (11th Cir. 2019) ........................................... 45

*In re Metris Cos., Inc. Sec. Litig.*, 428 F. Supp. 2d 1004 (D. Minn. 2006) ..................................... 27

*Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013) ..................................... 21, 33, 37, 39

*Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014) ..................................... 12, 15

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008) ..................................... 25, 32

*Nakkhumpun v. Taylor*, 782 F.3d 1142 (10th Cir. 2015) ..................................... 33, 38

*In re NTL, Inc. Sec. Litig.*, 2006 WL 330113 (S.D.N.Y. Feb. 14, 2006) ..................................... 39

*Ohio Pub. Emps' Ret. Sys. v. Fed. Home Loan Mtg. Corp.*, 830 F.3d 376 (6th Cir. 2016) ..................................... 33

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ...................................................................................23

*Ont. Provincial Council of Carpenters' Pension Tr. Fund v. Walton*,
294 A.3d 65 (Del. Ch. 2023) ......................................................................17

*Phillips v. Sci.–Atlanta, Inc.*,
374 F.3d 1015 (11th Cir. 2004)....................................................................25

*Pub. Emps.' Ret. Sys. v. Mohawk Indus.*,
564 F. Supp. 3d 1272 (N.D. Ga. 2021) .......................................................36

*Sapssov v. Health Mgt. Assocs., Inc.*,
608 Fed. App'x 855 (11th Cir. 2015) ..........................................................33

*SEC v. Falstaff Brewing Corp.*,
629 F.2d 62 (D.C. Cir. 1980) ......................................................................17

*SEC v. Morgan Keegan & Co.*,
678 F.3d 1233 (11th Cir. 2012)....................................................................13

*SEC v. World-Wide Coin Invs., Ltd.*,
567 F. Supp. 724 (N.D. Ga. 1983).................................................................7

*Shash v. Biogen, Inc.*,
84 F.4th 1 (1st Cir. 2023) .....................................................................38, 39

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) ......................................................................33

*Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*,
2019 WL 4600409 (M.D. Fla. Sept. 23, 2019) ...........................................37

*In re Sunterra Corp. Sec. Litig.*,
199 F. Supp. 2d 1308 (M.D. Fla. 2002) ......................................................45

*In re: Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021) ........................................................................25

*Theodore v. Purecycle Techs., Inc.*,
2022 WL 20157415 (M.D. Fla. Aug. 4, 2022) ............................................36

*Theodore v. Purecycle Techs., Inc.*,
2023 WL 4035880 (M.D. Fla. June 15, 2023)..............................................28

*In re Theragenics Corp. Sec. Litig.*,
    137 F. Supp. 2d 1339 (N.D. Ga. 2001) ............................................................. 28

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013) ................................................................................ 20

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
    985 F.2d 1190 (2d Cir. 1993) ............................................................................ 14

*United States v. Goyal*,
    629 F.3d 912 (9th Cir. 2010) ............................................................................. 26

*Wang v. Cloopen Grp. Holding Ltd.*,
    661 F. Supp. 3d 208 (S.D.N.Y. 2023) ......................................................... 12, 16

*Weisberg v. Coastal States Gas Corp.*,
    609 F.2d 650 (2d Cir. 1979) ............................................................................. 43

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) ............................................................ 45

*Werner v. Werner*,
    267 F.3d 288 (3d Cir. 2001) ............................................................................. 21

*In re Willis Towers Watson Plc Proxy Litig.*,
    439 F. Supp. 3d 704 (E.D. Va. 2020) ............................................................... 41

*Wilson v. Great Am. Indus., Inc.*,
    855 F.2d 987 (2d Cir. 1988) ............................................................................. 41

*In re Zoom Sec. Litig.*,
    2022 WL 484974 (N.D. Cal. Feb. 16, 2022) ......................................... 10, 17, 18

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A) ..................................................................................... 41

**Other Authorities**

17 C.F.R. § 229.105(a) ........................................................................................... 15

17 C.F.R. § 240.10b-5 .............................................................................................. 7

17 C.F.R. § 240.14a-9 .............................................................................................. 7

@apbrallenuk, Instagram (May 9, 2023), https://perma.cc/5UKM-3G6N ................................................................................................31

Fed.R.Civ.P.9(b) ...................................................................................42

Hester M. Peirce, SEC Comm'r, Remarks Before the Brookings Inst.: Chocolate-Covered Cicadas (July 20, 2021), http://tinyurl.com/yn3kp7x3..........................................................................................27

Lucian A. Bebchuk & Roberto Tallarita, *The Perils and Questionable Promise of ESG-Based Compensation*, 48 J. Corp. L. 37 (2022) ............................27

Target, *We Are Never Done: Inside Target's 2019-2021 Diversity, Equity & Inclusion Journey — and Where We're Going Next* (Mar. 7, 2022), https://perma.cc/TEV3-4ZSA ................................................................ 23, 26

Thomas Lee Hazen, 3 *Law Sec. Reg.* (Nov. 2023 update) .................................. 41, 43

## TABLE OF DEFINITIONS AND ABBREVIATIONS

| Term/Definition | Abbreviation(s) |
|---|---|
| Amended Complaint | AC. All citations of the AC are styled "¶[_]" |
| Brian Cornell, CEO and Chairman of the Board of Directors, Target Corporation | Cornell |
| Business Roundtable 2019 Statement on the Purpose of the Corporation | BRT Statement |
| Defendants David P. Abney, Douglas M. Baker, Jr., George S. Barrett, Gail K. Boudreaux, Robert L. Edwards, Melanie L. Healey, Donald R. Knauss, Christine A. Leahy, Monica C. Lozano, Grace Puma, Derica W. Rice, and Dmitri L. Stockton | Director Defendants |
| Defendants' Motion to Dismiss the Amended Complaint | MTD |
| Diversity, Equity & Inclusion | DEI |
| Environment, Social & Governance | ESG |
| The Governance & Sustainability Committee of Target's Board of Directors | GS Committee |
| Lesbian, gay, bisexual, transgender, queer, intersex, and asexual or other | LGBTQIA+ or LGBT, etc. |
| Private Securities Litigation Reform Act of 1995 | PSLRA |
| Securities Exchange Act of 1934 | Exchange Act |
| Securities and Exchange Commission | SEC |
| Target's 2023 "Pride Collection" | 2023 LGBT-Pride Campaign, Pride Campaign, or Campaign, etc. |
| Target 2021 Annual Report | 2021 Report |
| Target 2022 Annual Report | 2022 Report |
| Target 2022 Proxy Statement | 2022 Proxy |
| Target 2023 Proxy Statement | 2023 Proxy |

## I.    PRELIMINARY STATEMENT

Nothing about the federal securities laws prevents a company from sacrificing financial returns to "Embrace[] DEI and ESG" or express "support for the LGBTQ+ community." MTD.2-3. But they *do prohibit* doing that while saying that the company is focused on "shareholder returns," ¶380, and "oversee[ing] … social and political issues and risks" affecting their bottom line, ¶329, thereby misleading investors about the financial consequences of their decision.

That is precisely what Defendants did here. Target took on an immense risk that its middle-class customers would revolt when it systematically subjected its merchandising, marketing, and other core operations to the interests of "stakeholders" that advocate for ESG and DEI. But instead of truthfully describing the risks of this strategy to investors (as other similarly positioned companies do), Target lulled investors with misleadingly incomplete descriptions of those risks and false statements about how its Board of Directors was monitoring them. Investors learned the truth. Target rolled out a 2023 LGBT-Pride Campaign that was so extreme and offensive to its customers that they boycotted *en masse*, resulting in record investor losses. Plaintiffs—four individual investors and a small investment adviser—brought this action afterward to seek recovery of those losses.

## II.    SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS

### A.    TARGET'S LEADERSHIP HAS SYSTEMATICALLY SUBJECTED CORE COMPANY BUSINESS TO STAKEHOLDER-DRIVEN SOCIAL ACTIVISM.

This case is about Target's coordination with pro-ESG/DEI interest groups it

calls "stakeholders"—and its false and misleading portrayal of that strategy to investors. In corporate-speak, the term "stakeholders" is "used to refocus corporate decision-makers on constituencies *other than* their shareholders." ¶¶63-67.[1]

Under Target's CEO and Board Chairman Cornell—who sought to use his role to "drive change" on "civic discussions and policy," ¶401—Target made "stakeholder" interests "core to the Company's governance." ¶¶73, 68-110. Target responded "at the beck and call" of activists on initiatives ranging from gay marriage, ¶¶8, ¶137, transgender access to women's bathrooms, ¶¶10, 83, supplier diversity, ¶¶11, 13, 78 "racial equity," ¶¶12, 77, 79-80, abortion, ¶81, DEI, ¶¶84-88, and LGBT issues and LGBT-Pride themed merchandise, ¶¶8-9, 82, 111-162, among others, ¶76.

At every turn, Target used "stakeholders" to advance ESG/DEI initiatives. It even viewed its stakeholder category of "guest" as "an opportunity for *us* to … create waves of change" on DEI. ¶¶89-91. Target told SEC staff how its ESG "programs and commitments" were designed "to address evolving stakeholder expectations." Ex.EE.2. Search this case's record: there is no example where Target's attempts to meet stakeholder "expectations" produced anything other than ESG/DEI initiatives.

**B.    TARGET'S STAKEHOLDER-DRIVEN ACTIVISM CULMINATED IN RECORD LOSSES CAUSED BY CUSTOMER BACKLASH TO THE 2023 LGBT-PRIDE CAMPAIGN**

Target's coordination with "stakeholders" was especially aggressive in showing its "commitment … to the LGBTQIA+ community." ¶251. Target created internal

---

[1] Unless otherwise stated, all emphasis is added and internal citations, brackets, and quotation marks are omitted. All pinpoint citations are to the document's original pagination, not the ECF stamp.

