UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BRIAN CRAIG, et. al.,

       Plaintiffs,

v.                                       Case No:  2:23-cv-599-JLB-KCD

TARGET CORPORATION, et. al.,

       Defendants.

_____/

## ORDER

In May 2023, Target Corporation undertook a children and family-themed LGBT "Pride Month" marketing and sales campaign as part of an environmental, social, governance ("ESG") and diversity, equity, and inclusion ("DEI") initiative. (Doc. 52 at ¶ 6).  The campaign focused on displaying Pride Month-related merchandise at the front and center of Target's stores across the United States. (*Id.* at ¶¶ 203, 260).  This resulted in customer backlash and a boycott that Plaintiffs allege caused Target's sales and stock price to decline.  (*Id.* at ¶ 2). Plaintiffs—shareholders of Target stock—now sue Target and its board of directors ("Defendants"), alleging numerous Federal securities law violations.  (*See id.*). Target moved to dismiss this case.  (Doc. 70).  Plaintiffs responded in opposition (Doc. 82), and Defendants replied (Doc. 89).  For the reasons stated, Defendants' motion to dismiss is **DENIED**.[1]

---

[1] Having now resolved Defendants' motion to dismiss, the Court will address Defendants' motion to transfer venue to the District of Minnesota in a subsequent Order.

## BACKGROUND[2]

In 2014, Target hired Defendant Brian C. Cornell as Chief Executive Officer, and its Board of Directors (the "Board") elected him Chairman of the Board. (Doc. 52 at ¶ 7).  Following Mr. Cornell's hiring, Target began adopting several ESG and DEI initiatives.  (*Id.*).  These initiatives were incorporated into Target's corporate strategy and business plan.  (*Id.*).

Target then began a Pride Month campaign in June 2015, where Target published a "Pride Manifesto" and accompanying video transcript.  (*Id.* at ¶ 9).  The following year, Target published an announcement in opposition to a North Carolina transgender bathroom law.  (*Id.* at ¶ 10).  Target experienced customer and investor backlash after both publications.  (*Id.* at ¶ 14).  Specifically, shareholders, consumer groups, and conservative commentators repeatedly warned Target that future ESG, DEI and LGBT initiatives would cause the company to lose customers.  (*Id.* at ¶ 15).

Target released Annual Proxy Statements and Reports in 2021, 2022 and 2023.  (*Id.* at ¶¶ 4, 16).  Plaintiffs accuse Target of including misleading statements and omissions in those filings.  (*Id.* at ¶ 4).  Specifically, Plaintiffs allege that Target misled investors by either falsely stating or omitting the risk of customer boycotts from its ESG, DEI, and LGBT initiatives.  (*Id.*).  According to Plaintiffs, Target

---

[2] "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citation omitted).  Accordingly, this background section relies on the facts recited in the amended complaint.  (*See* Doc. 52)

shareholders relied on the alleged misleading statements and omissions in re-electing Target's Board, turning down multiple proposals via shareholder vote to reform the Board's risk oversight functions, and approving executive compensation plans that incentivized Target's officers to implement DEI programs.  (*Id.* at ¶ 22).

Following the reelection of Target's board, Target undertook a children and family themed "Pride Month" marketing and sales campaign in May 2023 (the "2023 Pride Month Campaign").  (*Id.* at ¶ 6).  The campaign focused on displaying "Pride Month" related merchandise at the front and center of Target's stores across the United States.  (*Id.* at ¶¶ 203, 260).  Customers then boycotted Target, causing Target to lose $10 billion in market valuation between May 18 and May 23, 2023. (*Id.* at ¶ 28).  Plaintiffs allege this devaluation was due to parents' backlash over the company's LGBT themed clothing line for children.  (*Id.*).  Between May 17 and October 6, 2023, Target lost more than $25 billion in market capitalization.  (*Id.*).

Plaintiffs now sue Defendants for various securities law violations.  (*See id.*). Specifically, Plaintiffs bring claims under the Securities and Exchange Act of 1934 including: Section 10(b), Rule 10b-5, Section 14(a), Rule 14a-9, and Section 20(a). (*Id.* at 156, 158, 159).  Defendants moved to dismiss this case.  (Doc. 70).  Plaintiffs responded in opposition (Doc. 82), and Defendants replied (Doc. 89).

## MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a complaint to be dismissed for failure to state a claim upon which relief can be granted. To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). This plausibility standard is met when the plaintiff pleads enough factual content "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When reviewing a motion to dismiss, courts must accept all factual allegations in a complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). Legal conclusions, however, "are not entitled to the assumption of truth." *Ashcroft*, 556 U.S. at 679. "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In a securities fraud case, the court may consider securities filings alleged to contain misstatements. *Bryant*, 187 F.3d at 1278. A court may also look to documents incorporated by reference into the complaint if they are central to the plaintiff's claim and undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (citation omitted).

## DISCUSSION

Defendants argue that this action should be dismissed.  (Doc. 70).

Specifically, Defendants argue that Plaintiffs' section 10(b) claim should be

dismissed because they failed to plead (a) material misstatements or omissions, (b)

plead a strong influence of scienter, and (c) loss causation.  (*Id.* at 27, 44, 51).

Moreover, Defendants argue that Plaintiffs' section 14(a) claim should be dismissed

because Plaintiffs failed to plead (a) strong inference of scienter and (b) transaction

and loss causation.  (*Id.* at 58–61).  Upon review of Plaintiffs' amended complaint,

the parties' briefing, and the entire record, the Court finds that Defendants' motion

is due to be **DENIED**.

### I.    Plaintiffs pleaded a section 10(b) claim.

In count one of the amended complaint, Plaintiffs assert a claim against

Defendants for violating section 10(b) of the Exchange Act.  (Doc. 52 at 156–58).

Section 10(b) prohibits the "use or employ, in connection with the purchase or sale

of any security . . . any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the [SEC] may prescribe as

necessary or appropriate in the public interest or for the protection of investors."

15 U.S.C. § 78j(b).

To plead a claim under section 10(b), a plaintiff must demonstrate

"(1) a material misrepresentation or omission; (2) made with scienter; (3) a

connection with the purchase or sale of a security; (4) reliance on the misstatement

or omission; (5) economic loss; and (6) a causal connection between the material

misrepresentation or omission and the loss, commonly called 'loss causation.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008) (citation omitted).

Claims brought under section 10(b) are subject to a triple-layered pleading standard. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019). Specifically, Plaintiffs must satisfy the pleading requirements of (1) Federal Rule of Civil Procedure 8(a)(2); (2) Federal Rule of Civil Procedure 9(b); and (3) the Private Securities Litigation Reform Act (the "PSLRA"). *Id.* at 1317–18.

First, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed. R. Civ. P. 8(a)(2).

Second, the complaint must comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004). Federal Rule of Civil Procedure 9 requires a complaint to specifically allege, *with particularity*, the circumstances constituting fraud or mistake.[3] Fed. R. Civ. P. 9(b). Further, Rule 9 requires that a plaintiff state (1) precisely what statements were made in what documents or oral representations or what omissions were made; (2) the time and place of each such statement and the person responsible for making (or in the case of omissions, not making); (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendants obtained as a consequence of the fraud.

---

[3] Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b).

*Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997); *Tello v. Dean Witter Reynolds, Inc.,* 494 F.3d 956, 972 (11th Cir. 2007).

Third, the complaint must also satisfy heightened pleading standards under the PSLRA.  Under the PSLRA, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed[,]" and "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §§ 78u-4(b)(1)(B), (b)(2)(A).

Failure to meet any of the three-layered standards results in a complaint's dismissal.  *Carvelli*, 934 F.3d at 1318 (citation omitted).