LGBT advocacy stakeholder groups, ¶101, 113, and donated millions to LGBT advocacy nonprofits that called for and participated in Target's LGBT-Pride business initiatives, ¶¶111-62. Target willfully engaged in these initiatives despite clear red flags that they risked backlash from Target's middle-class customers. ¶¶163-86. For example, after Target endorsed transgender access to female bathrooms in 2016, boycotts ensued and caused financial losses. ¶¶172-79. Cornell admitted the losses were "self-inflicted" because he and Target's leadership "didn't adequately assess the risk" of backlash. ¶177. Nonetheless, Target continued to push LGBT initiatives, prompting more attempts to organize boycotts. ¶¶180-86, 194.

As relevant here, last year Target advanced "stakeholder" interests by launching its most extreme LGBT initiative ever, the 2023 Pride Campaign. ¶¶188-246. Target knew the Campaign would outrage Target's customers. Executives wanted to "push the envelope" even if that meant "alienating" customers. ¶205. The employees they put in charge did not disappoint: They committed to "whip out the Glitter & Hellfire flamethrowers and rip that old world to shreds" and "make sales tank." ¶¶200-01. For the first time, Target moved LGBT displays "front and center when you walk into the store" and stocked products that could not be more offensive to customers, including "pride toddler legging," genital "tuck-friendly" transgender swimsuits in "extra-extra-small" sizes, and products designed by an LGBT Satanist. ¶¶203, 213-224. It aimed the Campaign directly toward children as young as infants. ¶¶212-14.

The result was a customer-relations disaster that directly harmed investors. Massive customer boycotts followed the Campaign, tanking sales. Target's stock price

plunged, with $10 billion of its market capitalization lost in 10 days. ¶¶230-36. Target's quarterly sales fell for the first time in six years and its stock continued to decline as information about the Campaign and the boycotts spread. ¶¶238-41.

### C. DEFENDANTS CONCEALED THE RISKS OF CUSTOMER BACKLASH AGAINST TARGET'S STAKEHOLDER-DRIVEN ESG/DEI INITIATIVES LIKE THE PRIDE CAMPAIGN.

Of course, the federal securities laws didn't prohibit Defendants from prioritizing "stakeholder" interests. But they did require Defendants to truthfully disclose it. If a company decides to satisfy stakeholders with an initiative designed to "make sales tank," investors are entitled to know before they put their money in. But instead of accurately stating Target's decision to prioritize stakeholder-driven "waves of change" "even at the risk of alienating" customers as they were required, ¶205, Defendants concealed it. That set Target apart from other companies that have adopted pro-ESG/DEI measures while openly disclosing their risks. ¶¶269-76. Leading up to the Pride Campaign and after, Defendants made a series of misleading statements designed to mask the risks of customer backlash that Target faced.

ESG/DEI Risk Statements. In Target's 2021 Annual Report (published in March 2022 and incorporated into each subsequent quarterly report, ¶¶278-80) Defendants vaguely noted ESG/DEI risks in a blunderbuss disclosure and made no mention of the then-existing risk of customer backlash against Target's ESG/DEI mandates and the 2023 Campaign. The 2022 Report (published in March 2023) was even worse, tailoring the disclosure to provide that Target faced risk *only* from "failure … to achieve" its ESG/DEI mandates, telling Target investors they need only worry

if Target did *too little* in initiatives like the Pride Campaign. ¶¶286-87. An investor would have had no idea that Target intended to do *too much* by pursuing intentionally provocative, pro-ESG/DEI initiatives designed to "push the envelope" and alienate customers. Defendants continued to conceal this risk even *in the midst of* ongoing customer backlash to the 2023 Campaign by incorporating the same misleading disclosures in their subsequent quarterly reports as well. ¶288.

Social & Political Risk Oversight Statements. In Target's 2022 and 2023 Proxies to secure shareholder votes to elect directors and defeat proposals that would limit Cornell's power, Defendants represented that the Board monitored the "social and political issues and risks" arising from Target's ESG/DEI mandates. ¶¶311-15. The Board overhauled its GS Committee to establish this new risk oversight function instead of "instill[ing] ESG-related priorities into our business" as it previously had. ¶¶319-32. But instead of overseeing social and political risks from any source, the Board and the Committee only made sure that Target *adopted* ESG/DEI mandates to please pro-ESG/DEI stakeholders and did *not* monitor the social and political risk that it would outrage consumers in the process. ¶¶333-361.

Shareholder Value Statements. Also in Target's 2022 and 2023 Proxies, Defendants declared that the Board was committed to the policies that "best serve[] the interests of Target and our shareholders." ¶¶365-67. Defendants did so even though they knew that Target was engaged in ESG/DEI initiatives to satisfy "*stakeholder*" interests that were antagonistic to *shareholder* interests. ¶¶369-78.

Executive Compensation Statements. Seeking votes to approve Cornell's and

other executives' pay, Defendants also advertised in the 2022 and 2023 Proxies that Target's compensation plans were "directly linked to performance and long-term value creation for our shareholders," among other attestations of financial-results orientation. ¶¶380-81, 385, 392-94. But Defendants failed to truthfully describe how its compensation methodology, when pieced together with the rest of the fragmented disclosure, tied executives' compensation to vague metrics of "progress on … DE&I goals" rather than financial results. ¶¶383-90, 395-96.

Employee Safety Statements. Once the 2023 Pride Campaign launched and boycotts ensued, Cornell and Target lulled investors about the threats to Target's bottom line by announcing that offensive LGBT merchandise would be relocated to less prominent places in Target stores. ¶¶248, 251. That reaction would have normally told investors that Target recognized the financial harm the Campaign was causing. But Cornell and Target concealed this fact by representing that they did it because Target's own customers were posing "threats" to employees' "safety" by voicing their opposition to the offensive merchandise. *Id*. That was false: At the time they said it, internal Target systems reported no threats, and Target's internal communications did not indicate safety was the reason for changing the Campaign. ¶¶252-61. Instead, as Defendants later admitted, the real reason Target moved the merchandise was to mitigate the financial effects of customer backlash to the Campaign. ¶¶262-68.

## III.  ARGUMENT

To state a Section 10(b) claim, a plaintiff must allege, as relevant here, (1) a material misrepresentation or omission; (2) made with scienter; and (3) loss causation.

6

*Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019). A Section 14(a) claim is similar, but is limited to proxy statements, requires only negligence rather than scienter, and requires establishing transaction causation. Plaintiffs proceed as follows:

A.    Plaintiffs adequately allege that Defendants' statements were materially false and misleading. All of the statements are actionable under Section 10(b). All but one set, the Employee Safety Statements, are also actionable under Section 14(a).[2]

B.    Plaintiffs adequately allege the remaining Section 10(b) elements against Cornell and Target. Cornell acted with scienter and, thus, Target did too. Loss causation is established because the massive customer backlash—the risk of which Defendants concealed—caused Plaintiffs' losses.

C.    Plaintiffs adequately allege the remaining Section 14(a) elements. All Defendants were negligent. Transaction causation is established because re-electing the Board via misleading proxies encouraging them to double down on ESG/DEI, defeating proposals that would have diminished Cornell's power, and approving their DEI-incentivizing compensation together caused the 2023 Campaign. Plaintiffs also request declaratory and injunctive relief that satisfy transaction causation.

### A.    DEFENDANTS' STATEMENTS WERE MATERIALLY FALSE AND MISLEADING UNDER SECTIONS 10(b) AND 14(a).

Rules 10b-5 and 14a-9 each impose liability for material misstatements and omissions. 17 C.F.R. §§ 240.10b-5, 240.14a-9. A statement or omission is misleading

---

[2] The ESG/DEI Risk Statements were made in annual reports but were attached to the Proxies. Exs.C.71, D.73. *See SEC v. World-Wide Coin Invs., Ltd.*, 567 F. Supp. 724, 742 (N.D. Ga. 1983).

"'if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.'" *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, 2019 WL 5394011, at *9 (M.D. Fla. Oct. 16, 2019). This happens when a statement is false or technically accurate but misleadingly incomplete (i.e., a half-truth). *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011).

### 1.    The ESG/DEI Risk Statements Were Materially False and Misleading.

#### a.    Defendants Misled Investors About the Risk of Backlash to Target's ESG/DEI Mandates.

Defendants first argue the 2021 Report was not misleading because Target disclosed the risk of customer backlash to Target's ESG/DEI mandates when it stated that "anyone" could "influence perceptions of Target" and that reputational harms to Target could "result in consumer boycotts." MTD.17-18. But that wasn't specifically about customer backlash to ESG/DEI. To be sure, the Report said indirectly that one potential cause of reputational harm was Target's "position or perceived lack of position" on ESG/DEI. ¶278.[3] But Target lumped that coin-flip boilerplate in with various other vague causes, including "anyone" on "social media," "negative publicity," "negative incidents," and "guests" who "unfavorably view ... other companies with whom we have relationships." *Id*. Such a blunderbuss description does not disclose a discrete, presently-existing risk and thus misleads as to its existence.

---

[3] As with later disclosures, the context shows Defendants clearly didn't have in mind the risk of *opposition* to Target's ESG/DEI positions here. The same sentence clarified that ESG/DEI risks came from Target's "perceived lack of transparency about [ESG/DEI]," ¶278, which is a reference to the ESG/DEI-related disclosures that stakeholders frequently demand from companies and then use as "pressure points" to induce further ESG/DEI commitments. ¶66.

*Davidco Invs., LLC v. Anchor Glass Container Corp.*, 2006 WL 547989, at *11 (M.D. Fla. Mar. 6, 2006) ("'[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.'"). Defendants even admit the language "did not limit the potential sources of reputational harm." MTD.18. That waters down the disclosure to nothing.