**A.  Material Misrepresentations or Omissions.**

Defendants first argue that Plaintiffs' section 10(b) claim should be dismissed because Plaintiffs failed to plead facts showing that any alleged misstatement was materially false or misleading.  (Doc. 70 at 27).  Specifically, Defendants claim that Plaintiffs failed to plead falsity of the (1) risk warnings, (2) oversight statements, (3) value statements, (4) compensation statements, and (5) backlash statements. (*Id.* at 27–45).  The Court will address each argument in turn.

  *i.  The Risk Warnings.*

Defendants assert that Plaintiffs have failed to plead falsity of risk warnings in the 2021 and 2022 Annual Reports.  (*Id.* at 28–35).  They contend that (1) the

risk warnings disclosed the risk of adverse reactions (*id.* at 28–32); (2) even had

Target failed to warn of adverse reactions, any such omission would not be material

as shareholders knew of those risks (*id.* at 32–33); and (3) the risk warnings are

inactionable forward-looking statements (*id.* at 33–35).

a. The 2021 Report Risk Disclosure

Target's 2021 Annual Report contained the following paragraph in their "risk

factors" section:

> We believe that one of the reasons our shareholders, guests, team
> members, and vendors choose Target is the positive reputation we have
> built over many years for serving those constituencies and the
> communities in which we operate.  To be successful in the future, we
> must continue to preserve Target's reputation.  **Our reputation is
> based in large part on perceptions, both about us and others
> with whom we do business, and broad access to social media
> makes it easy for anyone to provide public feedback that can
> influence perceptions of Target**.  **It may be difficult to control
> negative publicity, regardless of whether it is accurate.  Target's
> responses to crises and our position or perceived lack of
> position on environmental, social, and governance (ESG)
> matters, such as sustainability, responsible sourcing, and
> diversity, equity, and inclusion (DE&I), and any perceived lack
> of transparency about those matters, could harm our
> reputation.  While reputations may take decades to build,
> negative incidents involving us or others with whom we do
> business can quickly erode trust and confidence and can result
> in consumer boycotts, workforce unrest or walkouts,
> government investigations, or litigation.**  For example, we have a
> limited ability to end our relationship with CVS, which leases space to
> operate their clinics and pharmacies within our stores.  If our guests
> have negative experiences with or unfavorably view CVS or other
> companies with whom we have relationships, it could cause them to
> reduce or stop their business with us.  **Negative reputational
> incidents could adversely affect our business and results of
> operations, including through lost sales, loss of new store and
> development opportunities, or team member retention and
> recruiting difficulties.**

8

(Doc. 71-1 at 9) (emphasis added).

Plaintiffs contend that this statement is materially false and misleading because Target "neglected to mention the known risk of adverse customer and stockholder reactions to its ESG/DEI mandates in general, and its 'Pride Month' campaigns in particular. . . ." (Doc. 52 at ¶¶ 280–81).  Plaintiffs further insist that Target did not mention that "the known risk of [] reactions was not being monitored or addressed by the Board" and because of this, "Target was thus not attempting to 'preserve Target's reputation' or 'control negative publicity'. . . ." (*Id.* at ¶ 282).  As such, Plaintiffs accuse Target of failing to disclose the known risk of adverse customer reaction to ESG/DEI mandates and the 2023 Pride Month Campaigns, which they contend is required by Item 105 of Regulation S-K.[4]  (*Id.* at ¶ 283).

Defendants argue that Target disclosed the risk of adverse customer and stockholder reactions to its ESG/DEI mandates "in general." (Doc. 70 at 28).   They contend that they have disclosed this risk since 2018 and that a securities fraud claim cannot be premised on the failure to disclose a risk that was actually disclosed.  (*Id.*).

The Eleventh Circuit considered a similar case in *FindWhat Inv'r Group v. FindWhat.com*, 658 F.3d 1282 (11th Cir. 2011).  There, the plaintiffs alleged that the defendant company made false or misleading statements to the public in

---

[4] Regulation S-K Item 105 requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."
17 C.F.R. § 229.105(a). The discussion must also address each risk factor and each factor "should be set forth under a subcaption that adequately describes the risk." *Id.*

violation of section 10(b) of the Exchange Act. *Id.* at 1290. Specifically, the

plaintiffs accused the defendant of failing to disclose the risk of "click fraud."[5] *Id.* at

1292–93. The defendant included a "general" risk warning in its Form 10-K

statement, noting it employed an integrated system that continually monitors click

traffic quality and that the defendant strictly enforces guidelines to ensure the

quality of traffic. *Id.* at 1297. The district court dismissed the plaintiff's claim and

held that the Form 10-K statements were not actionable because they were not

misleading. *Id.* at 1298. The Eleventh Circuit reversed, holding that the

defendant's statements were materially misleading because the statements

suggested that the defendant was monitoring for click fraud. *Id.* at 1298–99. In

reality, the defendant did not have systems in place to detect such fraudulent

activity. *Id.* Because of this, the Eleventh Circuit held that the plaintiff's

complaint should not have been dismissed because of "general cautionary or risk-

disclosing language." *Id.* at 1299 (citing *SEC v. Merchant Capital, LLC,* 483 F.3d

747, 770–71 (11th Cir. 2007) (holding that a duty to disclose all material

information relating to a particular subject arises by voluntarily "touting" the

subject to investors)). Moreover, the *FindWhat* court reasoned that "cautionary

language consist[ing] only of general warnings about risks inherent to the

Company's business model" was not specifically tailored to risks from click fraud.

*Id.* at 1299 (citation omitted).

---

[5] "Click fraud generally refers to the practice of clicking on an Internet
advertisement for the sole purpose of forcing the advertiser to pay for the click."
*Id.* at 1291 (citation and internal quotations omitted).

Like *FindWhat*, this Court similarly finds that Defendants' general warning in their risk disclosure *could* be materially misleading because it was not specifically tailored to the risks from their 2023 Pride Month Campaign.  To be clear, the Court is not finding that Defendants' 2021 disclosure is misleading because such an assertion would be premature at this stage in the proceedings. But, the Court disagrees with Defendants' argument that this case should be dismissed because Target made a general disclosure that reputational incidents could affect its business.  Target's 2021 disclosure, for the most part, focuses on its general reputation and how negative publicity could result in harm to the business. (Doc. 71-1 at 9).  The disclosure generally mentions that "[i]t may be difficult to control negative publicity, regardless of whether it is accurate."  (*Id.*).  Target made this statement relating to its inability to control its reputation on social media. (*Id.*).  The report then states that Target's "responses to crises and [Target's] position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing and diversity, equity and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm [Target's] reputation."  (*Id.*).  The disclosure neither mentions Target's upcoming 2023 Pride Month Campaign nor Target's plan to avoid any potential reputational damage or control negative publicity associated with the campaign. The report then discusses how negative incidents involving Target's reputation can quickly erode trust and confidence in its business and can result in customer boycotts.  (*Id.*).  The disclosure mentions a general example: its relationship with

11

CVS, which leases space to operate clinics and pharmacies within Target's stores. (*Id.*).  It states that if guests have negative experiences with CVS, it could harm Target's reputation.  (*Id.*).  The disclosure ends with a general statement saying that "[n]egative reputational incidents could adversely affect [Target's] business and results of operations, including through lost sales, loss of new store and development opportunities, or team member retention and recruiting difficulties." (*Id.*).