But even (and especially) if the 2021 Report's language about Target's "position" on ESG/DEI disclosed a risk of backlash, the 2022 Report categorically did not. The 2022 Report deleted the 2021 Report's language about Target's "position" on ESG/DEI and replaced it with a disclosure that Target faced risk stemming only from its "***failure, or perceived failure, by us to achieve [ESG/DEI]*** goals and initiatives or to otherwise meet evolving and varied stakeholder expectations." ¶287. Defendants trumpet that merely adding new language means Defendants "***expanded*** on Target's prior disclosure." MTD.19 (emphasis in original). But that flatly ignores how it *narrowed* the disclosure by only mentioning risks from failing to achieve ESG/DEI goals for stakeholders.[4] Even if "stakeholder expectations" somehow meant "customers opposed to our ESG/DEI mandates" (as Defendants now suggest it does) Target still only disclosed risks from its failure to "***achieve*** [ESG/DEI] goals and

---

[4] Defendants misleadingly characterize the 2022 Report as disclosing risk from "'***[a]ny failure***, or perceived failure' by Target to '***meet evolving and varied***' expectations of stakeholders" such as "through [ESG/DEI] goals and initiatives." MTD.19 (emphasis in original). But the Report said that the risk came from Target's failure, first, "***to achieve [ESG/DEI] goals and initiatives*** or otherwise meet evolving and varied stakeholder expectations." ¶287.

initiatives" and not from its "position" in favor of ESG/DEI in the first place.[5]

In any case, the meaning of "stakeholder expectations" decidedly did not include opposition to ESG/DEI initiatives. That disclosure only meant that Target faced risk from *pro*-ESG/DEI stakeholders, not from customers or others opposed to ESG/DEI. §II.A, *supra*. In the context of ESG/DEI issues, "stakeholders" means constituencies that *support* ESG/DEI. ¶¶63-67. And even if that weren't the term's ordinary meaning, that was its meaning in the 2022 Report because Target treated it that way. §II.A, *supra*; *see In re Zoom Sec. Litig.*, 2022 WL 484974, at *3 (N.D. Cal. Feb. 16, 2022) (terms are defined by the company's conduct even when that suggests a definition that is "different[] from 'the commonly accepted definition.'"). Thus, the 2022 Report's disclosure of risks from failing to meet "stakeholder expectations" referred only to other ways that Target might fail to advance ESG/DEI programs in the eyes of these stakeholders and *not* to ways in which Target's customers might find those programs objectionable.[6]

The background context that "stakeholders" equate to pro-ESG/DEI interests is so strong that even when arguing the contrary, Defendants let slip that stakeholders

---

[5] Compared to the 2021 Report, the 2022 Report also removed the risk of "consumer boycotts" from its discussion of ESG/DEI issues. The 2022 Report placed its discussion of ESG/DEI in a new paragraph separate from the paragraph discussing consumer boycotts. ¶286. Defendants say the new ESG/DEI paragraph warned of the same outcomes as the preceding paragraph, including "consumer boycotts." MTD.6, 19. But while the preceding paragraph repeated the 2021 Report's disclosure of potential "consumer boycotts, workforce unrest or walkouts, government investigations, and litigation," ¶286, the new paragraph identified only a subset of those outcomes—"legal and regulatory proceedings against us"—and did not include customer boycotts, ¶287.

[6] Target itself previously used almost the exact same phrase ("evolving stakeholder expectations") when it told the SEC that its ESG "programs and commitments" were designed "to *address evolving stakeholder expectations*," Ex.EE.2, confirming that the phrase means *pro*-ESG/DEI interests.

were the *intended targets* of Target's ESG/DEI initiatives. MTD.19 (characterizing the

Statements as disclosing risks of Target failing to meet the "expectations of

stakeholders *through these goals and initiatives*"). It would make no sense for Target to

meet the expectations of customers opposed to ESG/DEI "*through* ESG/DEI goals

and initiatives." That statement is only logical if "stakeholders" means interests that

support ESG/DEI. Indeed, Defendants themselves admit that Target warned about

the risk of backlash only from "*[s]ome* [s]takeholders." MTD.2.

Reversing themselves, Defendants next say that references to "stakeholders"

instead broadly means "customers" and "investors" "among others," including

"suppliers, investors, nonprofits, and others." MTD.6, Ex.EE.2. That proves too

much. If "stakeholders" just means the numerous groups that happen to interact with

the company, then that just means reputational risk could be caused by anyone and

anything. A disclosure that Target faced risks from failing to "meet evolving and varied

[employee, customer, supplier, investor, nonprofit, or other groups'] expectations"

adds nothing of substance. *See Davidco*, 2006 WL 547989, at *11.

In short, when Target told investors it faced risks for its "failure … to achieve

[ESG/DEI] goals and initiatives" or meet "stakeholder expectations," that meant one

thing: Target faced risks only from not catering enough to pro-ESG/DEI stakeholders,

but there was no such warning about the risks of catering too much to them.

> **b.** <u>Defendants Misled Investors About the Risk of Backlash to
> the 2023 LGBT-Pride Campaign.</u>

Defendants argue they didn't have to mention risks of the 2023 Pride Campaign

because their "disclosure of the risk of adverse reactions in response to [Target's] ESG/DEI initiatives" included them. MTD.20. That fails because Defendants misled as to those risks, too. §III.A.1.a, *supra*.[7] And at all events, Target still had to disclose the risks of the 2023 Campaign.

Assuming that the ESG/DEI Risk Statements disclosed the risk of customer backlash to Target's ESG/DEI mandates, they were still misleading because they failed to disclose the imminent and ongoing 2023 Campaign. To be covered by another disclosure, the "actually realized" risk must be "of a *significance* similar" to that of the disclosed risks. *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999). "A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014).

While (on this reading) Target would have disclosed risks to its ESG/DEI positions coming from any source (not only from those who wanted *more* ESG/DEI), the 2023 Pride Campaign zeroed in on a specifically controversial issue, ¶¶187-90, 196-97, and was intentionally designed to stoke extraordinary controversy. §II.B, *supra*; *see Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 227 (S.D.N.Y. 2023) (disclosure of sales decline that gave the impression of stabilizing was rendered

---

[7] Here, Defendants apparently can't bring themselves to say that Target disclosed the risk of customer backlash (as they did earlier), saying only that Target disclosed "the risk of adverse reactions in response to its ESG/DEI initiatives." MTD.20. But that characterization of the disclosure is consistent with disclosing the one-sided risk of pro-ESG/DEI stakeholders adversely "responding" to Target's "failure to achieve" its ESG/DEI goals. §III.A.1.a, *supra*. To the extent "adverse reactions" just means falling short of stakeholders' pro-ESG/DEI expectations, that disclosure plainly does not include customer opposition to the 2023 Campaign.

misleading by the omission of an ongoing "dramatic [sales] decline"). The 2023
Campaign's uniquely offensive LGBTQ+ merchandise and marketing certainly
increased the "probability" that the warned of backlash would occur, and Defendants
knew it was more "significant." Thus, Defendant's failure to disclose the risks incurred
by the 2023 Pride Campaign is actionable.

c.    The Misleading ESG/DEI Risk Statements Were Material.

Defendants argue that these statements weren't material because investors
allegedly knew of the risks of customer backlash to Target's activism. But investors'
supposed awareness of the "risks inherent" to a company's business do not make
misleading statements about it immaterial. *FindWhat*, 658 F.3d at 1299 (11th Cir.
2011). The same applies to Target's ESG/DEI commitments here.

A misrepresented or omitted fact is material if there is a "substantial likelihood"
that the information "would have been viewed by [a] reasonable investor as having
significantly altered the 'total mix' of information made available" to investors. *SEC v.
Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012). "[M]ateriality is not
typically resolved at the motion to dismiss stage" unless the facts are "'so obviously
unimportant to an investor that reasonable minds cannot differ.'" *Bellocco v. Curd,* 2005
WL 2675022, at *3 (M.D. Fla. Oct. 20, 2005). That is especially true here because
Defendants rely on the materiality of *other* public information that they themselves did
not disclose. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

Defendants say investors knew about the risk of backlash because the history of
Target's ESG/DEI activism assembled in the AC was "public." MTD.21. But the fact

13

that Plaintiffs independently researched and developed publicly accessible evidence of Defendants' fraud does not mean reasonable investors did. *See United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) ("[M]ere presence in the media of sporadic news reports" is not part of the "total mix," especially where "articles were few in number, narrow in focus, and remote in time").[8]

The AC painstakingly documents and connects disparate sources of evidence spanning over a decade to uncover Target's history of stakeholder activism. Essential parts documenting the prominence of LGBT activism within Target's system of stakeholder governance and the risks it continually involved were available only on obscure LGBT news and progressive activist websites, ¶¶108, 121-22, 130, 133-34, 139, 142-43, 146, 148, 164, 166, 168, online Target employee forums, ¶185, social media, ¶¶85, 121, 144, 170, 183, deleted webpages available only via archiving services, ¶¶9, 168, interviews with the confidential witness, ¶¶202-03, 205, religious and conservative blogs and news media, ¶¶84, 114, 117, 168, 171, 181, 184, 194, 200-01, and legal briefs filed with SEC staff, ¶¶72-74, 113, 132. *See Int'l Paper*, 985 F.2d at 1199 ("regulatory agency documents" that were not the challenged securities filings were not included in the "total mix"). These facts were not "addressed openly in [Target's] filings," *Carvelli*, 934 F.3d at 1321, and were decidedly not "'reasonably available to the

---

[8] Regardless, Defendants' materiality argument does not apply to Plaintiffs' Section 14(a) claims because publicly available information that was not distributed to shareholders entitled to vote at the shareholder meeting does not enter the "total mix" of information. *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993). None of the AC's facts showing a history of backlash was distributed to shareholders for the 2022 or 2023 annual meetings.

shareholders,'" MTD.21. Defendants have not met their burden to show that the risk of customer backlash was "'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance'" their "'one-sided representations'" that none existed. *In re Andrx Corp., Inc.*, 296 F. Supp. 2d 1356, 1366 (S.D. Fla. 2003).

Regardless, the ESG/DEI risks of the Pride Campaign were materially greater in kind and degree than risks that had previously materialized.[9] Target's plans for the 2023 Campaign were not public, and thus no investors could have known about them.

> d.   The ESG/DEI Risk Statements Are Not Protected by the PSLRA's Safe Harbor for Forward-Looking Statements.