Here, the 2021 risk disclosure accounted for a general risk that reputational incidents could have an adverse impact on Target's business.  However, it failed to account for the specific risk that Target's upcoming 2023 Pride Month Campaign (or previous campaigns championed by Target) could cause customer boycotts and a loss of sales.  The amended complaint alleges that Target knew the risks of the 2023 Pride Month Campaign and failed to disclose such risks.  (Doc. 52 at ¶ 281). Generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known risks.  *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D. N.Y. 2010) ("[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of risks described. . . .") (citation omitted)); *see also Merch. Capital,* 483 F.3d at 768 (holding that general cautionary language does not render omission of specific adverse historical facts immaterial); *see also In re Westinghouse Sec. Litig.,* 90 F.3d 696, 710 (3d Cir. 1996) (general cautionary language did not render misrepresentations immaterial where management knew about specific negative

events already occurring).  Because Plaintiffs have alleged in their amended complaint that Target knew of the risks of their upcoming 2023 Pride Month Campaign and failed to craft a tailored disclosure, the Court declines to dismiss this case on the basis that the 2021 Annual Report adequately disclosed the risk of backlash from Target's 2023 Pride Month Campaign.

### b. The 2022 Report Risk Disclosure

Defendants next argue that the 2022 Annual Report expanded on Target's 2021 disclosure.  (Doc. 70 at 29–30).  They contend that the risk of Target's 2023 Pride Month Campaign was adequately disclosed to investors and that this case should be dismissed.  (*Id*.).  Accepting the facts in the operative complaint as true for the purpose of evaluating Target's motion to dismiss, the Court disagrees.

On March 8, 2023, Target released its 2022 Annual Report.  (*See* Doc. 71-2; Doc. 52 at ¶ 285).  The 2022 Annual Report included the following disclosure:

> We believe that one of the reasons our shareholders, guests, team members, and vendors choose Target is the positive reputation we have built over many years for serving those constituencies and the communities in which we operate.  To be successful in the future, we must continue to preserve Target's reputation.  Our reputation is largely based on perceptions. It may be difficult to address negative publicity across media channels, regardless of whether it is accurate.  Negative incidents involving us, our workforce, or others with whom we do business could quickly erode trust and confidence and result in consumer boycotts, workforce unrest or walkouts, government investigations, and litigation.   Negative reputational incidents or negative perceptions of us could adversely affect our business and results of operations, including through lower sales, the termination of business relationships, loss of new store and development opportunities, and team member retention and recruiting difficulties.
>
> In addition, stakeholder expectations regarding environmental, social, and governance matters continue to evolve and are not uniform.  We

have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics. We cannot guarantee that we will achieve these goals and initiatives. Any failure, or perceived failure, by us to achieve these goals and initiatives or to otherwise meet evolving and varied stakeholder expectations could adversely affect our reputation and result in legal and regulatory proceedings against us. Any of these outcomes could negatively impact our results of operations and financial condition.

(Doc. 71-2 at 10).

Notably, Target removed the following language that had appeared in its 2021 risk disclosure: "Target's responses to crises and our position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation." (*Compare* Doc. 71-2 at 10 *with* Doc. 71-1 at 9). Defendants argue that, even though this language was removed, Target had *expanded* on its 2021 disclosure because of the addition of the second paragraph. (Doc. 70 at 30). The second paragraph states that Target stakeholders have ESG expectations that continue to evolve. (Doc. 71-2 at 10). In response to those expectations, Target states that it has established various goals with respect to DEI. (*Id.*). Target further warned that any failure or perceived failure to achieve its DEI and ESG goals could adversely affect its reputation and thereby impact its financial condition. (*Id.*). However, nothing within the second paragraph discusses the risk that Target's ESG and DEI goals could lead to investor backlash and a loss of sales. The second paragraph merely discusses that Target continues to implement ESG

14

and DEI goals to align with stakeholders which could expose Target to financial risks. But, while a generic disclosure ordinarily may be sufficient to warn investors of the failure to implement ESG and DEI programs, the Defendants fail to mention the specific risk of its upcoming 2023 Pride Month Campaign. Plaintiffs have pleaded that Target failed to mention the "known risk of adverse customer reactions to its DEI/ESG mandates." (Doc. 52 at ¶ 296). Further, Plaintiffs state that "[s]hareholders, consumer groups, and conservative commentators repeatedly warned Target that its ESG/DEI initiatives and LGBT activism would cause it to lose customers." (*Id.* at ¶ 15). While Target's disclosure warned that its failure to *meet* ESG and DEI objectives may impact its financial condition, Target fails to mention that implementing such objectives may lead to adverse financial conditions. As stated above, generic disclosures are inadequate to protect the Defendants if there is a known risk. *See In re Am. Int'l. Grp.*, 741 F. Supp. 2d at 531; *Merchant Capital*, 483 F.3d at 768. Plaintiffs have pleaded that there was a known risk. Accordingly, the Court declines to dismiss this case on the basis that the 2022 Annual Report adequately warned investors of Target's upcoming 2023 Pride Month Campaign.

c. The Shareholders Knowledge of the Pride Month Campaign Risks

Defendants next argue that the amended complaint fails to plead that the risk warnings were materially misleading because the risk of Target's 2023 Pride Month Campaign was already in the public domain. (Doc. 70 at 32). Specifically, they point to Target's history of supporting the LGBT community. (*Id.* at 32–33).

15

Put simply, Defendants insist that Target's history of supporting the LGBT community lends credence that the risk warnings were not materially misleading. (*Id.*).  The Court disagrees and declines to dismiss Plaintiffs' amended complaint on this basis.

An omitted fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *S.E.C. v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976))); *see also SEC v. Ginsburg,* 362 F.3d 1292, 1302 (11th Cir. 2004) (same).  "[A] defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose."  *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir. 1986).  A duty arises where a corporation voluntarily reveals one fact about its operations but omits others that are necessary to ensure what was revealed is not "so incomplete as to mislead."  *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1275 (11th Cir. 2016) (quoting *FindWhat*, 658 F.3d at 1305).  However, materiality is not a bright-line test.  *Carvelli*, 934 F.3d at 1317.  It depends on the specific circumstances of each case, including "the totality of information available to investors. . . ."  *Id*.

Here, Defendants point to the amended complaint proclaiming that Plaintiffs "were aware of the risk of backlash against Target's ESG/DEI initiatives, including Pride Collections."  (Doc. 70 at 32).  Defendants cite various paragraphs that

16

contain news articles and other statements purportedly showing that Plaintiffs assumed the risk of the customer backlash to the 2023 Pride Month Campaign.  (*Id.* (citing Doc. 52 at ¶¶ 14–15, 18–19, 33, 111–87, 194–97, 203, 276, 402–04, 414, 420)). They claim that where an undisclosed risk is publicly known, its omission is not actionable.  (Doc. 70 at 32 (citing *Carvelli,* 934 F.3d at 1321–22)).  However, Defendants overlook that none of the paragraphs they cite mention Target's plans for a new and aggressive 2023 Pride Month Campaign.  Target's plan to enact a new campaign—*i.e.,* placing potentially controversial merchandise at the center of its stores—*could* be construed as a change to their ESG/DEI campaigns in prior years. Upon review of the amended complaint and the parties briefing, it is unclear whether this information was publicly available and it is further unclear how much information investors and Plaintiffs knew about the plans for the new campaign. Thus, Plaintiffs have adequately pleaded that information revealed in the 2021 and 2022 risk disclosures may not have been complete.  Adding to that, the Court finds that—based on the totality of the information available to investors—it is premature to dismiss this case.  Accordingly, the Court declines to dismiss Plaintiffs' amended complaint on the grounds that investors knew of the risks of the 2023 Pride Month Campaign.