Defendants argue that the ESG/DEI Risk Statements are inactionable under PSLRA because they were forward-looking statements. MTD.22-23. But Plaintiffs allege that the Statements omitted risks that had already occurred and were in fact ongoing: backlash to Target's ESG/DEI mandates, ¶¶157-86, and—when Target's 10-Q report incorporating the Statements was issued on May 26, 2023—***the ongoing boycotts of the company*** over the 2023 Campaign. ¶¶225-28, 288; *see FindWhat*, 658 F.3d at 1299; *Jinkosolar*, 761 F.3d at 251 ("then-ongoing" incurrence of risk not insulated by "'[c]autionary words about future risk'"). The Statements thus are not protected. And for the same reason, the Statements are independently actionable for violating Defendants' duty to disclose under Item 105. 17 C.F.R. § 229.105(a) (requiring disclosure of "material factors that make an investment … speculative or risky"); *see*

---

[9] Defendants wrongly claim the AC "does not plead the contents of past Pride Collections." MTD.24. n.15. It does. ¶¶135, 184.

*Wang*, 661 F. Supp. 3d at 232.

The same goes for the Reports issued before the 2023 Campaign's launch date, when its unique risks were already evident. Risk disclosures are actionable not only when they are "virtually certain to occur," MTD.22, but when the company possesses information that is "inconsistent" with its public disclosures. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 779 (9th Cir. 2023). However characterized, both are present here. Target "already had information suggesting the [customer backlash]," *id.* at 779, as evidenced by senior leadership seeking to "push the envelope" "even at the risk of alienating" customers, ¶205, Pride-team staff saying that "sales [will] tank," ¶201, and other employees telling investors that "the environment seems to have changed," ¶197. That's all without even mentioning the customer backlash caused by past Target LGBT initiatives. Defendants incorrectly assert that Plaintiffs do not allege previous LGBT Pride initiatives impacted Target's sales, MTD.23, but it does. ¶¶172, 175 (falling sales after Target's 2016 transgender initiative). The 2023 Pride Campaign followed a well-traveled road to disaster.

## 2. The Social & Political Risk Oversight Statements Were Materially False and Misleading.

The Proxies stated that the Board monitored the "social and political issues and risks" of Target's ESG/DEI mandates, but that was false because the Board either did not monitor them or (at most) monitored only those important to pro-ESG/DEI "stakeholders." ¶¶307, 309. Defendants argue these statements referred only to the "allocation" of risk oversight between the Board and its committees. MTD.24-25. But

the Proxies affirmatively stated that the committees were "fulfilling the oversight and other responsibilities delegated by the Board." 2022 Proxy at 12; 2023 Proxy at 12. Falsity is established by language that creates a misleading "impression of a state of affairs." *MAZ Partners*, 2019 WL 5394011, at *9. A reasonable investor would have understood the statement that the GS Committee was "fulfilling" its "oversight responsibility" for "social and political issues and risks" to mean that the committee was, as its charter states, "[o]verseeing … social and political issues and risks *impacting the Corporation*," ¶315, as caselaw recognizes.[10] The Proxies calling out the GS Committee's risk oversight takes on even greater significance in light of Target's self-admitted failures to "adequately assess the risk … [of] backlash" to its ESG/DEI initiatives, ¶177, and the Board's overhaul of its committee structure to "'enhance its approach to oversight of risk and ESG matters.'" ¶¶319-31. *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019) (isolated statements about risk oversight were actionable when made to "reassure" investors about company's integrity); *In re Zoom.*, 2022 WL 484974, at *3 (company's "acknowledgement" of prior errors on the same subject altered the meaning of general language). That confirms the impression that the GS Committee monitored the risks.

---

[10] *See Ont. Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 95 (Del. Ch. 2023) (proxy statement's disclosure that "'Board committees … play active roles in fulfilling the risk oversight function'" "reassured [company] stockholders that they were complying" with oversight obligations); *Emps. Ret. Sys. of City of St. Louis v. Jones*, 2021 WL 1890490, at *8-9, 14 (S.D. Ohio May 11, 2021) (proxy statement's disclosure that there were "oversight processes in place" "assured the shareholders [directors] were protecting the Company from risk"); *SEC v. Falstaff Brewing Corp.,* 629 F.2d 62, 75 (D.C. Cir. 1980) (proxy statement's mention of "[t]he existence of a committee implies a structured investigation and analysis" and makes an "implication of careful oversight").

Moving on from the Proxies' meaning, Defendants argue the AC doesn't plead facts showing the Board failed to monitor risk or was engaged in one-sided oversight. MTD.25. They claim Target's consistent history of subjecting its business to pro-ESG/DEI stakeholder demands, §II.A, *supra*, "says nothing" about its oversight of social and political risks. MTD.26. That protests too much. "Statements about the adequacy of risk management operations and capabilities may be false and misleading where the speaker knows, or should know, that such operations are inadequate to manage the risks a company faces." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 761 (S.D. Tex. 2012); *see also In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 404-06 (S.D.N.Y. 2010); *Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1208-09 (W.D. Wash. 2009).

Target and its Board's own statements about their pro-ESG/DEI stakeholder governance evince their knowledge, ¶¶68-110, 398-427, and the recurrent history of attempted boycotts, ¶¶163-86, 194, combined with similar backlash ongoing with other companies' LGBT initiatives, ¶188-90, means they at least *should have known* that Target's social and political risk oversight was faulty. §§III.B.1, III.C.1, *infra*. Target's risk oversight "was designed for … chocolate sundaes" like ESG/DEI activism instead of the "plain vanilla" risk of alienating customers. *Fannie Mae*, 742 F. Supp. 2d at 404. Defendants say Plaintiffs' definition of stakeholders as pro-ESG/DEI groups doesn't fit the definition Target gave in the Proxies, but that only highlights why the Proxies were misleading: the Board's equation of monitoring social and political risk with pursuing ESG/DEI was "contrary to the plain language of the Proxies." MTD.26.

Defendants next say that the "uniquely controversial" 2023 Pride Campaign is not evidence of the Board's lack of oversight because it was only the "result" of a business decision. MTD.26-27. But the Campaign's disaster of epic proportions is powerful evidence of previous "corner-cutting, overlooked and disregarded warnings, [and] a lack of oversight" and thus "raises a genuine question as to whether [the company] was truly making the progress it claimed" on monitoring social and political risks, especially since it was preceded by customer backlash to similar initiatives. *BP*, 843 F. Supp. 2d at 758. The historic customer backlash to the Pride Campaign was the "culmination," *id.*, of over a decade of ignored red flags. Defendants rely on a higher burden state-law issue in *In re Citigroup Inc. Shareholder Derivative Litigation*, 964 A.2d 106 (Del. Ch. 2009), but there the plaintiffs only alleged directors' awareness of non-particular risks "in the economy generally," *id.* at 128. By contrast, Plaintiffs here plead facts supporting that directors would have been aware of ***the same risks*** that the Pride Campaign ultimately incurred. And Plaintiffs allege these facts not only for prior similar issues, but during the preparation of the 2023 Campaign itself, §II.B, *supra*, in no way hinging on the "result" of the campaign.[11]

### 3.    The Shareholder Value Statements Were Materially False and Misleading.

---

[11] Having been denied leave to file a 65-page MTD, Defendants resorted to attaching a 12-page "Annex A," where they place an "X" in the boxes for "Puffery" and "Forward-Looking" next to their reproduction of the ESG/DEI Risk Oversight Statements, as well as for the Shareholder Value and Executive Compensation statements, and in the box for "Reason/Opinion" next to the Shareholder Value, Executive Compensation, and Employee Safety Statements. MTD.4-12. Defendants do not argue in the 50-page MTD itself that the applicable statements were puffery, forward-looking, or reasons or opinions—and thus they have forfeited any contention on these points.

The Proxies repeatedly misled investors by declaring the Board's commitment to shareholder value and framing ESG/DEI as just another way to achieve it. That covered both the "stated subject matter" of ESG/DEI and the "reasons" they did it.

Defendants recast the Board's commitments to shareholder value to include ESG/DEI by emphasizing that the Proxies referred to "the interests of *the company* and its shareholders (not solely shareholders)," MTD.28, as if this meant the company's interests were distinct from shareholders and included nonshareholder "stakeholder" ESG/DEI interests. But this is sheer misdirection: As a matter of law, a board's duty "to the corporation and its stockholders" refers to the duty to "maximize the value of the corporation *for the benefit of its residual claimants*," i.e., shareholders. *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 20 (Del. Ch. 2013).

Defendants next say that Plaintiffs plead no underlying facts showing Target's commitment to shareholder value was false, arguing that the AC's detailed facts are just "taken out of context." MTD.28. But they blow past the AC's explanation of how Target's adhering to the BRT Statement introduced collateral "stakeholder" interests that are contrary to shareholder value. ¶¶69-70. Defendants admit Cornell defended Target's DEI commitments because they were the "right thing for society," but say that's okay because he also said DEI was somehow responsible for sales growth. MTD.29. That entirely ignores the AC's debunking of that claim. ¶¶373-74.

Finally, Defendants deflect Target executives' conflicts from serving in senior positions of LGBT nonprofits that received money for Target's LGBT initiatives (and that participated in the Pride Campaign, ¶120, 213), on the theory that

"'[i]nvolve[ment] with a non-profit'" is not a "legally cognizable conflict." MTD.30. But conflicts need not be a predicate for a breach of state-law fiduciary duties to nonetheless be inconsistent with Target's public commitment to shareholder value. ¶201 (Pride team employee saying "I will make sales tank."). Knowingly allowing extreme conflicts of interest undercuts Target's commitment to shareholder value.

### 4. The Executive Compensation Statements Were Materially False and Misleading.

Defendants argue that the Compensation Statements were not misleading because the Proxies disclosed their DEI incentives and Defendants' declaration that Target's compensation plans were aligned with financial results was an opinion, not a fact. But the disclosure was inadequate because it was buried, and Target's statement that its own compensation plan was aimed at financial results is actionable.

Target misled investors about its compensation plan's DEI incentives. A disclosure is "inadequate if it is presented in a way that conceals or obscures" the relevant information in a way that "prevents a reasonable shareholder from realizing [its] 'correlation and overall import.'" *Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001). "[D]isclosure cannot be achieved through piecemeal release of subsidiary facts which if stated together might provide a sufficient statement of the ultimate fact." *Kennedy v. Tallant*, 710 F.2d 711, 720 (11th Cir. 1983).[12] The Proxies' language mentioning DEI incentives, standing on its own, failed to disclose the truth: "'specific

---

[12] Defendants' cited case, *Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013), says that an efficient market will incorporate company-disclosed information. But the issue here is *whether* a disclosure was sufficiently clear to qualify in the first place. *Tallant,* 710 F.2d at 720.

team scorecard progress indicators' included … 'progress on … DE&I.'" ¶389; *Tallant*,
710 F.2d at 720 ("The ultimate conclusion … was never disclosed.").