### d. Forward-Looking Statements

A forward-looking statement is "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer. . . ."  15 U.S.C. § 78u-5(i)(1)(B).  The PSLRA

provides a safe harbor for such statements, making them not actionable.  *Bryant*, 187 F.3d at 1276 n.7; *see also* 15 U.S.C. § 78u-5.  But, there are exceptions to the safe harbor.  "A plaintiff wishing to preclude a defendant from statutory safe harbor must prove that forward-looking statements were made with actual knowledge that they were false or misleading."  *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 795 (11th Cir. 2010) (internal quotations and citation omitted).  If the plaintiff pleads facts demonstrating that the statement was made with actual knowledge of its falsity, the plaintiff "precludes the defendant from utilizing the safe harbor at the pleadings stage entirely."  *Id.* at 796.

Here, Plaintiffs have pleaded facts showing that Defendants' statements were made with actual knowledge that they were false and misleading.  They allege that Target "already had information suggesting the [customer backlash]."  (Doc. 82 at 26 (citation omitted)).  Specifically, Plaintiffs state in their amended complaint that a confidential witness, who held a senior marketing position at Target, observed the "senior executives' decisions to undertake the 2023 LGBT-Pride Campaign and make it more prominent were deliberate, explaining that nothing was spontaneously decided on, and everything was thought through." (Doc. 52 at ¶¶ 56, 205).  Further, the witness states that Target's corporate "mantra now" was to "stick [its] nose so far out. . . even at the risk of alienating certain customers" and "without thinking [if the campaign went] too far."  (*Id.* at ¶ 205).

Plaintiffs also allege in their amended complaint that Erik Thompson, the

senior segmentation strategist for LGBT and Pride at Target[6], shared a social media post stating, "Time to whip out the Glitter & Hellfire flamethrowers and rip that old world to shreds darlings. . . ."  (*Id.* at ¶¶ 200–01 (citing Amanda Harding, *Target Promotes 'GayCruella' To 'LGBTQIA+ Segmentation Strategist' Amid Abysmal Sales From Pride Backlash*, THE DAILY WIRE (Nov. 15, 2023), https://tinyurl.com/3b2u7w3j)).  A commentator responded to the social media post asking Thompson if his LGBT plan would hurt Target's sales.  (*Id.* at ¶ 201).  Thompson responded, "Yes. Yes I will make sales tank."  (*Id.*).

Defendants contend that risk disclosures are "actionable only if plaintiffs show that the speaker *knew* that the disclosed *potential risk* was already occurring or virtually certain to occur."  (Doc. 70 at 33 (alterations in original) (citing *Williams v. Globus Med., Inc.*, 869 F.3d 235, 243 (3d Cir. 2017))).  Adding to that, they state that Plaintiffs "do not and cannot contend that *at the time* the Risk warnings were *issued*. . . Target or Cornell knew that backlash to the 2023 Pride Collection was occurring or was virtually certain to occur."  (*Id.* at 34 (alterations in original)).  But, Plaintiffs plead precisely that.  They plead that past LBGT campaigns harmed Target's reputation and sales.  (Doc. 52 at ¶ 172).

Specifically, Plaintiffs mention Target's reaction to North Carolina's 2016 transgender bathroom law, which Target rigorously opposed.  (*Id.*).  They contend that more than 1.5 million people pledged to boycott Target over this policy.  (*Id.* at

---

[6] Plaintiffs further allege that Thompson was employed by Target in several corporate roles and has worked for the company since June 2014. (Doc. 52 at ¶ 201).

¶ 174). And, Plaintiffs include a Wall Street Journal analysis of Target's sales for the three quarters following the bathroom reaction, showing three quarters of declining sales. (*Id.* at ¶ 175). These facts demonstrate that it is plausible that Defendants knew or should have known that a new and more aggressive Pride Month campaign posed a risk of backlash and financial repercussions.

Further, the confidential witness stated that "decisions about the content of the 2023 LGBT-Pride Campaign were made at the senior-executive level . . . and executives saw it as their role to 'push the envelope' on social issues." (*Id.* at ¶ 406). To that end, Plaintiffs allege that Defendant Cornell "knew about the Board's lack of oversight of ESG/DEI risk because he managed a senior executive team that pushed the 2023 LGBT-Pride Campaign without regard for . . . risks." (*Id.*).

The above facts demonstrate that it is plausible that the risk disclosures were knowingly false. These facts are sufficiently pleaded by Plaintiffs. Because they have pleaded facts demonstrating that the risk disclosures were made with actual knowledge of falsity, Plaintiffs preclude the Defendants from utilizing the safe harbor at the pleadings stage of this case. *See Edward,* 594 F.3d at 796. Accordingly, the Court declines to dismiss Plaintiffs' amended complaint under the safe harbor provision that protects forward-looking statements.

> ## ii. *The Oversight Statements.*

Defendants next contend that Plaintiffs fail to plead falsity of oversight statements within the 2022 and 2023 proxy statements. (Doc. 70 at 35–38). Specifically, Defendants assert that Plaintiffs misconstrue the proxy statements

and do not plead particularized facts showing that the Board failed to oversee social and political risks.  (*Id.* at 35–36).  The Court disagrees and finds that Plaintiffs have pleaded falsity of the oversight statements.

Target's 2022 and 2023 annual proxy statements contained "oversight statements" stating that Target's Board was monitoring social and political risks. (*See* Doc. 71-3 at 17, 19–20; Doc. 71-4 at 17–18).  Both proxy statements note that the Board is responsible for overseeing ESG strategy, risks, and reputation management.  (Doc. 73-1 at 19; Doc. 71-4 at 17).  The proxy statements also delegated responsibility for "social and political issues and risks" to Target's Governance & Sustainability Committee (the "GSC").  (Doc. 71-3 at 20; Doc. 71-4 at 18).  To that end, the GSC was responsible for "fulfilling the oversight and other responsibilities delegated by the board" (Doc. 71-3 at 15; Doc. 71-4 at 14), "collaborating. . . to instill ESG-related priorities into [Target's] business operations" (Doc. 71-3 at 20; Doc. 71-4 at 18), and "conducting regular priority assessments to determine the topics of most significance to [Target's] stakeholders" (Doc. 71-3 at 20; Doc. 71-4 at 18).

Plaintiffs insist that the Board either did not monitor social or political risks, or in the alternative, the Board only monitored risk from one side of the political spectrum.  (Doc. 52 at ¶¶ 339–42).  Thus, they contend that the 2022 and 2023 proxy statements were false and misleading because the Board and the GSC were not monitoring the risks, leading to the 2023 Pride Month Campaign backlash. (*See id.*).