Discovering the fact that "progress on DE&I" was, in fact, a substantial part of
the compensation plan requires unwrapping "fragmented" disclosures "separated by
[eight] pages." *Tallant*, 710 F.2d at 720; ¶¶384-89. The meaning of an acronym
necessary to popping open these nesting dolls (DE&I was a part of "team scorecard,"
which was a part of "***STIP***," which was part of "Pay for performance") was only
available in the appendix. MTD.9 n.7; *see Kohn v. Am. Metal Climax, Inc.*, 322 F. Supp.
1331, 1362-63 (E.D. Pa. 1970) ("referr[ing] [material information] generally to [an]
Appendix" was not "justified by [its] importance"). And the fact of undercutting
Target executives' financial-results incentives was highly material because it induced
behavior like failing to oversee risks to ESG/DEI initiatives. §III.B.1, *infra*.

Burying these DEI incentives was all the more problematic because the Proxies
boldly advertised the plans' "direct[] link to performance and long-term value creation
for our shareholders" and design to "encourage[] outstanding *financial* results."
¶¶379-81. Defendants respond by pointing out that several statements were prefaced
by phrases like "[w]e believe," turning them into opinions. MTD.30. But these
statements (which are not all of them)[13] are actionable. Even opinions are actionable
when they convey a misleading impression of why the speaker holds his belief.

---

[13] Such "belief" prefaces do not accompany the 2022 Proxy's statement that "[t]he pay programs
described … are structured based on financial and operational performance and shareholder
outcomes," ¶394, or the Proxies' others describing compensation as "Pay for performance," ¶384.

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015). That is especially so where a reasonable investor would understand the statement "to convey facts about how the speaker has formed the opinion." *Id.* In a proxy statement, an investor can "expect[] not just that the issuer believes the opinion … but that it fairly aligns with the information in the issuer's possession." *Id.* at 188-89. How was a reasonable investor supposed to understand Target's statement that it believed its own compensation plan should be directly linked to financial results? *Id.* at 189. Surely, he can trust that Target looked at its own proposal and confirmed that it does indeed tie compensation to financial results.

But that turned out to be false. Target's proposal compensated executives based on vague DEI metrics, not strictly "financial results" or quantifiable "financial goals." *Compare* ¶384 (pay based on "Sales, Incentive Operating Income"), *with* ¶389; Target, *We Are Never Done: Inside Target's 2019-2021 Diversity, Equity & Inclusion Journey — and Where We're Going Next* (Mar. 7, 2022), https://perma.cc/TEV3-4ZSA (pay based on "driving equitable business decisions").

### 5.    The Employee Safety Statements Were Materially False and Misleading.

After Target customers revolted against the Pride Campaign, Defendants misleadingly downplayed the extent of the backlash by rolling back parts of the Campaign—but cited "safety" rather than customers' negative *sales* reactions as their reason for doing so. ¶¶248-51. Defendants attempt to escape this conclusion by arguing that the "safety" motivation was true because there were "real" "threats" to employee

safety. MTD.33. But the "threats" Defendants cite were unspecified, not directed toward Target,[14] or legitimate expressions of customer opposition to the Pride Campaign that did not threaten employee safety. MTD.33; ¶255 ("calls and emails from guests accusing the company of 'grooming' and 'indoctrinating' kids"). Characterizing Target customers' behavior as "transphobic" and "homophobi[c]," MTD.11 n.8, does not make it a threat. Cornell's resort to making the demonstrably false claim that the Campaign inspired safety concerns worse than "violen[t]" riots does not inspire confidence. ¶¶252-53. Indeed, Target's internal monitoring system had no mention of safety issues before the Threat Statements were issued. ¶¶254, 258.

The real reason for Target's changes was the intuitive one: to mitigate the *financial* damage caused by the boycotts. ¶254 ("move these items … to better meet our sales goals"); ¶256 ("avoid the kind of backlash Bud Light has received"); ¶¶257, 260-61. That reason is supported not only by Target employees who "post[ed]" on the "internet," MTD.32, but also by reporting published by media outlets like Business Insider and Fox News—and later by CEO Cornell himself. ¶¶ 264-68.[15]

---

[14] Defendants incorrectly cite a news article as reporting that "Target received 'threats and transphobic commentary.'" MTD.11 n.8. Instead, the article reports that these were made "towards brands including Bud Light and Nike," not Target. Ex.L.2.

[15] Defendants say Cornell's later explanation for why he relocated Pride merchandise was "consistent" with his initial "safety" justification, MTD.33, but that's incorrect. Cornell vacillated, going *further* than the earlier safety statements, making the obviously false claim that the backlash was worse than "violence," ¶252, but then implying there were, in fact, problems with the 2023 Campaign's design, ¶266 ("We'll curate our assortment *much more carefully*"); *see also* ¶267 (Pride Campaign lacked "broad-based appeal"), which the earlier statements did not do. Cornell's takeaway for *sales* reasons—ensuring offensive merchandise won't "be the first thing you see in our store," ¶266—was more "consistent" with the act of relocating the Pride merchandise than was employee "safety."

**B.    PLAINTIFFS SUFFICIENTLY PLEAD THE REMAINING SECTION 10(b) ELEMENTS.**

### 1.    Plaintiffs Allege a Strong Inference of Scienter.

To establish scienter, plaintiffs must show intent or "'severe recklessness.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008). Under the PSLRA, that requires facts "'giving rise to a strong inference' that the defendants either intended to defraud investors or were severely reckless" in making the statements. *Id.* However, courts "must be careful not to mistake heightened pleading standards for impossible ones." *In re: Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021). Plaintiffs can aggregate facts to infer scienter. *Phillips v. Sci.–Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004). The whole mosaic, not the individual tiles, is what is important.

### a.    Cornell's DEI-Based Compensation Supports an Inference of Scienter.

Motive and opportunity are "evidence" of scienter. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1286 (11th Cir. 1999). As CEO and Board Chairman, Cornell had the opportunity to commit fraud. *See Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). To establish motive, plaintiffs must identify "'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures.'" *Id.*

Incentive-based bonuses can provide a motive to mislead. Standard financial incentives that merely link a decisionmaker's compensation to the company's earnings are not likely to do so. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). But when financial incentives to mislead "go far beyond the *usual arrangements of*

*compensation based on the company's earnings*, they may be considered among other facts to show scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *cf. Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1275 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010) ("An 'extraordinary' incentive package provides circumstantial evidence of scienter."); *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1374 (N.D. Ga. 2004) (same).

Cornell's DEI-based incentive package is extraordinary and reveals he had a strong motive to mislead investors about the costly DEI initiatives he championed and reap a concrete benefit—better compensation—as a result. One of the "indicators" that determined Cornell's pay was how he "advance[d] progress on our new three-year enterprise DE&I goals." ¶¶ 389-90. Those goals include that he "keep driving equitable business decisions" like intensifying the Pride Campaign. Target, *We Are Never Done*, *supra*. Paying executives to advance *that goal* instead of financial results certainly is not "the usual arrangement[] of compensation based on the company's earnings." *Aldridge*, 284 F.3d at 83.[16]

Unlike a typical performance-based compensation policy—which "merely reinforces [the executive's] preexisting duty to maximize [the company's] performance," *United States v. Goyal*, 629 F.3d 912, 919 (9th Cir. 2010)—Cornell's DEI-based incentive compensation incentivized a *different* priority: not improving financial performance, but improving the "equity" of Target's business decisions,

---

[16] Because Cornell was undoubtedly aware of the terms of his own employment contract, the Executive Compensation Statements were necessarily made with scienter.

which he had no duty to perform. If Cornell was incentivized to improve his ESG metrics, he was also incentivized to make sure shareholders wouldn't discover that he intended to pursue financial value-destroying initiatives like the Pride Campaign.

Social activists push for DEI-linked compensation *precisely because* it provides a motive for managers to set aside their duties to shareholders and take actions that benefit nonshareholder "stakeholders." When executives' compensation "is tied to meeting [ESG] metrics," activists have an easier time imposing "non-investor demands to address ESG issues," while "[i]nvestors stand to lose." Hester M. Peirce, SEC Comm'r, Remarks Before the Brookings Inst.: Chocolate-Covered Cicadas (July 20, 2021), http://tinyurl.com/yn3kp7x3. Tying executive compensation to ESG/DEI "is a tangible way to close the say-do gap," driving executives to take pro-ESG/DEI actions that the executives' actual legal duties do not give "sufficiently strong incentives" for them to undertake. Lucian A. Bebchuk & Roberto Tallarita, *The Perils and Questionable Promise of ESG-Based Compensation*, 48 J. Corp. L. 37, 46, 74 (2022).

Resisting this conclusion, Target points to two cases that, in its view, stand for the proposition that incentive-based compensation can never support a finding of scienter. MTD.34-35. One actually acknowledges that incentives can be probative of scienter. *Jabil,* 595 F. Supp. 2d at 1275. And both cases deal with a typical arrangement where executives receive compensation tied to the *financial* performance of the company. *Id.* at 1269 (defendants received "'bonuses for meeting and exceeding profitability goals'"); *In re Metris Cos., Inc. Sec. Litig.*, 428 F. Supp. 2d 1004, 1013 (D. Minn. 2006) (defendants "were working to obtain *earnings* bonuses and pay raises").

Neither case applies to unusual incentives to prioritize "stakeholder interests" over
financial results.

> b.    Cornell Knew Target Was Prioritizing Its Standing with
>       Pro-ESG/DEI Stakeholders Over Financial Results.

Plaintiffs allege "severe recklessness 'by providing evidence that defendants
possessed knowledge of facts or access to information contradicting their public
statements.'" *Theodore v. Purecycle Techs., Inc.*, 2023 WL 4035880, at *6 (M.D. Fla. June
15, 2023). When an executive makes *separate* comments contradicting the *challenged*
statements, that implies that the challenged statements were reckless or intentionally
false. *In re Theragenics Corp. Sec. Litig.*, 137 F. Supp. 2d 1339, 1348-49 (N.D. Ga. 2001);
*Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198 (S.D.N.Y. 2010).