The D.C. Circuit considered a similar situation in *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62 (D.C. Cir. 1980). There, a company issued a proxy statement to its shareholders seeking approval to pay dividends to a director. *Id.* at 65, 74. The proxy statement referred to an audit committee consisting of three directors. *Id.* at 75. The district court found that the audit committee never formally met or functioned. *Id.* Thus, the court held that this nonexistent committee created the false impression that the board of directors was exercising careful oversight of the company's finances. *Id.* Therefore, the court ruled that the proxy statement was misleading. *Id.* On appeal, the defendants argued that even though the committee was not operating as a formal committee, the three directors were still overseeing the company's finances. *Id.* at 75. Thus, they argued the statement was not false. *Id.* The D.C. Circuit held that "[t]he existence of a committee implies a structured investigation and analysis of a company's fiscal welfare." *Id.* The court reasoned that "formal entities such as committees create at least the impression of great care and precision through detailed review and oversight." *Id.*

Here, the Court finds the reasoning in *Falstaff* persuasive. The existence of the GSC implies a structured investigation and analysis of social and political risks. Further, due to its formal status, the GSC creates the impression amongst investors that social and political risks are being considerably analyzed, reviewed, and monitored. Plaintiffs allege that social and political risks were not properly monitored because "[a] reasonable investor would have understood the statement that the [GSC] was 'fulfilling' its 'oversight responsibility' for 'social and political

issues and risks'" would mean that the GSC was monitoring for social and political backlash.  (Doc. 82 at 27).  Plaintiffs point to the recurrent boycotts of prior Target LGBT campaigns as evidence that the Board failed to adequately monitor the social and political risks before pushing a new and more aggressive Pride Month campaign in 2023.  (*Id.*).  Specifically, Plaintiffs plead that Target's response to the North Carolina bathroom law prompted a boycott of over 1.5 million customers, leading to a drop in sales for the following three quarters.  (Doc. 52 at ¶¶ 173–75).  And Plaintiffs plead that Defendant Cornell admitted to Target staff that "Target didn't adequately assess the risk, and the ensuing backlash was self inflicted. . . ." (*Id.* at ¶ 177 (citing Khadeeja Safdar, How Target Botched Its Response to the North Carolina Bathroom Law, WALL ST. J. (Apr. 5, 2017), https://tinyurl.com/ycyddz93)).  These pleaded facts demonstrate that it is plausible that Target, its Board, and its GSC may have ignored social and political risks relating to the 2023 Pride Month Campaign.  *See In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 761 (S.D. Tex. 2012) ("Statements about the adequacy of risk management operations and capabilities may be false and misleading where the speaker knows, or should know, that such operations are inadequate to manage the risks a company faces."); *see also In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 414 (S.D. N.Y. 2010) (denying defendant's motion to dismiss where plaintiff alleged that defendant misrepresented the soundness of their internal risk management capabilities).  Accepting these facts set forth in the amended complaint as true, this Court concludes that Plaintiffs have pleaded that the 2022

23

and 2023 proxy statements contained at least one false, misleading statement, or omission.[7]  Accordingly, the Court declines to dismiss Plaintiffs' amended complaint on this basis.

**B. Scienter Material Misrepresentations or Omissions.**

Defendants next argue that Plaintiffs' section 10(b) claim should be dismissed because Plaintiffs fail to plead particularized facts supporting a strong inference that Cornell or Target acted with scienter.  (Doc. 70 at 44–45).  The Court disagrees.

As stated previously, a section 10(b) claim under the PSLRA must "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 633 (11th Cir. 2010) (internal quotations omitted) (citing 15 U.S.C. § 78u–4(b)(2)).  A "strong inference" of scienter is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007).  Put simply, the court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. . . ." *Id.* at 323 (alteration in original).

To plead a strong inference of scienter, section 10(b) requires a showing of "intent to deceive, manipulate, or defraud," or "severe recklessness." *Bryant,* 187

---

[7] As Plaintiffs have sufficiently pleaded falsity of the oversight statements, the Court need not discuss whether Plaintiffs have pleaded falsity of the value, compensation, or backlash statements.

F.3d at 1282.  Severe recklessness is defined as "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Id.* at 1282 n.18 (internal quotation marks and citation omitted).  "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Tellabs,* 551 U.S. at 326.

      *i.  Scienter as to Defendant Cornell.*

Plaintiffs allege that Defendant Cornell acted with scienter because he (1) had a motive to mislead Target's investors because his compensation was based on Target's advancement of subjective ESG/DEI goals (Doc. 52 at ¶ 399); (2) prioritized "stakeholder" benefits over "shareholder" benefits and thus, the stakeholder benefits excluded oversight of social and political risks (*id.* at ¶ 400); and (3) knew that the 2023 Pride Month Campaign would result in customer backlash because he oversaw Target's response to the North Carolina bathroom law, where he admitted that Target "didn't adequately assess [the] risk" of backlash (*id.* at ¶ 402). Defendants disagree, arguing that Cornell's (1) routine compensation cannot support a strong inference of scienter (Doc. 70 at 45); (2) public statements regarding stakeholders do not show that the Board failed to oversee risk (*id.* at 46); and (3) awareness of prior, publicly known anti-ESG backlash does not show that he

intended to deceive investors (*id.* at 47).  The Court will address each argument in turn.

As for Defendants first argument—that ordinary compensation cannot support a strong inference of scienter—the Court finds this argument persuasive. "Receipt of a standard incentive-based bonus has limited probative value for scienter." *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1275 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010); *Kalnit v. Eichler*, 264 F.3d 131, 139–40 (2d Cir. 2001).  However, an "extraordinary" incentive package may provide circumstantial evidence of scienter.  *Jabil*, 595 F. Supp. 2d at 1275 (citing *In re AFC Enters., Inc. Sec. Litig.*, 348 F.Supp.2d 1363, 1374 (N.D. Ga. 2004)).  Here, Cornell's compensation was weighted 67% based on "incentive operating income" and 33% based on a "team scorecard."  (Doc. 71-3 at 43; Doc. 71-4 at 46).  The proxy statements provide that "incentive operating income" is a metric representing operating income on a short-term basis and is calculated by excluding short-term incentive expenses from operating income.  (Doc. 71-3 at 42; Doc. 71-4 at 45).  The "team scorecard" is weighted based on several factors such as market share, "progress on three-year enterprise DE&I goals," strong team engagement, and growth in same-day sales.  (Doc. 71-3 at 47; Doc. 71-4 at 49).  Upon review of both proxy statements, it is unclear how much each individual factor is weighed in the team scorecard.  Thus, the Court is unable to determine how much the DEI incentives factor affected Cornell's compensation.  As such, the Court finds it speculative to assume that the "progress on three-year enterprise DE&I goals" factor

constitutes "extraordinary" compensation.  The Court finds that Plaintiffs do not plead a strong inference of scienter based on Cornell's compensation.

Defendants second argument—that Cornell's public statements regarding stakeholders does not give a strong inference of scienter—is also persuasive.  Cornell signed the "Business Roundtable Statement on the Purpose of a Corporation" (the "BRT Statement").  (Doc. 52 at ¶ 68).  The BRT statement, which executives from other companies signed, provided "[w]hile each of our individual companies serves its own corporate purpose, [the companies] share a fundamental commitment to all of our stakeholders.  [The companies] commit to:" (1) delivering value to customers, (2) investing in their employees, (3) dealing fairly and ethically with our suppliers, (4) supporting the communities in which the companies work, and (5) generating long-term value for shareholders.[8]  The statement ended by stating, "[e]ach of our stakeholders is essential.  [The companies] commit to deliver value to all of them, for the future success of our companies, our communities and our country."[9]  Plaintiffs plead that Cornell's signing of this statement demonstrates a strong inference of scienter because the statement indicates that he prioritized stakeholder interests over shareholder interests.  (Doc. 52 at ¶ 69).  Defendants contend that the BRT statement does not show that Cornell prioritized stakeholders over shareholders because (1) Target's definition of stakeholders includes customers and shareholders, and (2) the comments do not show that he or Target's Board ignored risks.  (Doc. 70

---

[8] The complete BRT statement can be found at Doc. 71-25 at 2.
[9] *Id.*

at 46–47).  The Court agrees with Defendants.  First, Target has routinely defined stakeholders as customers and shareholders.  (*See* Doc. 71-31 at 3; Doc. 71-3 at 19; Doc. 71-4 at 17).  Second, the Court finds that Cornell's signing of the BRT Statement fails to show that he did not oversee risks of backlash to Target's ESG/DEI mandates.  This is because the BRT Statement generally states that Target will commit to delivering value to all of their stakeholders in the form of (1) delivering value to customers, (2) investing in employees, (3) dealing fairly and ethically with suppliers, (4) supporting the community, and (5) generating long-term value for shareholders.  (Doc. 71-25 at 2).  Nothing within the BRT Statement shows that Cornell failed to oversee a risk of backlash to the 2023 Pride Month Campaign.  Accordingly, the Court finds Defendants' second argument persuasive.