Cornell repeatedly made clear in separate comments that Target prioritized
favors to "stakeholder" groups over financial returns. He signed the BRT Statement,
which described an intent to prioritize stakeholders over shareholders, and he stated
that Target fully implemented those goals. ¶¶ 68-93. And he said that he viewed the
role of the CEO as "driv[ing] change" and "impact[ing] civic discussions and policy."
¶401. Once an executive makes a choice to prioritize stakeholders, inadequate
oversight on behalf of shareholders is inevitable.

Given these separate comments, it's hard to believe that Cornell and Target
could make Social and Political Risk Oversight or Shareholder Value Statements with
a straight face. The Proxies, contrary to Cornell's comments in other venues, said that
Target would prioritize *financial results*. ¶¶ 362-78. They also assured shareholders that

Target would monitor social and political risks from their engagement with stakeholders. ¶¶307-61. And they stated that paying Cornell to improve DEI outcomes was best for financial results, even when Cornell was already acknowledging that he saw his role as driving social change. Cornell's comments gesturing at a business case for DEI, MTD.36 & n.21, do not alter this conclusion. That Cornell thought ESG/DEI activity might from time to time also be in Target's interests does not show that, when push came to shove, he was prioritizing shareholder returns *over* stakeholder demands. Defendants themselves say Target's interests differed from shareholders' on ESG/DEI. §III.A.3, *supra*.

If the 2023 Campaign revealed anything, it was that Cornell's separate comments were the ones that told the truth: stakeholders came first. Yet he continued to espouse Target's commitment to shareholder value through the Proxies.

c.    Cornell Knew the 2023 Pride Campaign Carried the Risk of Customer Backlash.

Scienter is established when defendants act with such recklessness that they make "'highly unreasonable omissions or misrepresentations'" that involve "'"an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Bryant*, 187 F.3d at 1282 n.18. Put differently, defendants can be liable when they show an "'egregious refusal to see the obvious, or to investigate the doubtful.'" *MBI Acquisition Partners v. Chronical Publ'g Co.*, 301 F. Supp. 2d 873, 889 (W.D. Wis. 2002).

29

Cornell refused to see the obvious. He continued to reiterate that Target only faced risks from doing too little ESG/DEI initiatives ***during the middle of the boycotts*** over the 2023 Campaign that, as the false Employee Statements show, he knew were happening. ¶288; III.A.5, *supra*. But even before those boycotts began, recall that Cornell personally approved the company's statements on "hot-button" issues. ¶403. He also said he knew about his team's efforts in developing the 2023 Campaign and specifically praised their activities. ¶¶ 199, 403, 405-06. And here's what that team was up to: The top brass at Target had made "push[ing] the envelope" in the 2023 Campaign a "big priority." ¶¶ 202-05, 405-06. They wanted Pride displays "front and center." ¶203. One of the team's leaders has described himself as seeking to "whip out … Glitter & Hellfire flamethrowers and rip that old world to shreds" and "make sales tank." ¶¶ 200-01. And the team knew the Pride Campaign was going to market a "Satanist-inspired" activist brand. ¶¶ 220-25, 408. Making Cornell's refusal to honestly apprise investors even less reasonable, he had already seen firsthand the customer backlash that followed from Target going too far on this exact set of issues. ¶402.

Given that all of this was ongoing when the 2023 Proxy was issued, its declarations that Cornell was carefully monitoring backlash risk were at least severely reckless. Cornell must have known full well how little effort was being directed at avoiding overreach in the 2023 Campaign. Yet he led investors to believe that he was carefully avoiding that very outcome.

Defendants claim that Plaintiffs' characterization of the 2023 Campaign as obviously risky and offensive is "not a fact" because it is "hyperbolic." MTD.37. But

the facts (and pictures) in the AC—which must be accepted as true—speak for themselves. ¶¶207-29. Target also claims the confidential witness's allegations about the Pride Campaign team are "group pleading." MTD.38. But Cornell himself said explicitly that he personally knew of the team's activities, ¶251, and, indeed, company policy required his awareness to prevent another debacle. ¶403. The confidential witness statement merely provides particularized facts about that team—it's not necessary for identifying which corporate officers made particular statements.

Finally, Defendants argue that Plaintiffs merely allege "fraud by hindsight" because the Campaign occurred after the Reports and Proxies were issued. That's flatly wrong as to the May 26, 2023 10-Q that incorporated the 2022 Report. And for everything else, Cornell's reckless oversight of the 2023 Pride Campaign was already under way by the time the Reports and Proxies said he would engage in appropriate oversight. A marketing campaign of this size and scope takes far more time to prepare than the few weeks between the release of the 2022 Report (March 2023) and the beginning of the Pride campaign (May 2023). Indeed, the Satanist-inspired designer reported that Target had reached out "nearly a year" before the 2023 Campaign began. ¶¶220-24; @apbrallenuk, Instagram (May 9, 2023), https://perma.cc/5UKM-3G6N.

> ### d.    Cornell Knew His Claims About Threats to Employees Were Misleading.

Cornell and Target made repeated statements that Pride merchandise would be moved to alleviate threats to employees from right-wing protesters. In reality, Pride merchandise was moved to mitigate financial losses from the campaign, and the

threats that Target received came from protestors *who supported the Campaign*.

Cornell knew those statements were false. In fact, he later explained exactly why he moved the Pride material: He had learned that their "prominent" display had created the backlash. ¶¶262-67. Moreover, Target insiders reported that the message inside of Target was that displays needed to be moved *solely for sales* reasons, not for safety. ¶¶254, 260. Indeed, five days before Cornell sent an all-staff email explaining that Pride displays would be moved for safety reasons, Target told certain stores to move the Pride material "to avoid the kind of backlash Bud Light has received." ¶¶256-57. All along, the only actual threats came from groups who supported the Campaign, who were angry that Target was moving the Pride display for *sales* reasons. ¶259. Unsurprisingly, Target employees took to the internet to accuse Cornell of "lying through his teeth." ¶258.

### e.     Cornell's Scienter Is Imputed to Target.

To hold corporations liable under Section 10(b), "the scienter of their agents must be imputed to them." *Mizzaro*, 544 F.3d at 1254. This requires discerning "'the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like).'" *Id.* As CEO and Chairman, Cornell was responsible for the 2021 and 2022 Reports and 2022 and 2023 Proxies. ¶409. For all the reasons above, Cornell had scienter that those statements contained materially misleading information, and so did Target.

### 2.     Plaintiffs Allege Loss Causation.

Hoping the Court skips past the obvious result of their fraud—a plummeting stock price after the Pride Campaign—Defendants make loss causation into a complex pleading burden. But it really isn't complicated. Loss causation is just "the standard common law fraud rule" of proximate cause "borrowed" for securities cases. *Bastian v. Petren Res. Grp.*, 892 F. 2d 680, 683 (7th Cir. 1990). Like proximate cause, it simply requires that a defendant's conduct be "a 'substantial' or 'significant contributing cause'" of the plaintiff's injury—a declining stock price. *FindWhat*, 658 F.3d at 1309. Also like proximate cause, "pleading rules are not meant to impose a great burden," but rather "provide … some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

<u>a.</u>    <u>Plaintiffs Plausibly Allege Loss Causation.</u>

Where, as here, a stock trades on an efficient market, plaintiffs typically allege causation in one of two ways. *First*, if the price declined after a "corrective disclosure" or series of "corrective disclosures" informed the market a truth the defendant concealed. *See Meyer*, 710 F.3d at 1197. *Second*, even without a corrective disclosure, plaintiffs may allege a materialization of a concealed risk—i.e., "that a risk defendants allegedly concealed materialized and arguably caused the plaintiffs' losses." *In re Jiangbo Pharms., Inc. Sec. Litig.*, 884 F. Supp. 2d 1243, 1264-65 (S.D. Fla. 2012).[17]

---

[17] Although the Eleventh Circuit has not ruled on the materialization-of-the-risk theory, *see Sapssov v. Health Mgt. Assocs., Inc.*, 608 Fed. App'x 855, 861 n.7 (11th Cir. 2015), other courts routinely apply it to sustain allegations of causation, *see, e.g.*, *Singer v. Reali*, 883 F.3d 425, 445 (4th Cir. 2018); *Ohio Pub. Emps' Ret. Sys. v. Fed. Home Loan Mtg. Corp.*, 830 F.3d 376, 385-86 (6th Cir. 2016); *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1153-55 (10th Cir. 2015); *Jiangbo*, 884 F. Supp. 2d at 1264-65; *Damian v. Montgomery Cnty. Bankshares, Inc.*, 981 F. Supp. 2d 1368, 1383 (N.D. Ga. 2013).

Either way, the question is the same: Whether the complaint plausibly alleges that "'the relevant truth eventually c[a]me out and thereby cause[d] the plaintiffs to suffer losses.'" *MacPhee v. MiMedix Grp., Inc.* 73 F.4th 1220, 1243 (11th Cir. 2023); *see Jiangbo*, 884 F. Supp. 2d at 1264. Here, the answer is a no-brainer: Yes.

Privately, Defendants doubled down on ESG/DEI initiatives destined to offend customers, empowered Pride-team employees to "whip out the Glitter & Hellfire flamethrowers" and "make sales tank," and planned a 2023 Pride Campaign aimed at children featuring extra-small versions of chest binders and genital "tucks." ¶¶ 184, 194-206. But publicly, Defendants concealed those plans, their financial incentives to pursue them, and the inevitable customer reaction, instead misleading investors with statements assuring them Defendants were monitoring the risks. ¶¶ 278-99, 310-39.