As to Defendants third argument—that Cornell's awareness of prior, publicly known anti-ESG backlash does not show that he intended to deceive investors—the Court finds this argument unpersuasive.  Notably, Plaintiffs pleaded that Defendant Cornell acted with severe recklessness because he knew that the 2023 Pride Campaign carried the risk of customer backlash.  (Doc. 52 at ¶ 525; Doc. 82 at 39–41).  Severe recklessness constitutes a strong inference of scienter.  *Bryant,* 187 F.3d at 1282.  Severe recklessness is established by showing "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Id.* at

1282 n.18 (internal quotation marks omitted).  Here, the Court finds that Plaintiffs have adequately pleaded severe recklessness.  Specifically, Plaintiffs have pleaded that Cornell had knowledge that prior LGBT campaigns led to backlash, such as Target's opposition to the North Carolina transgender bathroom law.  (Doc. 52 at ¶¶ 14, 18, 172).  Target's reaction to the law caused 1.5 million people to pledge to boycott Target, and Target's sales fell in the following three quarters following Target's opposition.  (*Id.* at ¶¶ 174–75).  Further, Plaintiffs pleaded that—not only did Cornell know about the boycott—he admitted that Target "didn't adequately assess risk" in the matter.  (*Id.* at ¶ 402).  These facts demonstrate severe recklessness.  It is highly unreasonable that Cornell would approve a new, more aggressive LGBT campaign in 2023 after allegedly admitting that Target didn't adequately assess the risk of boycotts in a prior campaign.  Plaintiffs have pleaded that Cornell's decision to issue a new aggressive campaign—knowing that the preceding campaign received immense backlash—is an extreme departure from the standards of ordinary care that was so obvious that Cornell should have been aware of it.  Accordingly, Plaintiffs have adequately pleaded scienter as to Defendant Cornell.

> ii. *Scienter as to Target.*

Corporations do not have their own state of mind to establish scienter. *Mizzaro*, 544 F.3d at 1254.  Instead, "the scienter of their agents must be imputed to them." *Id*.  To impute scienter to the corporation, the court looks at the state of mind of corporate officials who allegedly made the statements or omissions. *Id*.

29

(citation omitted).  As stated in the prior section, the Court finds that Plaintiffs have adequately pleaded scienter as to Defendant Cornell, who is Target's CEO.  *See supra* Section (I)(B)(i).  This is sufficient to impute scienter to Target.  Accordingly, the Court finds that Plaintiffs have adequately pleaded scienter as to Target.

### C. Loss Causation.

Defendants next claim is that Plaintiffs have failed to plead loss causation.  (Doc. 70 at 51).  Specifically, Defendants claim that (1) the 2023 Pride Month Campaign backlash did not cause cognizable losses, and (2) the 2023 quarter 2 earnings call did not cause cognizable losses.  (*Id.* at 51–57).  The Court finds that Plaintiffs have adequately pleaded loss causation.

To show loss causation for a section 10(b) claim, a plaintiff must (1) identify a "collective disclosure," *i.e.,* "a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud"; (2) "show that the stock's price dropped soon after that corrective disclosure"; and (3) "eliminate other possible explanations for the price drop."  *MacPhee v. MiMedx Group, Inc.*, 73 F.4th 1220, 1242 (11th Cir. 2023).  A plaintiff must offer "proof of a causal connection between the misrepresentation and the investment's subsequent decline in value."  *Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013) (citation omitted); *see also* 15 U.S.C. § 78u–4(b)(4) (demonstrating that the plaintiff must show that the misrepresentation "caused the loss for which the plaintiff seeks to recover damages").  The loss causation element requires that the defendant's fraud

"be both the but-for and proximate cause of the plaintiff's later losses." *FindWhat*, 658 F.3d at 1309 (citation omitted). "[T]he plaintiff need not show that the defendant's misconduct was the 'sole and exclusive cause' of his injury; he need only show that the defendant's act was a 'substantial' or 'significant contributing cause.'" *Id.* (citing *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir. 1997)). The main question courts ask is "even if the plaintiffs paid an inflated price for the stock as a result of the fraud (*i.e.,* even if the plaintiffs relied on the statements), did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?" *Meyer*, 710 F.3d at 1197 (quoting *FindWhat*, 658 F.3d at 1312). Loss causation is "not subject to the PSLRA's heightened pleading requirement and must only be plead in accordance with Federal Rule of Civil Procedure 8(a)(2)." *Skypoint Advisors, LLC. v. 3 Amigos Productions LLC*, No. 2:18-cv-356-FtM-29MRM, 2019 WL 4600409, at *8 (M.D. Fla. Sept. 23, 2019).

   *i. The 2023 Pride Month Campaign.*

Defendants insist that Plaintiffs have not pleaded loss causation because the 2023 Pride Month Campaign backlash did not relate back to a misrepresentation that Target made. (Doc. 70 at 52). They contend that Target's support of the campaign did not reveal any new truth because of Target's support of prior LGBT campaigns. (*Id.*). They claim that the 2023 Pride Month Campaign was consistent with Target's prior risk warnings and, thus, did not reveal a new truth. (*Id.*). The Court finds these arguments unpersuasive.

Here, Plaintiffs pleaded that Target "failed to disclose. . . the known risk of

adverse customer reaction to its ESG/DEI mandates and to the Pride Month

campaigns it intended to continue with increasing intensity." (Doc. 52 at ¶ 283).

They point to the 2021 Annual Report (*id.* at ¶ 284) and the 2022 Annual Report

(*id.* at ¶ 285) for their contention that the risk warnings contained within were

materially misleading.  As stated previously, the Court finds that Defendants'

general warning in their risk disclosure *could* be materially misleading because it

was not specifically tailored to the risks from their 2023 Pride Month Campaign.

*See supra* Section (I)(A)(i)(a)–(b).  This is because Target's 2021 and 2022 risk

disclosures focus on its general reputation and how negative publicity could result

in harm to its business rather than the specific risk of backlash to its LGBT

campaigns.  (Doc. 71-1 at 9; Doc. 71-2 at 10); *see In re Am. Int'l. Grp.*, 741 F. Supp.

2d at 531  (holding that warnings of specific risks do not shelter defendants from

liability if they fail to disclose them).  Adding to that, Plaintiffs and other

shareholders did not know that Target planned to aggressively promote a new

LGBT campaign despite knowing that prior campaigns led to immense backlash.

By acting aggressively to push a new campaign, knowing that prior campaigns led

to a backlash, Target revealed a concealed new truth.  Importantly, Plaintiffs

pleaded that the 2023 Pride Month Campaign was the "most ambitious and

extreme" campaign in Target's history, featuring more extensive marketing and

products than ever before.  (Doc. 52 at ¶ 6).  They state that these actions would be

vulnerable to strong adverse reactions from Target's customers and that Target

knew of such risk.  (*Id.*).  These pleaded facts, which the Court must accept as true

at this early stage of litigation, demonstrate a new truth because investors were unaware that the Defendants planned to enact a new campaign despite their knowledge of adverse reactions to prior campaigns.