The AC details how the market learned the truth and the stock price dropped thereafter. In May 2023, after Target launched the Pride Campaign, news began to spread, and customers gradually became outraged and boycotted the company. ¶¶208, 225-29. Between May 18 and May 31, there were multiple press accounts reporting facts about the Campaign, growing customer anger, and resulting boycotts. ¶¶224, 227-38, 436. During *that same period*, the stock price plummeted: *$10 billion* of market capitalization vanished between May 18 and May 28 alone. ¶231. Corroborating the link, expert market analysts attributed the decline to the Campaign, ¶¶234, 236,[18] and Target's competitors did not see similar declines, ¶440. Plaintiffs have plausibly alleged

---

[18] *See Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2014 WL 6661918, at *7 (N.D. Ga. Nov. 19, 2014) (analysts' attribution of decline "of course[] is evidence of price impact").

both a series of corrective disclosures about Target's ESG/DEI risks and a

materialization of an undisclosed risk of boycotts that caused Target's stock to drop.

*See Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 923 (11th Cir. 2020); *Beckel v.*

*Fagron Holding USA, Inc.*, 2019 WL 5110828, at *8 (M.D. Fla. Jun. 24, 2019).

Critically, Defendants don't argue that there is some other explanation for the

sudden, substantial drop in the stock price. That omission is important: The entire

point of loss causation is to ensure a plaintiff's loss was caused by the fraud alleged

and not by events like "'changed economic circumstances, changed investor

expectations, [or] new industry-specific or firm-specific facts'" unrelated to the fraud.

*CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1334 (11th Cir. 2018). It confirms that

Plaintiffs have plausibly alleged loss causation.

> ### b.    Defendants' Corrective Disclosure Arguments Are Meritless.

To allege a corrective disclosure, Plaintiffs need only (1) "identify a 'corrective

disclosure,'" (2) "show that the stock's price dropped soon after," and (3) "eliminate

other possible explanations" for the drop. *MacPhee*, 73 F.4th at 1242. The AC does

that. §III.B.2.a, *supra*. Defendants contest only the identification of a corrective

disclosure and the timing of the decline. MTD.40-42.

Corrective disclosure. Defendants assert that press accounts of the Pride

Campaign and backlash are not "corrective" because those disclosures don't "'relate

back'" to what Defendants misrepresented. MTD.41. That's just wrong. Plaintiffs

allege that Target made false statements and omissions about a "known risk of adverse

customer reaction to its ESG/DEI mandates and to the Pride Month campaigns it intended to continue with increasing intensity," ¶283, and Defendants' failure to monitor social and political risks of backlash. ¶¶340-341, 353. And as a matter of law, a corrective disclosure "need not precisely mirror the earlier misrepresentation," *MacPhee*, 73 F.4th at 1243, so long as it "share[s] the same subject matter as the prior misstatement," *FindWhat*, 658 F.3d at 1311 n.28. In substance, those late May 2023 accounts exposed the occurrence of the very risks Defendants concealed. *See, e.g.*, *Pub. Emps.' Ret. Sys. v. Mohawk Indus.*, 564 F. Supp. 3d 1272, 1306-07 (N.D. Ga. 2021).

Defendants' assertion that the May 2023 events did not "reveal[] a new truth" because "the possibility of backlash … was not new," MTD.41, likewise ignores the AC. Plaintiffs pleaded that the 2023 Pride Campaign was the "most aggressive and offensive yet"—it involved, among other things, moving LGBT displays to the front of the store, directly marketing to young children—and was "certain" to cause exactly the backlash that occurred. ¶¶6, 198, 199-206. An investor reading Target's misleading disclosures about its "failure to achieve" progress on social issues and a generalized possibility of adverse consumer sentiment would have had no idea. The widespread press accounts reporting these and other facts about the campaign and customers' reactions provided new information to the market. *See, e.g., Theodore v. Purecycle Techs., Inc.*, 2022 WL 20157415, at *18 (M.D. Fla. Aug. 4, 2022); *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *20 (M.D. Ga. Mar. 23, 2018).

<u>Timing of disclosure.</u> Defendants assert that the AC fails to allege "the timing of an alleged corrective disclosure," MTD.42, but ignore the series of disclosures

36

beginning on May 18, 2023. What Defendants appear to say is that Plaintiffs are supposed to identify a *single* corrective disclosure that caused the stock to drop, but that's not accurate: "[A] plaintiff need not rely on a single, complete corrective disclosure; rather it is possible to show that the truth gradually leaked out ... 'through a series of partial disclosures.'" *Meyer*, 710 F.3d at 1197; *see also Luczak*, 812 F. App'x at 923. Here, customers reacted to the Campaign over time, their response grew and was reported over time, and investors' knowledge that reality contradicted what Defendants represented grew over time as well. ¶¶ 219, 225-36, 439. Those are plausible allegations identifying a series of corrective disclosures. *See, e.g.*, *Luczak*, 812 F. App'x at 293; *Jiangbo*, 884 F. Supp. 2d at 1265; *Flowers Foods*, 2018 WL 1558558, at *18-19.

Similarly, Defendants point to a Facebook post by Plaintiff Craig's wife containing a May 12, 2023 article about the Campaign and say that because the stock price rose after that, loss causation can't be alleged. MTD.42-43. That is thrice flawed. *First*, it assumes that the May 12 article was a complete disclosure of everything the market learned about the Campaign and the customer reaction to it; yet, the AC alleges that this was a gradual process with customer knowledge of and reaction to the campaign—and investor knowledge of the relevant facts—growing over time. ¶¶230-38, 439. *Second*, a motion to dismiss is the wrong legal vehicle for resolving fact questions about loss causation—e.g., whether the May 12 article was complete, there were other reasons the stock price might have increased after it, and the market reacted to additional information. *See Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, 2019 WL

4600409, at *9 (M.D. Fla. Sept. 23, 2019); *Eastwood Enters., LLC v. Farha*, 2009 WL
3157668, at * 5 (M.D. Fla. Sept. 28, 2009). *Third*, the argument begs the question: If it
wasn't the public revelations about the Pride Campaign, what plausibly explains the
sudden and drastic stock price drop? Despite a 50-page motion and a 12-page annex,
Defendants have no answer. That's because the causality is obvious.

c.    Defendants' Materialization-of-the-Risk Arguments Just
Rehash Their Meritless Corrective Disclosure Arguments.

To allege a materialization of the risk, a plaintiff must plead that a concealed
risk materialized and foreseeably resulted in a loss. *See Lynn Finkelstein & Co. v. Ball*,
2007 WL 9701156, at *16 (S.D. Fla. May 15, 2007). The AC identifies a risk of
customer boycotts in response to a highly provocative campaign that was certain to
cause a stock price hit. §II.B, *supra*. In response, Defendants repeat the point that they
disclosed the risk, which is addressed above. §III.A.1-5, *supra*. The only new argument
they make is that Plaintiffs have not alleged that Target's stock price plummeted
immediately after the concealed risk materialized, MTD.44, but that ignores the
articles, cited in the AC, beginning on May 18, 2023 and the corresponding decline in
price. ¶¶230-33.

But even if Plaintiffs hadn't made those allegations, Defendants are twice wrong
on the law. *First*, loss causation does *not* require a plaintiff to plead an "immediate,"
same-day price drop, and temporal gaps or short-term price increases between facts
hitting the market and a price drop do *not* render a pleading infirm. *See Shash v. Biogen,
Inc.*, 84 F.4th 1, 21 (1st Cir. 2023); *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1156 (10th

38

Cir. 2015); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 266 n.33 (5th Cir. 2009); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008).[19] Whether those circumstances may ultimately defeat loss causation "is a factual question, and is not enough to dismiss a complaint that alleges a specific causal link, as is the case here." *Lormand*, 565 F.3d 267 n.33; *see also Shash*, 84 F.4th at 21.

*Second*, courts routinely recognize that where, as here, a fraud is gradually exposed over time, a correlated stock price decline over that time is sufficient to plead loss causation. *See Gruber v. Gilbertson*, 628 F. Supp. 3d 473, 487 (S.D.N.Y. 2022); *In re NTL, Inc. Sec. Litig.*, 2006 WL 330113, at *9 n.14 (S.D.N.Y. Feb. 14, 2006) (collecting authorities). The key question is whether Plaintiffs have alleged a stock price decline plausibly attributable to the fraud: They have.

d.     <u>Plaintiffs Sufficiently Allege Loss Causation Corresponding to the Q2 2023 Earnings Call.</u>

Defendants assert that Target's statements during its August 16, 2023 conference call in which it attributed declining financial performance to the Pride Campaign cannot have caused any loss. MTD.44-45. *First*, they claim that the effect of the Pride Campaign on Target's financial condition was known to the market before then, so it was old news. But as far as the AC is concerned, (1) this was the first recognition by *Target itself* that the campaign had impaired its sales and harmed the company financially, and (2) it corrected Target's prior statements that it had

---

[19] Although the Eleventh Circuit has not addressed the question, it has hinted that "we might be willing to countenance some lag in the market's processing of the information." *Meyer*, 710 F.3d at 1198 n.9.

39

responded to customer outrage only for reasons of employee safety. ¶¶251-58, 444. Those were major new developments. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 795 (9th Cir. 2020) ("'public failed to appreciate [the] significance'" of a risk "until its impact on revenue was made plain from the earnings release").

Defendants assert Target repeated its concerns about safety in the August 16 call, MTD.45, but that misses the point. The point is that Target officially confirmed that its financial performance was adversely affected by the Pride Campaign. Ex.T.5 (noting "the strong reaction to this year's Pride assortment"), 9 ("traffic and top line trends were affected by the reaction to our Pride assortment"). In addition, it also revealed that safety was not the only—or even the primary—reason Target responded to the customer backlash. *Id.* at 6 ("In this case, the reaction is a signal for us to pause, adapt and learn…"); §III.A.5, *supra*.

Finally, Defendants argue that Target's price traded at slightly higher prices for a few days following the August 16 call. MTD.14, 46. But as shown, whether that fleeting increase can defeat enormous loss causation is a matter of proof for summary judgment or trial, not a matter of pleading. §III.B.2.b, *supra*. Plaintiffs have alleged a corrective disclosure by Target on August 16 and connected that disclosure to a decline in price. ¶¶ 444-48. They have pleaded loss causation.