Lastly, the parties spar over whether a materialization-of-concealed-risk theory may be used to prove loss causation within the Eleventh Circuit. (Doc. 70 at 54–55; Doc. 82 at 48–49). Because the Court finds that Plaintiffs have sufficiently pleaded loss causation as described above, the Court declines to resolve this discrepancy. *See Sapssov v. Health Mgmt. Associates, Inc.*, 608 F. App'x 855, 861 n.7 (11th Cir. 2015) (declining to decide whether a materialization-of-concealed-risk theory may be used to prove loss causation where plaintiff has already pleaded loss causation).

Accordingly, the Court declines to dismiss the amended complaint on the ground that the 2023 Pride Month Campaign backlash did not relate back to a misrepresentation that Target previously made.

### iii. The Stock Drop.

Defendants next argue that Plaintiffs fail to plead a "stock drop soon after that corrective disclosure." (Doc. 70 at 53). They contend that Plaintiffs fail to allege "*when* the backlash to the 2023 Pride Collection began." (*Id.* (alteration in original)). The Court disagrees and declines to dismiss the amended complaint on this basis.

Defendants argue that the backlash to the 2023 Pride Month Campaign was reported in the media on May 12, 2023, and that the stock drop occurred on May 17,

2023.  (*Id.*).  Between those dates, they contend that the stock price *rose*.  (*Id.* at 53–54).  To that end, Defendants insist that Plaintiffs cannot plead loss causation because the stock price did not drop immediately following the media disclosure.  (*Id.* at 53).  Defendants rely on a Daily Mail article (Doc. 71-30) and a Facebook post by Plaintiff Craig's wife (Doc. 71-29) in support that the backlash in the media was discussed on May 12, 2023.  However, a plaintiff "need not rely on a single, complete corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace 'through a series of partial disclosures.'"  *Meyer*, 710 F.3d at 1197 (citation omitted).  Here, Plaintiffs allege that the relevant facts grew over time in the media.  (Doc. 82 at 47).  In their amended complaint, they cite articles from May 24 (Doc. 52 at ¶ 237), May 28 (*id.* at ¶ 231), May 31 (*id.* at ¶ 233), June 1 (*id.* at ¶ 232), and June 2 (*id.* at ¶ 234).  Plaintiffs plead that, due to these articles, the "market progressively realized the scope and intensity of customer backlash from May 17 to June 14."  (*Id.* at ¶ 439).  During this period of time, they allege that Target's stock declined from $160.96 per share to $124.12 per share.  (*Id.*).  This is sufficient to show that the facts relating to Target's 2023 Pride Month Campaign gradually became known over time.  *See Meyer*, 710 F.3d at 1197 (allowing plaintiffs to show that the truth gradually leaked out into the marketplace through a series of disclosures).  Accordingly, Plaintiffs have adequately pleaded that Target's stock dropped after customer backlash.

*iii. The 2023 Quarter 2 Earnings Call.*

Target's quarter 2 earnings call was held on August 16, 2023.  (*See* Doc. 71-20; Doc. 52 at ¶ 444).  On that call, Christina Hennington, Target's Executive Vice President and Chief Growth Officer, stated that financial "headwinds" affected Target throughout the second quarter.  (Doc. 71-20 at 6).  She stated that one of the headwinds was "the strong reaction to this year's Pride assortment" (*id.*) and that the public's reaction was "a signal for [Target] to pause, adapt and learn so that [Target's] future approach to these moments balances celebration, inclusivity and broad-based appeal" (*id.* at 7).  Moreover, Michael Fiddelke, Target's Executive Vice President and Chief Financial Officer, stated that "traffic and top line trends were affected by the reaction to our Pride assortment, which launched in the middle of May."  (*Id.* at 10).

Defendants argue that Plaintiffs have not pleaded loss causation as to the 2023 quarter 2 earnings call because the call (1) was not corrective of anything as the financial backlash was "old news"; (2) revealed that the 2023 Pride Month Campaign was pulled due to employee safety rather than financial implications; and (3) resulted in a stock increase.  (Doc. 70 at 56–57).  More specifically, Defendants contend that the earnings call revealed that the 2023 Pride Month Campaign was pulled due to threats and aggressive actions that affected Target's employees' sense of safety and well-being at work.  (*Id.*; Doc. 71-20 at 5).  Thus, they contend that the earnings call was "not corrective" because it didn't convey new

information.  But this assertion flies in the face of Ms. Hennington and Mr. Fiddelke's statements.  Both executives explicitly state that the 2023 Pride Month Campaign impacted Target's financial condition.  In short, they acknowledged that the campaign affected Target beyond Defendants' assertion of employee safety—*i.e.*, Target's financials.  Plaintiffs pleaded this in their amended complaint.  They allege that Ms. Hennington's statement admits that the strong reaction to the 2023 Pride Month Campaign caused a "headwind that negatively affected earnings."  (Doc. 52 at ¶ 239 (internal quotations omitted)).  Because of this, the Court agrees that Plaintiffs have pleaded new information.

As for Defendants' remaining argument—that Plaintiffs have not pleaded loss causation because Target's stock allegedly rose following the earnings call—the Court finds that a Rule 12(b)(6) motion is the improper vehicle to resolve this dispute.  While Defendants argument has some merit, loss causation is a fact-based inquiry that "should not typically be resolved on a Rule 12(b)(6) motion. . . ."  *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1351 (M.D. Fla. 2002); *Eastwood Enterprises, LLC v. Farha*, No. 807-CV-1940-T-33EAJ, 2009 WL 3157668, at *5 (M.D. Fla. Sept. 28, 2009) (holding that loss causation is a "fact-based inquiry that is generally not proper to resolve on a motion to dismiss"); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 n.35 (5th Cir. 2009) (noting that it is inappropriate to use a Rule 12(b)(6) motion as a vehicle to resolve disputes over loss causation).  Accordingly, the Court declines to dismiss the amended complaint on the basis of loss causation.

**II.     Plaintiffs sufficiently pleaded a section 14(a) claim.**

In count two of the amended complaint, Plaintiffs assert a claim against Defendants for violating section 14(a) of the Exchange Act.  (Doc. 52 at 158–59). Defendants argue that Plaintiffs have failed to plead a section 14(a) claim because they fail to plead (1) a strong inference of scienter and (2) transaction and loss causation.  (Doc. 70 at 58–61).  The Court disagrees.

Section 14(a) prohibits the use of false statements in proxy solicitations. *Edward*, 594 F.3d at 796.  To plead a claim under section 14(a), a plaintiff must allege that the defendants prepared a proxy statement that contained a material misstatement or omission that caused the plaintiff's injury.  *Id.*  When a section 14(a) claim alleges fraudulent conduct, a plaintiff must still conform to the PSLRA pleading standards.  *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 144, 144–45 (3d Cir. 2004).  Under those standards, a plaintiff must:

> [S]pecify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1).

**A. Scienter in a section 14(a) claim.**

Defendants first argue that Plaintiffs' section 14(a) should be dismissed because they fail to plead "a strong inference of scienter."  (Doc. 70 at 58). Defendants contend that, because the section 14(a) claim is based on the same

misleading statements and theory of deception as Plaintiffs' section 10(b) claim,

that scienter is required to be pleaded for section 14(a) claims.  (*Id.*)  This argument

fails.  In contrast to a section 10(b) claim, scienter is not a necessary element in a

section 14(a) claim.  *Jabil*, 595 F. Supp. 2d at 1290; *Wilson v. Great Am. Inds.,

Inc.,* 855 F.2d 987, 995 (2d Cir. 1988).  And, even though Plaintiffs' claim is sounded

in fraud, they are not required to plead scienter.  *In re Willis Towers Watson Plc

Proxy Litig.*, 439 F. Supp. 3d 704, 713 (E.D. Va. 2020) (holding that even where a

section 14(a) claim "sounds in fraud," scienter is not required); *Chubb Corp.*, 394

F.3d at 143 (same).