## C.    PLAINTIFFS SUFFICIENTLY PLEAD THE REMAINING SECTION 14(a) ELEMENTS.

### 1.    Plaintiffs Allege a Culpable State of Mind.

#### a.    Plaintiffs Need Not Plead Scienter for Section 14(a) Claims.

Target claims that Plaintiffs must plead scienter for their Section 14(a) claims because they "sound in fraud." MTD.46. But it is black-letter law that Section 14(a) claims require only negligence. *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 560 F. Supp. 2d 1221, 1244 (M.D. Fl. 2008); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988); *see also* Thomas Lee Hazen, 3 *Law Sec. Reg.* § 10:71 (Nov. 2023 update). Because the text of Section 14(a) is "devoid of any suggestion whatsoever of a scienter requirement," scienter is not required. *Aaron v. SEC*, 446 U.S. 680, 696 (1980). And nothing in PSLRA adds a scienter requirement for Section 14(a) claims "sounding in fraud." *See* 15 U.S.C. § 78u-4(b)(2)(A).

Unsurprisingly, when a court carefully considered this issue, it concluded that even a Section 14(a) claim that sounds in fraud need only allege negligence, not scienter. *See In re Willis Towers Watson Plc Proxy Litig.*, 439 F. Supp. 3d 704, 710-14 (E.D. Va. 2020). The *elements* of Section 14(a) do not change simply because the facts pleaded might also be used to allege, e.g., a Section 10(b) or common-law fraud claim.

Even when courts disagree about "whether *negligence* is a state of mind and thus whether [§ 78u-4(b)(2)(A)'s *separate* pleading rule] requires plaintiffs to allege facts that create a strong inference of *negligence* under § 14(a)," they all still agree that *negligence* is indeed the statutory element. *Knurr v. Orbital ATK Inc.*, 276 F. Supp. 3d 527, 540 & n.8 (E.D. Va. 2017); *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144-45 (3d Cir. 2004); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682-83 (9th Cir. 2005).

The Court should reject Defendants' novel attempt to change the statutory

41

elements of a well-established cause of action.[20]

> **b.**    **Plaintiffs Plead that Defendants Acted Negligently.**

Cornell and Target closed their eyes to the obvious when they did not conduct oversight of ESG/DEI initiatives—culminating in the disastrous Pride Campaign—that were clearly going off the rails. As a result, the promises they made in the Reports and Proxies that they were monitoring those risks can only be called reckless. §III.B.1, *supra*. But even if the Court disagrees that Cornell's conduct was reckless, it was surely negligent. In no sense did Cornell exercise reasonable care in blessing the Pride Campaign while telling investors that he would manage any backlash risk.

The other Director Defendants also acted negligently. They were aware of the risks to Target from consumer backlash to ESG/DEI. ¶¶412-16. Many had seen firsthand what that backlash could do to Target or similar companies. ¶¶414-16, 420, 427. Many also understood that a commitment to ESG benefits often required prioritizing ESG stakeholders over shareholders. ¶¶420-23, 425-27. The Director Defendants further knew that Target relied on employees who would push the envelope with the Pride campaign to the harm of the company. ¶418. But even though they were provided with the proxy statements in advance, they did not prevent their issuance or cause them to be corrected. ¶411. Thus, they failed to exercise due care.

---

[20] Like § 78u-4(b)(2)(A), Rule 9(b) speaks to pleading standards, *not* elements. It requires specificity only for the "circumstances constituting fraud or mistake," Fed.R.Civ.P.9(b), which (as Defendants' own authority acknowledges) means only that the complaint "set forth particular allegations about the 'who, what, when, where, and how' of the fraud," *Lee v. Frost*, 2021 WL 3912651, at *4 (S.D. Fla. Sept. 1, 2021). Plaintiffs allege those facts with extraordinary detail. Rule 9(b) still allows for mental state—e.g., "knowledge, and other conditions of a person's mind"—to "be alleged generally." Fed.R.Civ.P.9(b).

## 2. Plaintiffs Allege Transaction & Loss Causation.

A Section 14(a) claim requires two kinds of causation: transaction and loss causation. To establish transaction causation, "a plaintiff must show 'that the proxy solicitation itself … was an essential link in the accomplishment of the transaction'" that was "the source of the plaintiff's injury." *Jabil*, 594 F.3d at 796. Loss causation requires proving "a connection to actual economic harm resulting from the transaction affected by the material misrepresentation." Hazen, *supra*, § 10:82.

### a. Plaintiffs Allege Transaction & Loss Causation for their Declaratory & Injunctive Relief Claims.

Plaintiffs seek a declaration that the 2023 director election was void and an injunction requiring Target and the director defendants to comply with Section 14(a) in their proxy solicitations for the upcoming 2024 board election. ¶544. These claims, which challenge the board elections themselves, plainly satisfy the transaction causation requirement. Because there is "no doubt that the 'proxy solicitation itself … was an essential link in the accomplishment'" of the board's election, Section 14(a) claims specifically challenging board elections necessarily satisfy transaction causation. *Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650, 654 (2d Cir. 1979); *see Galef v. Alexander*, 615 F.2d 51, 65-66 (2d Cir. 1980); *Hastey v. Welch*, 449 F. Supp. 3d 1053, 1066 (D. Kan. 2020); *In re AGNC Inv. Corp.,* 2018 WL 3239476, at *6 (D. Md. 2018). To be clear, these claims are *not* about "management's failure" to act appropriately *after* the election. *Jabil*, 594 F.3d at 797.

These claims also clear the loss causation bar. Start with the 2024 election. If

43

Target's same board uses similar misstatements to return to power, the market would lose further faith in Target, causing further investor losses. ¶¶ 504-10. This is not at all far-fetched: Target's actions so far have suggested that it has not learned much from the disastrous experience of the 2023 Campaign. *Id*. In this scenario, the voting outcome encouraged by the misleading proxies would directly authorize a loss-causing action. And the 2023 election was similarly tied up in the 2023 Pride Campaign that caused investors such significant losses. ¶449-73.[21]

b.    Plaintiffs' Other Section 14(a) Claims Allege Transaction & Loss Causation.

Target's Proxies were essential links in executing the Pride Campaign. The Proxies not only returned to office the Target directors who oversaw the Pride Campaign, but also included language praising their approach to "risk management" and "ESG," rejected proposals that would diminish Cornell's power, and facilitated DEI-based executive compensation. ¶¶ 449-73, 491-501. Because the misleading proxy statements *both* re-elected the Board and "incentivized the Director Defendants' misconduct" to continue, transaction causation is satisfied. *Jones*, 2021 WL 1890490, at *14.[22]

Defendants respond by citing cases holding that mismanagement after a board

---

[21] The declaratory relief claim for the 2023 election is not moot. Challenges that would void director elections remain live until the directors have been subsequently re-elected to new terms. *See Gen. Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 934 (3d Cir. 1992).

[22] Target claims the 2023 Proxy wasn't a link to the 2023 Campaign because the board's election (in June) occurred after the Campaign began (in May). MTD.50. But voting opened on May 1, *before* the Campaign began. 2023 Proxy at 6. And Plaintiffs allege customer backlash was still materializing in June and after. §III.B.2.d, *supra*. Regardless, this argument doesn't touch the 2022 Proxy, which put into power the board that originally oversaw the planning and implementation of the Pride Campaign.

election does not, by itself, give rise to a Section 14(a) claim. MTD.49. True enough, but this case is different. Where, as here, the challenged proxy both brings back the board perpetrating a fraud *and* creates incentives for the Board to continue in that fraud, transaction causation exists. *Jones*, 2021 WL 1890490, at *15-17; *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1102-05 (N.D. Cal. 2017). Target's Proxies not only tricked voters to (1) support the Board's re-election, they also (2) encouraged the fraud to continue by praising the directors' management of ESG risk, (3) rejected proposals that would have diminished Cornell's power, and (4) established a DEI-based compensation system.[23] That makes the Proxies essential links in the Pride Campaign that they spurred on.[24] And as a cause of the Pride Campaign, the Proxies also caused the loss. §III.B.2, *supra*.

## IV.  CONCLUSION

For the foregoing reasons, the Court should deny the Motion to Dismiss. In the event the Court decides otherwise, Plaintiffs respectfully request leave to amend. *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1339 (M.D. Fla. 2002).

Dated: March 1, 2024

---

[23] Target claims that Plaintiffs rely on non-binding votes to establish transaction causation. MTD.49-50. But the director election votes that prompted the challenged proxy statements were binding. The proxy statements' blessing of the directors' management of ESG, request for shareholder approval of DEI-based compensation, and rejection of other proposals merely provided the further encouragement of the fraud necessary to make the solicitation a direct link in the causal chain.

[24] *Jabil* does not say otherwise. There, the fraud came from management *violating* the compensation scheme described in the proxy statement, not from the compensation scheme incentivizing continuation of the fraud that management was hiding from investors. 594 F.3d at 787-88, 796-97. Similarly, in *McDowell v. Bracken*, the issues the proxy statement got wrong (the executive's use of a company plane and discrepancies in the fees paid to a parent company) did not serve as *encouragement* for the fraud to continue. 794 F. App'x 910, 912, 917 (11th Cir. 2019).

Respectfully submitted,

Jason B. Gonzalez (FBN 146854)
Paul C. Huck, Jr. (FBN: 968358)
Samuel J. Salario, Jr. (FBN: 083460)
Lawson Huck Gonzalez, PLLC
215 S. Monroe Street, Suite 320
Tallahassee, Florida 32301
(850) 825-4334
jason@lawsonhuckgonzalez.com

/s/ Jonathan Berry
Jonathan Berry (pro hac vice)
    *Lead Counsel*
R. Trent McCotter (pro hac vice)
Andrew W. Smith (pro hac vice)
Caleb Orr (pro hac vice)
Boyden Gray PLLC
801 17th St. NW, #350
Washington, DC 20006
(202) 955-0620
jberry@boydengray.com

Gene P. Hamilton (pro hac vice)
Reed D. Rubinstein (pro hac vice)
Andrew J. Block (pro hace vice)
America First Legal Foundation
611 Pennsylvania Avenue S.E.
No. 231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2024, I filed the foregoing via the Court's CM/ECF system, which will serve all counsel.

/s/ Jonathan Berry

Jonathan Berry

46