A section 14(a) claim requires an allegation that the defendant *negligently*

drafted a proxy statement.  *Jabil*, 595 F. Supp. 2d at 1290; *In re Columbia Pipeline,

Inc.*, 405 F. Supp. 3d 494, 506 (S.D. N.Y. 2019).  Here, Plaintiffs pleaded that

Defendants acted negligently.  First, Plaintiffs met the PSLRA pleading standard

by alleging that the statements in Target's 2022 and 2023 annual proxy statements

contained misleading statements.  *See supra* Section (I)(A)(ii).  They have identified

the reasons why those statements were misleading and the facts on which their

belief was formed.  *See id.*  Second—as to negligence—Plaintiffs pleaded that the

Defendants "were also aware or should have been aware of red flags pertaining to

Target being subject to the risks caused by consumer backlash to its ESG/DEI

mandates."  (Doc. 52 at ¶ 412).  Moreover, they claim that the Defendants were "on

notice that Target was subject to the risk due to its activism on LGBT political

issues because Target was recently the subject of a large customer boycott organized

after Target entered the political fray on *another* LGBT political issue, namely, Target's response to the North Carolina transgender bathroom law." (*Id.* at ¶ 414 (emphasis in original)).  Plaintiffs also pleaded that each of Target's directors knew or should have known of the significant social and political risks of enacting the 2023 Pride Month Campaign.  (*Id.* at ¶¶ 419–427).  Accordingly, the Court finds that Plaintiffs have adequately pleaded that Defendants negligently drafted the 2022 and 2023 annual proxy statements.

## B. Transaction and Loss Causation.

Lastly, Defendants argue that Plaintiffs have failed to plead transaction or loss causation because they have not established "any causal link between the Proxies and their alleged losses."  (Doc. 70 at 59).  Further, they state that Plaintiffs have failed to allege that their injuries were the result of any voting outcome (*id.* at 60) and that loss causation cannot be based on non-binding shareholder votes (*id.*). The Court finds that Plaintiffs have adequately pleaded both transaction and loss causation.

Section 14(a) actions require that a plaintiff plead both transaction and loss causation.  *Edward*, 594 F.3d at 796–97; *see also Koppel v. 4987 Corp.,* 167 F.3d 125, 137 (2d Cir. 1999) (describing both transaction and loss causation as elements of a section 14(a) claim).  To plead transaction causation, a plaintiff must show that "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970); *Edward*, 594 F.3d at 796.  In other

words, transaction causation requires showing that the misrepresentations or omissions caused a plaintiff to engage in a transaction. *Jacobs v. Airlift Int'l, Inc.*, 440 F. Supp. 540, 542 (S.D. Fla. 1977). The re-election of board members based on false or misleading proxy statements is sufficient to establish an "essential link" for purposes of a section 14(a) claim. *See, e.g.*, *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017); *In re Fossil, Inc.*, 713 F. Supp. 2d 644, 655 (N.D. Tex. 2010); *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1016 (N.D. Cal. 2007). A plaintiff must then show loss causation, which requires a showing that the misrepresentation or omissions caused the harm. *Jacobs*, 440 F. Supp. at 542. The company's harm must have resulted directly from the transaction rather than misrepresentation or omission itself. *In re The Home Depot, Inc. S'holder Derivative Litig.*, 223 F. Supp. 3d 1317, 1331 (N.D. Ga. 2016) (citing *Edward*, 594 F.3d at 796–97)).

The Court finds that transaction causation is well-pleaded. Here, Plaintiffs claim that the 2022 and 2023 annual proxy statements contained false and misleading statements because Target's Board and the GSC represented that they were monitoring social and political risks. (*See* Doc. 82 at 26–29; Doc. 71-3 at 19–20; Doc. 71-4 at 17–18). Plaintiffs allege that, in fact, the Board and GSC were not monitoring the social and political risks of the 2023 Pride Month Campaign and that lack of monitoring led to an extensive loss for the company. (Doc. 52 at ¶¶ 339–42). As stated, the Court held that Plaintiffs have pleaded falsity of the 2022 and 2023 proxy statements. *See supra* Section (I)(A)(ii). That

said, Plaintiffs now claim that "[r]elying on these proxy statements. . . Target
shareholders re-elected Target's board, turned down multiple proposals via
shareholder vote to reform the Board's risk oversight functions, and approved
executive compensation plans that incentivized Target's officers to implement DEI
programs like the 2023 LGBT-Pride Campaign." (Doc. 52 at ¶ 22).  Defendants
argue that Plaintiffs have not pleaded that the alleged misstatements caused the
re-election of Target's Board, the rejection of shareholder proposals, and the
approval of executive compensation plans.  (Doc. 70 at 60).  They insist that the
Plaintiffs amended complaint lacks an "essential link" between the misstatements
and those events.  (*Id.*).  However, Plaintiffs have alleged that the Board would not
have been re-elected had it not been for the misleading statements identified above.
(Doc. 52 at ¶¶ 459, 473).  And because Plaintiffs have claimed that the re-election of
Target's Board, rejection of shareholder proposals, and the approval of
compensation plans would not have occurred if not for these false and misleading
proxy statements, an essential link is established for pleading a section 14(a) claim.
*See, e.g.*, *Wells Fargo*, 282 F. Supp. 3d at 1105; *Fossil,* 713 F. Supp. 2d at 655; *see
also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1077
(C.D. Cal. 2008) ("Shareholders would reasonably consider the Company's financial
performance in deciding whether to reelect the directors.").  In other words,
Plaintiffs have adequately pleaded that the alleged false and misleading proxy
statements caused the shareholders to engage in a transaction—i.*e.*, re-electing the
Board, rejecting shareholder proposals, and approving compensation.  Thus, the

41

Court finds that Plaintiffs have pleaded transaction causation.

Moreover, the Court finds that Plaintiffs have pleaded loss causation. Defendants claim that "Plaintiffs do not allege that their votes directly authorized the 2023 Pride Collection." (Doc. 70 at 60). For this reason, Defendants contend that Plaintiffs have not pleaded a section 14(a) claim. As stated previously, Plaintiffs must show that (1) a misrepresentation or omission in a proxy statement caused a harm and (2) that the alleged harm directly resulted from the transaction. *Jacobs*, 440 F. Supp. at 542; *Home Depot,* 223 F. Supp. 3d at 1331 (citing *Edward*, 594 F.3d at 796–97). Here, Plaintiffs pleaded both. Plaintiffs have pleaded that the 2022 and 2023 proxy statements contained misrepresentation or omissions that resulted in the re-election of the Board, rejection of shareholder proposals, and compensation approval. Plaintiffs allege that those events caused a harm—i.e. the lack of oversight of social and political issues and risks. (Doc. 52 at ¶ 458). One step further, Plaintiffs allege that the lack of oversight contributed to the "preparation of the 2023 LGBT-Pride Campaign and failing to oversee social and political issues and risks preceded and continued after their election to the Board at the 2022 Annual Meeting." (*Id*. at ¶ 458). This is sufficient to allege a direct harm from the transactions. Accordingly, the Court finds that Plaintiffs have pleaded loss causation.

**CONCLUSION**

To summarize, the Court concludes that Plaintiffs have adequately pleaded both section 10(b) and section 14(a) claims.  For the reasons stated above, the Court finds that Defendants' motion to dismiss (Doc. 70) is **DENIED**.  The Court now lifts the stay of this case.  The Clerk of Court is **DIRECTED** to lift the stay.

**ORDERED** in Fort Myers, Florida, on December 4, 2024

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE